GREGORY M. BERGMAN (SBN 065196)
MICHELE M. GOLDSMITH (SBN 178222)
JASON J. BARBATO (SBN 301642)
BERGMAN DACEY GOLDSMITH
10880 Wilshire Blvd. Suite 900
Los Angeles, California 90024-4101
Telephone: 310.470.6110
Facsimile: 310.474.0931

Attorneys for Defendants, CITY OF INGLEWOOD
MAYOR JAMES BUTTS; CHIEF OF POLICE MARK FRONTEROTTA

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| MARTIN SISSAC<br><br>                    Plaintiffs,<br><br>v.<br><br>CITY OF INGLEWOOD; MAYOR JAMES BUTTS; CHIEF OF POLICE MARK FRONTEROTTA AND DOES 1 THROUGH 10, INCLUSIVE,<br><br>                    Defendants. | Case No. 2:15-cv-01741-JAK-FFM<br><br>**DECLARATION OF MICHELE M. GOLDSMITH IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**<br><br>Date:    September 26, 2016 [Reserved]<br>Time:    8:30 a.m.<br>Ctrm:    750<br><br>[Filed Separately but concurrently herewith:<br>   1.  Motion for Summary Judgment;<br>   2.  Separate Statement;<br>   3.  Declaration of Kevin Harris;<br>   4.  Declaration of Cal Saunders; and<br>   5.  Declaration of Micah Herd.]<br><br>Trial:  December 6, 2016 |

BERGMAN DACEY GOLDSMITH
10880 Wilshire Blvd. Suite 900
Los Angeles, California 90024
Telephone: (310) 470-6110, Facsimile: (310) 474-0931

## DECLARATION OF MICHELE M. GOLDSMITH

I, Michele M. Goldsmith, declare:

1.      I am an attorney at law, duly licensed to practice before all of the courts of the State of California.  I am a shareholder with the law firm of Bergman Dacey Goldsmith, attorneys of record for Defendants City of Inglewood, Mayor James Butts, and Chief of Police Mark Fronterotta (collectively, "Defendants").  I am the lead attorney handling this matter on behalf of the Defendants.  I also act as Special Counsel to the City of Inglewood, and provide advice regarding personnel matters.  I have personal knowledge of the matters stated herein, and, if called as a witness, I could and would competently testify to the matters set forth in this Declaration.

2.      This Declaration is made in support of Defendants' Motion for Summary Judgment, or in the alternative, Partial Summary Judgment.

3.      On July 12, 2016, as part of this action, I conducted the first session of the deposition of Plaintiff Martin Sissac.  This deposition was conducted at the law office of Bergman Dacey Goldsmith, at 10880 Wilshire Boulevard, Suite 900, Los Angeles, California 90024.  I was present throughout the entirety of the deposition. Also present throughout the deposition were: the court reporter, Defendant Mark Fronterotta, Inglewood Assistant City Attorney Derald Brenneman, and Mr. Sissac's attorneys—Joseph Avrahamy.  Mr. Sissac's second attorney, Marla Brown, was there for a portion of the deposition.  I am the only attorney who asked questions of Mr. Sissac.  I am making this declaration to, in part, authenticate excerpts from this deposition that are cited in Defendants' Memorandum of Points and Authorities in support of its pending Motion for Summary Judgment.  Attached to this Declaration as **Exhibit A** is a true and correct copy of a selection of relevant excerpts from the first session of Mr. Sissac's deposition.

4.      On August 8, 2016, as part of this action, I conducted the second session of the deposition of Plaintiff Martin Sissac.  This deposition was conducted at the law office of Bergman Dacey Goldsmith, at 10880 Wilshire Boulevard, Suite 900, Los

BERGMAN DACEY GOLDSMITH
10880 Wilshire Blvd. Suite 900
Los Angeles, California 90024
Telephone: (310) 470-6110, Facsimile: (310) 474-0931

DECLARATION OF MICHELE GOLDSMITH IN SUPPORT OF MSJ

**BERGMAN DACEY GOLDSMITH**
10880 Wilshire Blvd. Suite 900
Los Angeles, California 90024
Telephone: (310) 470-6110, Facsimile: (310) 474-0931

Angeles, California 90024.  I was present throughout the entirety of the deposition.  Also present throughout the deposition were: the court reporter, Defendant Mark Fronterotta, Inglewood Assistant City Attorney Derald Brenneman, and Mr. Sissac's attorney—Joseph Avrahamy.  I am the only attorney who asked questions of Mr. Sissac.  I am making this declaration to, in part, authenticate excerpts from this deposition that are cited in Defendants' Memorandum of Points and Authorities in support of its pending Motion for Summary Judgment.  Attached to this Declaration as **Exhibit B** is a true and correct copy of a selection of relevant excerpts from the second session of Mr. Sissac's deposition.

5.     On July 18, 2016, as part of this action, I attended the deposition of Defendant Mayor James Butts.  This deposition was conducted at the law office of Joseph Avrahamy, at 16530 Ventura Boulevard, Suite 208, Encino, California 91436.  I was present throughout the entirety of the deposition.  Also present throughout the deposition were: the court reporter, a videographer, Inglewood City Attorney Kenneth Campos, Plaintiff Martin Sissac, and Mr. Sissac's attorney—Joseph Avrahamy.  Mr. Avrahamy was the only attorney who asked questions of Mayor Butts.  I am making this declaration to, in part, authenticate excerpts from this deposition that are cited in Defendants' Memorandum of Points and Authorities in support of its pending Motion for Summary Judgment.  Attached to this Declaration as **Exhibit C** is a true and correct copy of a selection of relevant excerpts from Mayor Butts' deposition.

6.     On July 15, 2016, as part of this action, I attended the deposition of Defendant Chief Mark Fronterotta.  This deposition was conducted at the law office of Joseph Avrahamy, at 16530 Ventura Boulevard, Suite 208, Encino, California 91436.  I was present throughout the entirety of the deposition.   Also present throughout the deposition were: the court reporter, a videographer, Plaintiff Martin Sissac, and Mr. Sissac's attorney—Joseph Avrahamy.  Mr. Avrahamy was the only attorney who asked questions of Chief Fronterotta.  I am making this declaration to,

1   in part, authenticate excerpts from this deposition that are cited in Defendants'

2   Memorandum of Points and Authorities in support of its pending Motion for

3   Summary Judgment.  Attached to this Declaration as **Exhibit D** is a true and correct

4   copy of a selection of relevant excerpts from Chief Fronterotta's deposition.

5         7.     On July 22, 2016, as part of this action, I attended the deposition of

6   Michael Falkow.  This deposition was conducted at the law office of Joseph

7   Avrahamy, at 16530 Ventura Boulevard, Suite 208, Encino, California 91436.  I was

8   present throughout the entirety of the deposition.   Also present throughout the

9   deposition were: the court reporter, Inglewood City Attorney Kenneth Campos,

10   Plaintiff Martin Sissac, and Mr. Sissac's attorney—Joseph Avrahamy.   Mr.

11   Avrahamy and I were the only attorneys who asked questions of Mr. Falkow.  I am

12   making this declaration to, in part, authenticate excerpts from this deposition that are

13   cited in Defendants' Memorandum of Points and Authorities in support of its pending

14   Motion for Summary Judgment.  Attached to this Declaration as **Exhibit E** is a true

15   and correct copy of a selection of relevant excerpts from Mr. Falkow's deposition.

16         8.     On July 19, 2016, as part of this action, I attended the deposition of Artie

17   Fields.  This deposition was conducted at the law office of Joseph Avrahamy, at

18   16530 Ventura Boulevard, Suite 208, Encino, California 91436.   I was present

19   throughout the entirety of the deposition.   Also present throughout the deposition

20   were: the court reporter, Inglewood City Attorney Kenneth Campos, Plaintiff Martin

21   Sissac, and Mr. Sissac's attorney—Joseph Avrahamy.   Mr. Avrahamy was the only

22   attorney who asked questions of Mr. Fields.  I am making this declaration to, in part,

23   authenticate excerpts from this deposition that are cited in Defendants' Memorandum

24   of Points and Authorities in support of its pending Motion for Summary Judgment.

25   Attached to this Declaration as **Exhibit F** is a true and correct copy of a selection of

26   relevant excerpts from Mr. Fields' deposition.

27         9.     Attached to this Declaration as **Exhibit G** is a true and correct copy of a

28   document, Bates number COI 13686, that was produced by Defendants in this action.

**BERGMAN DACEY GOLDSMITH**
10880 Wilshire Blvd. Suite 900
Los Angeles, California 90024
Telephone: (310) 470-6110, Facsimile: (310) 474-0931

Exhibit G, dated 10/21/2011, is a copy of the City of Inglewood's full time vacant position listings as of 8/29/2011.  I was provided a copy of this document by Assistant City Attorney Michael Falkow.  This document was referred to during the deposition of Michael Falkow.

10.   I am personally aware that Mr. Sissac applied for employment at the Fontana Unified School District, to be the Fontana Unified School District's Police Chief.   I was contacted by the City regarding the files that the background investigator was entitled to review in connection with his background investigation regarding Mr. Sissac.  Mr. Sissac had signed a written authorization permitting the background investigator to obtain and review Mr. Sissac's personnel file.  The City required, however, for Mr. Sissac to sign a second written authorization expressly permitting the City to disclose and to provide to the background investigator Mr. Sissac's Internal Affairs ("IA") files.  I am personally aware that Mr. Sissac signed that authorization, and that Mr. Sissac's personnel files and the IA files were provided to the background investigator to review.  The IA files included a folder which contains the written reprimand by Chief Fronterotta related to the missed training, and a letter of revocation of the written reprimand.  It is the policy, practice and procedure of the City not to destroy written reprimands (and/or revocations of same) consistent with Penal Code § 832.5, applicable to personnel complaints made against police officers.   Nevertheless, I know that Mr. Sissac was hired by the Fontana Unified School District in 2015, and remains its Police Chief.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed at Los Angeles, California, this 29th day of August 2016.

_Michele Goldsmith_

Michele Goldsmith

BERGMAN DACEY GOLDSMITH
10880 Wilshire Blvd. Suite 900
Los Angeles, California 90024
Telephone: (310) 470-6110, Facsimile: (310) 474-0931

1          UNITED STATES DISTRICT COURT

2      CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3

4    MARTIN SISSAC,

5              Plaintiff,

6         vs.                      Case No.:

                                   2:15-cv-01741-JAK-FFM

7

     CITY OF INGLEWOOD; MAYOR

8    JAMES BUTTS; CHIEF OF POLICE

     MARK FRONTEROTTA AND DOES 1

9    THROUGH 10, INCLUSIVE,

10             Defendants.

11   _____

12

13              DEPOSITION OF MARTIN SISSAC

14               Los Angeles, California

15               Tuesday, July 12, 2016

16                    Volume I

17

18

19

20

21   Reported by:

22   MICHELLE BULKLEY

23   CSR No. 13658

24   Job No. 2341197

25   PAGES 1 - 226

                                           Page 1

**EXHIBIT A**

1    A    Yes.   That was October 18th of 1993.

2    Q    And you promoted to sergeant in 2000; correct?

3    A    I'm not sure of the exact -- I'm not sure of

4    the exact year that I promoted to sergeant.  I'll have

5    to research it.

6    Q    Do you recall when you promoted to lieutenant?

7    A    No, I don't.  I would have to look at -- I

8    mean, I vaguely remember the years, but I'd have to look

9    at an employment document to give you an accurate

10   answer.

11   Q    There are certain allegations in the complaint

12   that you filed against the City of Inglewood.  Did you

13   review the complaint before it was filed?

14   A    Yes.

15   Q    In the complaint it states that you were

16   promoted to sergeant in 2000.  Is there any reason for

17   you to believe that that was incorrect?

18   A    No.

19   Q    The complaint states that you promoted to

20   lieutenant in 2006.  Any reason to believe that's

21   incorrect?

22   A    No.

23   Q    Did you promote to captain in 2008?

24   A    Yes.

25   Q    And who selected you for the captain position?

                                                    Page 12

**EXHIBIT A**

1       A    That's a different question than you just

2   asked, so --

3            MR. AVRAHAMY:  Just answer that question.  You

4   can answer that question.

5            THE WITNESS:  Which question would you like me

6   to answer?

7            MR. AVRAHAMY:  That last one.

8            THE WITNESS:  Okay.  Chief Seabrooks assigned

9   the Office of Administrative Services to me.  Under that

10  command I had responsibility for all grants.  This was

11  just one grant that I had responsibility for.

12  BY MS. GOLDSMITH:

13      Q    All right.  That's fine.  The record will be

14  what it is, and your answers are what they are to my

15  questions, which we'll be able to use at a later

16  proceeding.  That's fine.

17           What specific instruction, if any, did Chief

18  Seabrooks give you regarding the management of the CHRP

19  grant in 2009?

20      A    I don't recall any specific instructions that

21  she gave me regarding that particular grant.  We had

22  several discussions about it, but I don't remember or

23  recall any type of specifics.

24      Q    Did you have discussions initially in 2009

25  regarding the CHRP grant?

                                              Page 34

**EXHIBIT A**

1      Q   Do you recall any of the conversations with

2   Chief Seabrooks after the CHRP grant was awarded?

3      A   I don't recall any specific conversation with

4   her.

5      Q   As the captain of OAS and having the

6   responsibility to manage this grant and others, what

7   were your general duties and responsibilities regarding

8   managing grants after 2009?

9      A   To oversee the grants, making sure that all

10   the reporting requirements were taken care of, to make

11   sure that we audited the grant -- how we dealt with the

12   grants within the police department and report back to

13   the chief.   That's all I can recall right now.

14      Q   Do you recall in 2009 approximately how many

15   grants there were that you were overseeing?

16      A   No, I don't.

17      Q   Can you give me a best guesstimate?

18          MR. AVRAHAMY:   Guesstimate?

19   BY MS. GOLDSMITH:

20      Q   Is it -- won't hold you to it.   Was it one or

21   two grants, seven or ten?   Can you give us your best

22   estimate of how many grants were within the police

23   department at that time?

24      A   My best recollection is it was over ten, but I

25   can't be accurate.   Micah used to keep a --

                                               Page 38

**EXHIBIT A**

```
 1        A    No.

 2        Q    Why not?

 3        A    According to the information that I had read

 4   and the people that I had talked to at DOJ, an officer

 5   had to be officially laid off first before the grant

 6   could be used.

 7        Q    According to the information you read and any

 8   conversations you had with the Department of Justice,

 9   was a layoff notice sufficient before grant funds could

10   be used?

11        A    To my recollection, no.

12        Q    Are you aware with the City of Inglewood that

13   in October of 2011, layoff notices were issued to

14   officers, and the Department of Justice did grant a CHRP

15   modification with job layoff notices?

16        A    Am I aware of that?

17        Q    Correct.

18        A    Yes.  I am aware of that.

19        Q    Do you know upon what the Department of

20   Justice relied that they granted the CHRP modification

21   with just layoff notices as opposed to having the

22   officers actually laid off first?

23        A    No.

24        Q    Did you ever see any written documentation at

25   all that Department of Justice advised the City of
```

                                                    Page 45

**EXHIBIT A**

```
 1   right?
 2        A    It's my understanding that it was rejected.  I
 3   don't have any documents or anything like that, but it's
 4   my understanding that that first try was rejected by the
 5   DOJ.  I don't know why the DOJ rejected it.
 6        Q    You never knew why the DOJ rejected the city's
 7   first attempt to modify the grant?
 8        A    No.  Like I said, after that meeting, it's my
 9   recollection that I was already assigned to the Office
10   of Investigative Services.  So I don't know why they
11   called me to that meeting, but I can only assume that
12   they called me so I could give some expertise on CHRP.
13   I offered my expertise.  I found out that -- through
14   Chief Seabrooks, I believe, that the first attempt was
15   rejected, and that was it.
16        Q    At any time did you learn that it was rejected
17   because the City of Inglewood did not use your
18   recommendation to issue layoff notices first?
19        MR. AVRAHAMY:  I'm going to object as
20   misstates the testimony and mischaracterizes the
21   evidence; vague and ambiguous.  And if you can re-ask
22   the question because I don't think that there's evidence
23   that he made such a recommendation.
24        MS. GOLDSMITH:  I'll get to that.
25   BY MS. GOLDSMITH:
```

Page 65

**EXHIBIT A**

```
 1   lay someone off and then don't lay them off.  Issuing
 2   layoff notices in my context, the way I use the term,
 3   means that you have already laid officers off.  It's not
 4   a matter of getting a piece of paper and sliding it
 5   across the table to someone.  It's a matter of actually
 6   laying that police officer off.  That's the context in
 7   which I'm using it.
 8             So when I make a recommendation in that
 9   meeting with the mayor where I said you actually have to
10   issue layoff notices, where you actually have to lay off
11   officers, that's the context in which I'm giving that
12   advice, but I don't know necessarily that they actually
13   used that recommendation.  I had no interactions with
14   the mayor after that conversation that I can recall at
15   this particular moment in time regarding layoff notices
16   and things like that.
17             My only other conversation was with Captain
18   Fronterotta where he told me that they were just going
19   to lay off -- they were going to issue notices but not
20   actually lay officers off, and I told him that was
21   wrong.  We can't do that.  You actually have to lay them
22   off, not just issue notices.
23        Q   Well, are you aware that the Department of
24   Justice granted the modification even though the
25   officers weren't actually laid off?
```

**EXHIBIT A**

```
 1          A   I wasn't privy to Mayor Butts going up to
 2    Washington and talking with the DOJ.  I'm not sure what
 3    they talked about there, how they were able to rework
 4    the modification.  My input was only based on the
 5    information that I knew based on my training with the
 6    grant and based on talking to representatives at DOJ.  I
 7    simply gave advice.  That was it.  So, no, I don't
 8    know -- I don't know what Mayor Butts talked about when
 9    he went up to DOJ.
10          Q   Right.  So are you aware --
11              MR. AVRAHAMY:  It's 11:15 --
12              MS. GOLDSMITH:  Let me just finish this line
13    of questions.  Thank you.  And you've taken several
14    breaks, so I thought that was breaks enough.  So that's
15    okay.  That's why I didn't break again.
16              MR. AVRAHAMY:  Fair enough.
17    BY MS. GOLDSMITH:
18          Q   So are you aware if the Department of Justice
19    agreed to modify the City of Inglewood's grant when the
20    City of Inglewood only provided layoff notices and the
21    officers had not actually been laid off yet?
22          A   Am I aware of layoff notices being issued and
23    the grant being modified?  Is that what you're asking?
24          Q   Without the officers actually being laid off,
25    yes.
```

Page 70

**EXHIBIT A**

1    layoff notices, but the officers really weren't going to

2    be laid off.  I don't know what the direct words were.

3    I just heard from it from a few people that attended the

4    meeting.  So it confirmed what I heard from Chief

5    Fronterotta.

6         Q    Did you attend the meeting with Chief

7    Seabrooks, Captain Fronterotta at the time and the ten

8    officers?

9         A    No.  I told Chief Seabrooks that as long as

10   she didn't need me, I didn't want to participate in what

11   they were doing.  I didn't believe in it.  I thought it

12   was wrong, and I thought they were defrauding the

13   federal government.  So I requested that I --

14        Q    Uh-huh.

15             MR. AVRAHAMY:  Go ahead.  Finish.

16             THE WITNESS:  I requested not to attend, and

17   she allowed me not to attend.  She knew how I felt about

18   it.

19   BY MS. GOLDSMITH:

20        Q    So you requested not to participate in the

21   meeting because you thought the meeting -- or what was

22   going to be presented was falsified or illegal; is that

23   true?

24        A    Yes.

25        Q    Who were the officers that you spoke to that

Page 72

**EXHIBIT A**

1    withdrawn.

2           What was your understanding regarding the

3    layoff notices that were issued -- withdrawn.

4           Did you ever see copies of the notices of

5    layoffs from employment that were issued to the ten

6    officers?

7       A   I don't recall when I saw the layoff notices,

8    but I did -- I do remember seeing the layoff notices at

9    some particular point in time.

10      Q   Do you remember who authored the layoff

11   notices?

12      A   No.  I wouldn't remember that.  I didn't have

13   any involvement in it, so I wouldn't know.

14      Q   And based on your recollection, being a person

15   that is -- a person that is being laid off as opposed to

16   terminated, do you know who had the ultimate decision

17   regarding layoffs within the City of Inglewood?

18      A   I -- I don't know.  I don't -- I don't

19   understand the terminology of your question.

20      Q   Do you understand that a layoff is a decision

21   that is ultimately made by the city council?

22      A   Yes.

23      Q   So if the chief of police, whether it be Chief

24   Seabrooks or Chief Fronterotta -- if there was a

25   recommendation for layoff and the city council approved

                                            Page 79

**EXHIBIT A**

```
 1        A   No, I do not.

 2        Q   Do --

 3        A   Well, it was about CHRP, so I knew why it was

 4   called, but I didn't know what specifically it was

 5   about.

 6        Q   But then during the meeting did it become

 7   apparent what the subject matter was of the meeting as

 8   it related to CHRP?

 9        A   Yes.

10        Q   And what was that?

11        A   To modify the grant.

12        Q   And during that meeting did you offer an

13   opinion as to the proper way to modify the grant with

14   the DOJ?

15        A   I wouldn't call it an opinion.  I think a

16   question was posed, and I gave what I believe to be the

17   information from the CHRP's manual -- CHRP manual and

18   the training that I received.  I was just trying to

19   offer that information.  I didn't form an opinion.  I

20   was just trying to give information as to how to modify

21   the grant if they wanted to modify it.

22        Q   Do you ever recall any document to the chief

23   of police letting him know that you had formed an

24   opinion and offered it at that meeting?

25        A   No.  I don't recall.  If I see the document, I
```

Page 113

**EXHIBIT A**

```
 1    way.  I think they referred to Artie being from Salinas

 2    and he did it that way in Salinas, and I think the only

 3    comment I made after that was, you know, "That was

 4    Salinas.  This is Inglewood."  And I left it alone after

 5    that.  It wasn't my place to do anything.

 6         Q    During that meeting did you raise a concern to

 7    the people at that meeting that what they were doing was

 8    improper?

 9         A    I don't think so.  I don't recall that.  I

10    raised the concern to Mr. Fields and Chief Seabrooks

11    after the meeting.

12         Q    Right.  That's what I -- but I wanted to see

13    your recollection about that meeting.  So to the best of

14    your recollection in that meeting, the conversation did

15    not include you raising a concern as to what they were

16    doing or proposing to do?

17         A    I don't recall exactly what I said about

18    supplanting and things like that.  I don't think I said

19    it in that meeting.  I do recall saying it to Mr. Fields

20    in his office and also to Chief Seabrooks.

21         Q    Do you remember how long after your

22    conversation with Mayor Butts and Artie Fields and

23    yourself and Chief Seabrooks did the meeting with

24    Mr. Fields occur?

25         A    It was either that same day or the day after.
```

Page 115

**EXHIBIT A**

```
 1    that were budgeted to hire?
 2         A   That was based on the acceptance of the 2009
 3    grant.  So we didn't exceed our budgetary capacity.  We
 4    were using that money to fund the newly hired police
 5    officers.  So we had money available.  We had
 6    supervisory positions that we hadn't filled at the time.
 7    I think we had a deputy chief's position that we hadn't
 8    filled.  We had a lieutenant's position.  And I'm going
 9    off of memory now.  I don't remember exactly what
10    positions.  I could be wrong about the lieutenants
11    versus sergeants versus deputy chief's position, but all
12    those positions were vacant, and we had an amount of
13    money that we could use to support any officers that we
14    needed to retain, if that's the wording that you want to
15    use.  There was no need to have any officers laid off.
16              Plus we were giving raises.  I think at that
17    time or shortly after that, several people in the city
18    received raises.  So in my -- from my perspective, we
19    had not exhausted our general fund money like we were
20    supposed to do.
21         Q   Were you aware of the packet of information
22    that was provided by the City of Inglewood to the
23    Department of Justice to support the grant modification?
24         A   No.  Oh, I was aware of it, but I didn't
25    have -- I didn't review it, but, yes, I did know that
```

Page 119

**EXHIBIT A**

1    they submitted something to the DOJ.

2         Q    Did you ever analyze the documentation that

3    was provided to the Department of Justice in support of

4    the city's request for modification?

5         A    Did I ever analyze?

6         Q    Uh-huh.

7         A    No.  I did not analyze the documents, no.

8         Q    Although you were aware of documents being

9    submitted to the Department of Justice in support of the

10   request for modification, do you know what those

11   documents were?

12        A    No.  I don't know what those documents were.

13   I can assume, but I don't know.

14        Q    At the time when you formed the opinion that

15   the city was improperly supplanting funds, did anybody

16   give you a packet of the information that was being

17   submitted to the Department of Justice in support of the

18   modification request?

19        A    No one gave me -- from my recollection, no one

20   gave me a packet to review.

21        Q    So the information that you had on the

22   supplanting, what was the basis of that information?

23        A    The basis of my conclusion that they were

24   supplanting was Artie Fields' admission to me that he

25   was going to use the money to supplant officer salaries.

Page 120

**EXHIBIT A**

```
 1          A    No.

 2          Q    Did you have any input in the drafting of the

 3    two-page letter by Jacqueline Seabrooks?

 4          A    I had input, yes, but I don't -- I don't

 5    recall the document.

 6          Q    Did she ask you to review a draft of a letter

 7    that she was submitting to the Department of Justice?

 8          A    No.  My only input was to caution the chief

 9    against signing the modification request.  I believe

10    that her signature would expose her to legal issues and

11    not -- I begged her not to sign it.  That's the only

12    input that I had.

13          Q    And you agree her signing it ultimately was

14    her decision; right?

15          A    Oh, I don't know what pressure she was under,

16    but, yes, she -- that looks like her signature from what

17    I can recall.

18          Q    You were not asked to participate in the

19    signing or submission of the August 3, 2011 modification

20    request by Chief Seabrooks; correct?

21          A    Not that I can recall.

22          Q    And when she wrote that that this request was

23    made as a result of an in-depth analysis of the city's

24    fiscal condition and whether the city will be able to

25    maintain existing police officer staffing levels, did
```

Page 130

**EXHIBIT A**

1    you perform an in-depth analysis of the city's financial

2    condition?

3           A    No, not of the city's financial condition, no.

4           Q    And were you aware that the City of Inglewood

5    had declared a municipal fiscal emergency?

6           A    Yes.  I do --

7           Q    Do you remember?

8           A    I do recall that, yes.

9           Q    Do you remember when that was?

10          A    No, I don't recall when it was.

11          Q    And do you remember that the city did

12   implement a city-wide reduction -- workforce reduction

13   plan?

14          A    Yes.

15          Q    Do you remember when the city implemented its

16   workforce reduction plan?

17          A    I don't remember the exact dates, no.  It was

18   before this, though.

19          Q    Did the workforce reduction plan also impact

20   the Inglewood Police Department?

21          A    Oh, yes, very, very drastically, yes.

22          Q    And do you recall that the workforce reduction

23   plan had a 20 percent reduction in police positions?

24          A    Vacant positions, yes.  At the time, back in

25   2008, we -- when Chief Seabrooks first got to our

Veritext Legal Solutions
866 299-5127
EXHIBIT A

```
 1    which one you're referring to here.
 2         Q    You never saw the August 3, 2011 award
 3    modification request --
 4         A    No.
 5         Q    -- right?   Right?
 6         A    Yes.
 7         Q    And so were you aware that the City of
 8    Inglewood had received a modification request denial by
 9    the Department of Justice?
10         A    Yes.  I'm aware of the denial, but I didn't
11    know that there was a connection between that denial and
12    this request.
13         Q    What did you think the denial was a request
14    of?
15         A    From what I'm understanding, I -- you just
16    handed me this document.  I didn't know which document
17    this was.  Was this the first request or the second
18    request?
19         Q    That was the first request that was made by
20    Chief Seabrooks to modify the CHRP grant.
21         A    Okay.  Then, if this is the first request,
22    then, yes, the first request was denied.  So I'm aware
23    of that.
24         Q    And have you ever seen a copy of the
25    modification request denial?
```

Page 141

**EXHIBIT A**

1        Q    Did you ever see a memo that Jacqueline

2   Seabrooks issued to Artie Fields giving him a report

3   concerning a CHRP modification and an update?

4        A    I don't recall.

5             MR. AVRAHAMY:  Can we take a two-minute break?

6             MS. GOLDSMITH:  Sure.

7             (Recess.)

8   BY MS. GOLDSMITH:

9        Q    In August of 2011, do you know if Chief

10  Seabrooks was discussing layoffs with city council?

11       A    I don't know.

12       Q    Do you know if the city council directed Chief

13  Seabrooks to reduce her police budget?

14       A    I don't know.

15       Q    Were you ever a participant with the city's

16  human resources department and a representative of the

17  Inglewood Police Association to meet and confer

18  regarding potential layoffs in September of 2011?

19       A    I don't recall.

20       Q    Do you understand that there's a requirement

21  to meet and confer with the union prior to layoffs

22  regarding not particular officers but positions that are

23  being laid off?

24       A    Yes.

25       Q    And although you may not have attended, are

                                        Page 145

**EXHIBIT A**

```
 1    don't recall.  I don't think I was.
 2            Q    At some point you claim that you spoke to Cal
 3    Saunders about the CHRP modification request; right?
 4            A    Yes.
 5            Q    And what position was Cal Saunders?
 6            A    The city attorney.
 7            Q    On how many occasions did you speak with Cal
 8    Saunders regarding the CHRP grant?
 9            A    At least two that I can recall.
10            Q    Do you have any documentation which would
11    reflect when you spoke to Mr. Saunders?
12            A    I don't, no.
13            Q    You don't have any?
14            A    I don't.
15            Q    Okay.  To the best of your recollection, when
16    was the first conversation that you had with
17    Mr. Saunders?
18            A    It had to be right around the time that the
19    police officers were issued their layoff notices.  I
20    remember talking to Mike Falco about it, and he believed
21    that there was a serious issue -- I told him the story
22    of what I knew, and he believed that there was a serious
23    issue and agreed that we needed to tell the city
24    attorney and --
25            Q    Do -- oh.
```

Page 150

**EXHIBIT A**

1        A    I don't remember how the meeting came about.

2   I don't even know if we requested a meeting or if we

3   just went right up to his office, but we walked into the

4   city attorney's conference room, and he turned up the

5   music because he believed that the city attorney's

6   office was bugged, and he didn't want -- he didn't want

7   anyone else to hear our conversation.

8            So he had the music up loud, and we talked

9   about the issues that I found with CHRP and the fact

10  that the city was fraudulently laying officers off in

11  order to apply for the grant, which makes sense because

12  they didn't get a council vote until September after

13  they were -- after they received the additional denial.

14  So that also leads me to believe that the whole council

15  decision was false as well.  It was simply made to take

16  advantage of the CHRP funds, which is a violation of

17  taking advantage of them.  I'm just thinking about that

18  now.

19           But to answer your question --

20       Q   I think you've answered my question.  You

21  didn't know when it was exactly, but it was around the

22  time of the layoff notices.

23       A   Okay.

24       Q   And the music being loud because it was

25  bugged, who had that opinion?

                                        Page 151

**EXHIBIT A**

```
 1          A    Cal Saunders, he had found a bug in one of the
 2     offices.  He had a detective, a private investigator
 3     that did a search of areas that he was having
 4     discussions in, and he actually found some type of
 5     listening device.  So after that he didn't feel safe
 6     talking in certain rooms.  So we'd either go walking
 7     around the city hall, or we would go into the conference
 8     room and he would turn up the music.  We would talk very
 9     low.  Mike Falco was present at that meeting as well.
10          Q    I was going to ask.  So you went down with
11     Mike Falco to the city attorney's office?
12          A    Yes.
13          Q    And what did you tell the city attorney in
14     that meeting?
15          A    I told him that I thought the city was
16     supplanting money, that they issued the layoff notices
17     fraudulently, that it could be a situation of perjury;
18     it could be a situation of supplanting, and he said he
19     would look into it.  So, you know, at that point I did
20     my job.
21          Q    How did you do your job?
22          A    I'm a police officer, so if I see a crime
23     being committed, I'm supposed to take action on it.  I
24     can't just ignore it because it's involving a police
25     chief or city government.
```

Veritext Legal Solutions
866 299-5127

**EXHIBIT A**

1        Q    Right.   So you understood that it was one of
2    your responsibilities, even if it involved a superior
3    officer, to bring it to law enforcement -- to bring it
4    to someone's attention?
5        A    Yes.
6             MR. AVRAHAMY:  Can I speak with my client?
7             MS. GOLDSMITH:  Can I ask one more question
8    before you do, sir?
9             MR. AVRAHAMY:  No.
10            (Attorney-client conference outside of the
11        deposition proceedings.)
12   BY MS. GOLDSMITH:
13       Q    Do you recall when you had the second
14   conversation with Cal Saunders?
15       A    I just want to clarify one thing, if I may.
16       Q    That's okay.
17            MR. AVRAHAMY:  No.  Let him clarify.
18            MS. GOLDSMITH:  Well, he can answer my
19   question, and if you want to ask him questions to
20   further clarify any testimony, you can do that.  He's
21   responded --
22            MR. AVRAHAMY:  I think one of the admonitions
23   was if at any point you want to clarify anything at the
24   beginning of the deposition, this is the time to do it.
25   So this is the time to do it in the --

                                            Page 153

```
 1          Q   Do you remember what month it was in?

 2          A   No.

 3          Q   Was it after the layoff notices were issued?

 4     Was it after the city council revoked the layoff

 5     notices?  What can you recall?

 6          A   I recall a conversation with him telling me

 7     that he did look into it and he'll report it to the city

 8     council and they'll take care of it.

 9          Q   Were you there when Cal Saunders reported to

10     the city -- withdrawn.

11              Were you present at city council when Cal

12     Saunders allegedly reported to the city council?

13          A   No.  I don't think he reported, from what I

14     can recall -- and I don't know this to be a fact, but

15     Cal Saunders normally wrote memos to the city council

16     when something like this happened.  So, no, I wasn't

17     aware of any memo.  I wasn't aware -- I didn't see it.

18     That would be something that would be completely

19     inappropriate for me to see.

20          Q   Right.  So let me ask you my question again.

21     Were you present when Cal Saunders reported in closed

22     session anything that you allegedly told him?

23          A   As I stated just before --

24          Q   Yes or no were you there?

25          A   -- I said -- no.
```

Page 156

**EXHIBIT A**

```
1    stop.  That's what I recall.
2        Q   Did you ever speak to city council directly
3    about what you said had to stop?
4        A   Yes.  I spoke to Judy Dunlap.  She -- not to
5    council as a whole but Councilman Dunlap.
6        Q   Did you ever speak to the city council in
7    closed session regarding what you said had to stop?
8        A   No.  Oh, yes, I did speak to them about CHRP,
9    but about the supplanting issue, no.
10       Q   Do you know if Judy Dunlap ever -- withdrawn.
11           Do you claim that Judy Dunlap in any way
12   retaliated against you?
13       A   No.
14       Q   Do you claim that Cal Saunders in any way
15   retaliated against you?
16       A   No.
17       Q   Do you claim that Chief Seabrooks in any way
18   retaliated against you?
19       A   No.
20       Q   Other than Cal Saunders, Chief Seabrooks and
21   Judy Dunlap, who else did you mention the supplanting
22   issue to?
23       A   I can't recall.
24           MR. AVRAHAMY:  Besides who he's already
25   testified to.
```

                                                    Page 158

```
 1        A   Chief Seabrooks.

 2        Q   Anyone else?

 3        A   Cal Saunders.

 4        Q   Anyone else?

 5        A   Mike Falco.

 6        Q   Anyone else?

 7        A   The FBI.

 8        Q   Anyone else?

 9        A   Judy Dunlap, Mike Spriggs.  I think that's his

10   name, Spriggs.

11        Q   Anyone else?

12        A   Not that I can recall at this time.

13        Q   Earlier I'd asked you whether or not you had

14   any further conversations with Mayor Butts regarding the

15   CHRP funding.  You said the only conversation you had

16   with Mayor Butts himself was the meeting that he called,

17   and you provided your opinion regarding the use of the

18   CHRP funds.  Do you now have any recollection after that

19   conversation having any specific conversation with Mayor

20   Butts where you raised the concern that the city was

21   supplanting CHRP funds?

22        A   I can't recall at this time any other meeting

23   I had with Mayor Butts regarding supplanting.  I had

24   other meetings with Mayor Butts about CHRP, but

25   specifically supplanting, I can't recall any other
```

Page 191

**EXHIBIT A**

1      meeting.

2          Q    So is there any other illegal activities that

3      you believe that you -- withdrawn.

4              You consider yourself you said to have

5      reported misconduct.  Is that what you said?  Let me

6      see.  Hold on a second.  Withdrawn.

7              You said that you were retaliated against

8      because you spoke out against Butts and what perceived

9      to be illegal activity.  Do you recall that testimony

10     generally?

11         A    I don't think that was my exact words, but,

12     yes, I do recall.

13         Q    Is there anything else that you believe that

14     you spoke out against what you perceived to be illegal

15     activity that forms the basis of this complaint?

16         A    Not that I can recall at this time.

17         Q    Do you have any personal knowledge that Cal

18     Saunders disclosed what was discussed between you and

19     him with Mayor Butts?

20         A    As I stated before, the only knowledge I have

21     is that Cal Saunders told me that he reported it to the

22     council.  I don't know who specifically in the council

23     he reported it to.

24         Q    And sitting here today, you do not have a

25     specific date that you can recall when you spoke

                                           Page 192

**EXHIBIT A**

```
 1     initially to Cal Saunders; correct?

 2            MR. AVRAHAMY:  I believe that's asked and

 3     answered, but if you have any further information on

 4     that question.

 5            THE WITNESS:  If I had the opportunity to

 6     review some documents, then, yes, I could probably

 7     recall it, but sitting here right now, I cannot recall

 8     the specific date.

 9     BY MS. GOLDSMITH:

10        Q   What documents would you need to look at?

11        A   The documents I thought that we had given you.

12     I'm not sure if you have the entire folder here, but --

13        Q   I recall in your complaint that you allege

14     it's October of 2011.  What I don't know is when you

15     claim that you spoke to Cal Saunders in 2011.  Do you

16     have any documentation that would reflect when in

17     October of 2011 you spoke to Cal Saunders?

18        A   I would have to review the log that I typed

19     during that time.

20            MS. GOLDSMITH:  Can we go off the record for a

21     moment?  Yes?

22            MR. AVRAHAMY:  Yes.

23            (Discussion off the record.)

24     BY MS. GOLDSMITH:

25        Q   When you spoke with Cal Saunders, you didn't
```

Page 193

**EXHIBIT A**

1    raise any broad concerns about corruption or systematic

2    abuse.  You were just focused on the CHRP grant; right?

3         A    It was focused on -- for that particular

4    conversation, it was focused just on the CHRP grant.

5         Q    Did Chief Seabrooks ever tell you not to speak

6    to Cal Saunders?

7         A    No.

8         Q    Did Captain Fronterotta -- at the time Captain

9    Fronterotta -- ever tell you not to speak to Cal

10   Saunders?

11        A    Not that I can recall, no.

12        Q    Did any member of council ever give you a

13   directive not to speak with Cal Saunders?

14        A    No.

15        Q    Does the Inglewood Police Department have a

16   policy on how it responds to its employees who report

17   misconduct?

18        A    Yes.

19        Q    What policy is that?

20        A    Don't know.

21        Q    Don't know the individual IPD policy number,

22   or you don't remember the title?

23        A    I don't know the title, and I don't know the

24   policy number.

25        Q    What is the policy?  Can you describe it to

Page 194

**EXHIBIT A**

```
 1              You claim that Chief Fronterotta committed
 2    libel regarding your performance evaluation; right?
 3         A    Yes.
 4         Q    What is the basis that you believe it's libel?
 5         A    It was not factual, and I believe the intent
 6    was to sabotage my career so that I could not process
 7    with any other police department.
 8         Q    Are you aware if anyone, at the time the
 9    performance evaluation was made, received a copy of the
10    evaluation?
11         A    Not that I can recall at this time.
12              MS. GOLDSMITH:  It's 4:35.  Why don't we end
13    for today before I go into a different subject matter.
14              MR. AVRAHAMY:  Okay.
15              MS. GOLDSMITH:  I'll probably -- I'll come
16    back to the evaluation, but I think that will take too
17    long to now give him the evaluation and ask him what was
18    defamatory about it.  So we'll call it a day.
19              MR. AVRAHAMY:  Okay.  Thank you.
20              MS. GOLDSMITH:  At this time I'd like to
21    relieve the court reporter of her duties under the
22    United States District Court rules of evidence.  We are
23    in federal court.  That I instruct the court reporter to
24    begin preparing the transcript.  I'm waiving any
25    requirement that the witness go to the court reporting
```

**EXHIBIT A**

```
 1                UNITED STATES DISTRICT COURT

 2        CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

 3

 4   MARTIN SISSAC,

 5              Plaintiff,

 6        vs.                              Case No.:

                                           2:15-cv-01741-JAK-FFM

 7

     CITY OF INGLEWOOD; MAYOR

 8   JAMES BUTTS; CHIEF OF POLICE

     MARK FRONTEROTTA AND DOES 1

 9   THROUGH 10, INCLUSIVE,

10              Defendants.

11   _____

12

13

14

15              DEPOSITION OF MARTIN SISSAC

16                Los Angeles, California

17              Monday, August 8, 2016

18                     Volume II

19

20

21

22

     Reported by:

23   MICHELLE BULKLEY

     CSR No. 13658

24   Job No. 2358524

25   PAGES 226 - 438
```

Page 226

**EXHIBIT B**

```
 1    for the Office of Administrative Services; correct?
 2         A    To the best of my recollection, I don't
 3    remember when the transition occurred, but there was a
 4    transition that did occur sometime within that time
 5    period.
 6         Q    And when the transition occurred, do you
 7    recall that Chief Seabrooks disbanded the Office of
 8    Administrative Services?
 9         A    At some point, yes.
10         Q    Do you remember if that was in June of 2011?
11         A    I don't remember when.
12         Q    And after Chief Seabrooks disbanded the Office
13    of Administrative Services, you maintained command over
14    the Office of Criminal Investigations, which included
15    custody; correct?
16         A    Yes.
17         Q    Were you aware in August of 2011, specifically
18    August 10, 2011, Chief Seabrooks had a meeting regarding
19    CHRP with Captain Fronterotta, Lieutenant Mike Marshall,
20    Lieutenant James Madilla at a command staff meeting?
21         A    No.  I don't remember it.  I remember reading
22    one of the -- I believe in one of the documents, one of
23    the -- what's it called?  The notes, the minutes from
24    Command Staff, that they met and talked about it, but I
25    don't believe I was there.
```

Page 235

**EXHIBIT B**

1        Q   And you were a member of Command Staff at the

2    time; correct?

3        A   Yes.

4        Q   And you were not there; correct?

5        A   From my recollection, I was not there.

6        Q   And other than reviewing the minutes, did you

7    hear from any source what occurred during that August

8    2011 meeting?

9        A   I don't recall at this time.

10        Q   What is Command College?

11        A   It's a California POST training course that

12    teaches law enforcement professionals, both sworn and

13    nonsworn, how to look to current indicators and forecast

14    what may or may not happen within our industry.

15        Q   While a captain at the Inglewood Police

16    Department in 2011, did you attend Command College?

17        A   I don't recall the exact dates of Command

18    College, but I think it was going on in 2011.  It either

19    ended near there, or it was still in session.  I can't

20    recall.

21        Q   And what is the time commitment regarding your

22    attending Command College?  Meaning how long were you

23    gone from IPD to attend Command College?  Withdrawn.

24    I'll ask a cleaner question.

25            How long were you at Command College in 2011,

Page 236

**EXHIBIT B**

```
 1    if you can recall?

 2         A   I don't recall.  Command College is divided

 3    into several sessions, and I don't recall the dates of

 4    each session.  I think there's a total of six or seven

 5    sessions that occur over an 18-month period.

 6         Q   And that was a course that you completed while

 7    you were captain at the IPD?

 8         A   Yes.

 9         Q   Do you remember when you completed the course?

10         A   I don't recall the exact dates.

11         Q   In September of 2011, when there was a meeting

12    with Chief Seabrooks, human resources and the IPOA to

13    meet and confer and discuss regarding police layoffs,

14    were you at Command College?

15         A   I don't recall.

16         Q   Do you recall a time in September 2011 when

17    there was another meeting with Command Staff to discuss

18    layoffs that you could not attend because of a conflict

19    due to a meeting with a homicide victim's mother?

20         A   I don't recall.

21         Q   Are you familiar with the Inglewood Police

22    Department's description of a team entitled the Special

23    Enforcement Team?

24         A   Yes.

25         Q   And what is the Special Enforcement Team?
```

Page 237

```
 1              MS. GOLDSMITH:  He's not answering my
 2    question, and he's -- there's nothing about that
 3    statement for him to go on a dissertation or narrative
 4    to further support and bolster any type of opinion.
 5    BY MS. GOLDSMITH:
 6         Q    It's a very simple statement.  On October 5th,
 7    eight Inglewood police officers were served notices of
 8    layoff to become effective November 5, 2011.  Did that
 9    happen or did it not happen?
10         A    Yes, but that's not answering your original
11    question, but yes --
12         Q    My question was the factual information in
13    these bullet points; right?  So on October 5, 2011, were
14    eight Inglewood police officers served notices of layoff
15    to become effective November 5, 2011?  Yes or no?
16              MR. AVRAHAMY:  Counsel, I'd really appreciate
17    it if you'd give him an opportunity to answer your
18    original question about the factual basis for these
19    points.  He can answer and you can argue but --
20              MS. GOLDSMITH:  You know what?
21              MR. AVRAHAMY:  -- but let him answer.
22              THE WITNESS:  He's not --
23              MR. AVRAHAMY:  He is.
24              MS. GOLDSMITH:  -- answering the question,
25    Mr. Avrahamy.
```

Page 250

**EXHIBIT B**

```
1              MS. GOLDSMITH:  He's wasting our time.

2              MR. AVRAHAMY:  You're wasting our time in the

3    way you're not letting him answer.

4              MS. GOLDSMITH:  You know what?  I'm going to

5    move to strike my question and the answer, and I'm going

6    to try this one more time.  Okay.

7    BY MS. GOLDSMITH:

8         Q    Mr. Sissac, on October 5, 2011, do you know if

9    officers were served with layoff notices to become

10   effective October 5, 2011?

11        A    Yes.

12        Q    And were they?

13        A    I believe they were.

14        Q    Do you know, since the latter part of the

15   school year 2008, 2009, the City of Inglewood eliminated

16   121 full-time and 27 part-time or full-time-equivalent

17   positions, including the sworn positions of police

18   captain and police sergeant?  Do you know if that's true

19   or not?

20        A    I don't know if the numbers are accurate, but,

21   yes, a few position -- I mean a lot of positions were

22   eliminated, and a lot of people were laid off.

23        Q    In fiscal year 2010, 2011, did the City of

24   Inglewood implement a workforce reduction program, an

25   employee furlough program and a variety of other
```

Page 252

1    employee considerations?

2           A    Yes.

3           Q    In fiscal year 2010, 2011, did the City of

4    Inglewood defund five additional police sergeant

5    positions?

6           A    That was another one that I was going to

7    address in your original question.  I'm not sure what

8    defund -- how they're using that particular term.  Did

9    they freeze the positions?  I don't recall.  I don't

10   believe they defunded them.  I believe that they froze

11   them, but I'm not sure about that.  So I think that's

12   not factual.

13          Q    But sitting here today, you're not sure one

14   way or the other?

15          A    I'm not sure.

16          Q    On September 27, 2011, do you know if the

17   Inglewood City Council approved the fiscal year 2011,

18   2012 budget that had cost savings of eight laid-off

19   police officers?

20          A    You're asking me if that was factual?

21          Q    Correct.  Do you know?

22          A    I believe that they did, yes.

23          Q    Okay.  And do you know that in the 2011, 2012

24   budget, they froze 24 additional non-police positions?

25          A    I assume they did.  I don't know if that's

                                              Page 253

```
 1    factual or not.

 2         Q    Okay.  Did you yourself ever review the

 3    Inglewood meeting budget workshop's disks that were

 4    disseminated on September 26, 2011?

 5         A    I don't recall.  I could have reviewed them,

 6    but I don't know the specifics about them.

 7         Q    All right.  Thank you.

 8              At some point did you become aware that the

 9    Department of Justice, upon receiving the modification

10    request, approved the award modification request for

11    post-application layoffs?

12         A    If I understand your question correctly, yes,

13    the second time the city applied for the modification,

14    DOJ accepted it.

15         Q    And do you recall if you saw the approval

16    notification by the Department of Justice?

17         A    Most likely, I didn't, but I don't recall.

18              MS. GOLDSMITH:  I'm going to have the court

19    reporter mark next as Exhibit 10 an email and attachment

20    from Jacqueline Seabrooks to various people concerning

21    the preliminary notification that the Department of

22    Justice approve the modification request.

23              (Exhibit 10 marked.)

24    BY MS. GOLDSMITH:

25         Q    If you could review the email and attachment,
```

Page 254

1          Q    And if you look at the form, if you will, the

2     checkbox of the first five pages, each of the boxes is

3     satisfactory and above.  Do you see that?

4          A    Yes.

5          Q    Any part of that document do you claim to be

6     defamatory?

7          A    No.

8          Q    And there are other -- two pages, pages 6 and

9     7, that have also a form and various information filled

10    out.  Do you believe pages 6 and 7 to be defamatory?

11         A    No.

12         Q    There's also a typewritten attachment to the

13    personnel evaluation.  Do you see that?

14         A    Yes.

15         Q    Is that the document that you claim to be

16    defamatory?

17         A    Yes.

18         Q    I don't need you to recite the statements

19    contained therein because the document will speak for

20    itself.  Mr. Sissac, generally what is it about the

21    attachment that you believe to be defamatory?

22         A    They are factually incorrect.  They put me

23    into a light that I failed as a captain.  I think

24    there's language in here that actually says I failed at

25    my job or failed to complete something.  I don't know

                                        Page 386

**EXHIBIT B**

1    where it is.  I'll have to research the entire document

2    to find out.  So based on those two things.

3         Q   And did you grieve the evaluation?

4         A   Yes.

5         Q   And did the city manager grant portions of

6    your grievance?

7         A   I think he granted one portion, yes.

8         Q   Do you know -- I don't want you to guess.  Do

9    you know if Chief Fronterotta showed this performance

10   evaluation to anyone?

11        A   Yes.  I don't know if Chief Fronterotta showed

12   it to someone, but the document was seen by someone

13   else.

14        Q   Okay.  Let's break that down a little bit.  Do

15   you have any facts, including information or

16   documentation, that Chief Fronterotta showed your

17   performance evaluation to anyone else?

18        A   Defining the word "showed" as meaning that

19   Chief Fronterotta had a physical copy of the document

20   and actually gave it to another person, no, I don't

21   think that occurred.

22        Q   Upon what do you base your claim that the

23   document was seen by someone else?

24        A   My background investigation.

25        Q   And what is that?

Page 387

**EXHIBIT B**

1          A    When I applied to the Fontana Unified School

2     District, the document was seen by my background

3     investigator and also the representatives at the school

4     district.

5          Q    Did you get the job at Fontana Unified School

6     District?

7          A    Yes.

8          Q    And although it's understandable that the

9     background investigator may have seen the performance

10    evaluation, upon what do you base your claim that

11    representatives of the school district saw it?

12         A    Because they have my background package.  They

13    have copies of it.

14         Q    How do you know your background package

15    included a copy of your performance evaluation?

16         A    Because my background investigator told me.

17         Q    What was the name of your background

18    investigator?

19         A    Rick Frazier.

20         Q    And where does Rick Frazier work?

21         A    I don't know the name of the company.

22         Q    Is it a background investigation company?

23         A    It's a private company.  I don't know the name

24    of it.

25         Q    And with the most words that you can recall,

                                                  Page 388

**EXHIBIT B**

```
1    LAPD leadership program in writing or orally?

2         A    It was in writing.

3         Q    And did Chief Fronterotta deny your request in

4    writing?

5         A    He denied it through an email two days before

6    the training started.

7         Q    And what explanation, if any, did he provide

8    to you?

9         A    From what I recall -- I don't remember what

10   his exact reasoning was.  It was a short email saying

11   that I couldn't go.  The training had already been

12   approved by LAPD, and they were expecting me to be

13   there.

14        Q    So do you know anybody else who was denied

15   LAPD leadership program training?

16        A    No.

17        Q    Do you know anybody else that was denied

18   participating in training programs by Chief Fronterotta?

19        A    Directly by Chief Fronterotta?  No.

20        Q    Right.  Are you aware of any other instances

21   where Mayor Butts retaliated against someone for

22   exercising their First Amendment rights other than

23   yourself?

24        A    No.

25        Q    Are you aware of any instance where Chief
```

Page 398

**EXHIBIT B**

1    Fronterotta retaliated against anyone else when they

2    exercised their First Amendment rights other than

3    yourself?

4          A    No.

5          Q    Are you aware of any document or policy that

6    Chief Fronterotta wrote that said something to the

7    effect of if you, you know, disagree with me, I'm going

8    to retaliate against you?

9          A    No.

10         Q    Did Mayor Butts ever in writing have a policy

11   that states, if you don't get on the train, I'm not

12   going to support you?

13         A    You're saying a document; correct?

14         Q    Correct.

15         A    No.

16         Q    Did Mayor Butts ever say anything to you about

17   not complying with directives that he had?

18         A    In our discussions in his office, he would

19   talk about certain things, but to be specific, no,

20   that's the only thing I'm thinking of right now when you

21   ask that question.

22         Q    Right.  Do you know -- are you personally

23   aware of Mayor Butts retaliating against anyone else

24   other than you?

25         A    Yes.

Page 399

**EXHIBIT B**

```
 1        Q   Is there any other person that you believe was

 2   retaliated against by the mayor other than yourself and

 3   Oscar Serrano?

 4        A   No, not at this time.

 5        Q   Are you aware of Chief Fronterotta retaliating

 6   against anyone other than yourself?

 7        A   There were claims of retaliation by -- I can't

 8   remember her name.  It was a lady in communications, a

 9   manager in communications.  There was Keith Hoston.

10   There was -- those are the only two that I can think of

11   right now.

12        Q   Do you recall if the claims of retaliation

13   were in any way related to the exercise of First

14   Amendment free speech?

15        A   No.  I don't recall.

16        Q   And did Mr. Serrano ever bring a claim against

17   the mayor or Chief Fronterotta that he had been

18   retaliated against based on First Amendment free speech?

19        A   Not to my knowledge.

20        Q   Do you recall the name of the lady in

21   communications?

22        A   No, I can't.  I'm sorry.  It's just a blank

23   right now.

24        Q   You don't have to apologize.  Even though you

25   can't recall her name, do you recall --
```

Page 403

**EXHIBIT B**

James T. Butts
July 18, 2016

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

MARTIN SISSAC,

              Plaintiff,

       vs.

CITY OF INGLEWOOD; MAYOR JAMES
BUTTS; CHIEF OF POLICE MARK
FRONTEROTTA AND DOES 1 THROUGH
10, INCLUSIVE,

              Defendants.

CERTIFIED ORIGINAL

Case No.
2:15-CV-01741-JAK-FFM

VIDEOTAPED DEPOSITION OF

JAMES T. BUTTS

Monday, July 18, 2016

10:02 a.m. - 12:34 p.m.

16530 Ventura Boulevard, Suite 208

Encino, California

REPORTED BY:

Jean F. Holliday

CSR No. 4535, RPR, CRR

**EXHIBIT C**

James T. Butts
July 18, 2016                                                    23

```
 1   Sissac during the first six months?
 2       A.    Same as it was with any other captains and
 3   Chief in the police department, they were the command
 4   staff of the police department.  I was the chief
 5   executive officer of the City.  Same as with all of the
 6   captains and the Chief.
 7       Q.    Now, when you became the Mayor of Inglewood can
 8   you describe what their fiscal condition was?
 9       A.    I can.  It was poor.
10       Q.    And when you became the Mayor -- I believe in
11   January of 2011 is when you started?
12       A.    No.  Actually February 1st is when I took
13   office.  The election occurred January 11th, the runoff
14   election.  And I took office February 1st.
15       Q.    Okay.  So in February 1st, 2011, or shortly
16   after, thereafter, when you took office, did you learn
17   about the federal CHRP grant that had been awarded to
18   the City of Inglewood back in, I believe, 2009?
19       A.    At some point I did.
20       Q.    And what was your understanding when you first
21   learned about the CHRP federal grant?
22       A.    That it was somewhere in the area of $3 million
23   in total; that it required I believe a 25 percent match
24   by the City to accept the grant, and that it was a
25   hiring grant to allow you to hire more officers.
```

**EXHIBIT C**

James T. Butts
July 18, 2016                                                    24

1       Q.    And did you have an understanding of whether

2   that grant had been used or not?

3       A.    No, it had not been used because the City did

4   not -- was not in a position to do the 25 percent match.

5       Q.    And when you took office after learning about

6   the grant and having a fiscal -- based on the -- let me

7   try that again.

8             When you took office was it your intention to

9   try to figure out a way to have the grant utilized to

10  help the City with its financial issues?

11            MS. GOLDSMITH:   Objection.   Vague and ambiguous

12  as to time.

13  BY MR. AVRAHAMY:

14      Q.    Go ahead.

15      A.    Actually, no.   At the time that I took office

16  in the preceding years the City had spent probably, I

17  believe, 13 million, and then the year preceding me

18  taking office over $18 million in reserve funds just to

19  make it through the fiscal year.   At the time I took

20  office I believe that our reserves had dropped from once

21  a high of somewhere near over 35, 38 million, down to

22  $11 million, which for a city of our spending plan is

23  disastrously low.   Reserves are meant to allow the City

24  to navigate the ebbs and flows of revenues as they come

25  in and for a city our size, you know, you usually like

**EXHIBIT C**

James T. Butts
July 18, 2016                                                    25

1    to have somewhere in the area of 20 percent of your

2    reserves at a minimum in case there is an earthquake or

3    some -- some calamity where you won't receive your

4    property tax receipts because they can't be transmitted,

5    so that you can continue to function.  We were down to,

6    as I was informed at that time, $11 million when I took

7    office.  That's a disastrously low with a city with our

8    spending plan.

9             So actually my focus was on what were we going

10   to do to more put our expenditures in line with our

11   revenues and build our reserves to put us on more solid

12   financial footing.  At the rate we were burning money,

13   we were averaging about $50,000 a day more in

14   expenditures than we were taking in in revenues.  We

15   don't get revenues in on a straight line projection.

16   They come at different periods when the sales tax

17   receipts are sent, transmitted by the Board of

18   Equalization, when property tax receipts are sent in by

19   the County.  But since we don't get them in a straight

20   line you can only estimate, and our estimate was that

21   within six to eight months we would be cash flow

22   bankrupt, meaning we would not make payroll.

23             From a balance sheet perspective we owed the

24   employees -- and this is my recollection -- somewhere in

25   the order of 13 to $14 million in accrued vacation and

James T. Butts
July 18, 2016                                                     26

1    sick leaves.  Of course we're fortunate we wouldn't have
2    to pay all those out because everybody would have to
3    leave, but from a balance sheet perspective we owed the
4    employees more than what we had in the bank in reserves.
5            So actually, no, the CHRP grant was not the
6    thing that was on my mind.  What was on my mind was how
7    we were going to stabilize our finances, reduce our
8    expenditures but maintain services.  And so that was
9    what was on my mind when I took office.
10       Q.    And did you come to learn sometime in June of
11   2011 that at that time Captain Martin Sissac was
12   involved in the CHRP grant in some kind of capacity?
13           MS. GOLDSMITH:  What's the date again, Counsel?
14           MR. AVRAHAMY:  June of 2011.
15           THE WITNESS:  I wouldn't know what date I
16   became aware that he was involved.
17   BY MR. AVRAHAMY:
18       Q.    Okay.  At some point did you learn that Martin
19   Sissac was involved somehow with the CHRP grant?
20       A.    I did.
21       Q.    And what was your understanding of Martin
22   Sissac's involvement with the CHRP grant?
23       A.    Well, actually, the first information I had
24   about the CHRP grant was from Mr. Fields, who had been a
25   City Manager in Salinas before he came here, and he

**EXHIBIT C**

James T. Butts
July 18, 2016                                                                    27

```
 1   advised me, you know -- we talked about -- I may have

 2   talked about the CHRP grant with Mark Weinberg, I'm not

 3   certain, but one of the two City Managers, you know, we

 4   discussed it and it was clear we didn't have the $25,000

 5   match and we had contemplated let the grant go back.

 6   But Mr. Fields had experience in Salinas where they had

 7   been allowed to turn the hiring grant into a retention

 8   grant.  And so that was my first real ah-ha moment

 9   about, you know, that this is an opportunity to maintain

10   the strength of the police department because without

11   that, all options had to be on the table to prevent this

12   cash flow bankruptcy, and one of those was to reduce the

13   size of the police department.  And it was at that time

14   that I became aware that Marty Sissac, who I believe was

15   in Administrative Services, I can't be certain, you

16   know, had been involved in some of the paperwork as it

17   related to the application for the CHRP grant.

18        Q.    Okay.

19             MS. GOLDSMITH:  And there is just one thing I

20   wanted to clarify.  You had said that you had to

21   contribute 25,000 to the CHRP.

22             THE WITNESS:  A match.

23             MS. GOLDSMITH:  Did you mean $25,000 or 25 --

24             THE WITNESS:  25 percent.

25             MS. GOLDSMITH:  Percent, not thousand.
```

**EXHIBIT C**

James T. Butts
July 18, 2016                                                    33

1          MR. AVRAHAMY:  Yes.

2          MS. GOLDSMITH:  That budget would have been

3     2009-2010 for the projected year, but I'll let you ask

4     the questions.

5          MR. AVRAHAMY:  Thank you.

6          MS. GOLDSMITH:  Assumes facts not in evidence.

7     BY MR. AVRAHAMY:

8          Q.  Okay.  The workforce reduction plan that was in

9     effect when you became Mayor in February 1st of 2011,

10    were you aware if there were any sworn officers that had

11    to be laid off in the workforce reduction plan that had

12    been in place when you took office?

13         A.  I was aware that there were positions in the

14    police department that I believe were unfilled, I'm not

15    certain, that were removed from the table of

16    organization for the City and no longer funded.  That

17    also occurred in, I believe, in 2008-2009 as well, there

18    were reductions in the size of the police department.

19         Q.  Were there any layoffs of sworn officers in the

20    previous -- in the 2009-2010 fiscal year?

21         A.  I'm not certain.

22         Q.  Were there any plans for layoff of officers in

23    the 2010 workforce reduction?

24         A.  I don't recall.

25         Q.  I'll label as Plaintiff's Exhibit 2 the

**EXHIBIT C**

James T. Butts
July 18, 2016                                                    35

1    happened?  No, it does not.

2        Q.    Okay.

3        A.    Okay.  I accept your document, but no, it

4    doesn't refresh my recollection.  I'm not -- I'm not

5    doubting this, but there is a lot of things have

6    happened over the last five years.

7        Q.    And that's fine and that's -- yeah, I'll try to

8    rephrase it.

9        A.    Yeah.

10       Q.    Are you aware if -- when you became Mayor if

11   there were at any time as a result of the fiscal crisis

12   there were any sworn police officers that had to be laid

13   off as a result of the budgetary crisis?

14       A.    Absolutely, yes.

15       Q.    Okay.  And again, as of February of 2011, what

16   is your understanding of any police officers that had to

17   be laid off?

18       A.    As we went through the range of options that we

19   would have to look at to stabilize our finances, to

20   reduce the crushing operating deficit that would

21   manifest itself, in my estimation, with cash flow

22   bankruptcy, by the end of that fiscal year, that one of

23   the options that we had to consider was to lay off

24   police officers.  And we did in fact note -- provide

25   notice to I believe eight police officers that they

James T. Butts
July 18, 2016                                             46

```
 1    Weinberg, and Martin Sissac, where there was a
 2    discussion about the CHRP grant?
 3         A.   I don't remember the specifics of who was
 4    there, but I do remember a discussion of the CHRP grant.
 5         Q.   Do you remember Martin Sissac attending that
 6    meeting?
 7         A.   I think so.
 8         Q.   And is it then that you requested to see how
 9    the CHRP grant could be used by the City?
10         A.   I don't recall the meeting so I -- I mean I
11    remember generally a meeting to talk about the CHRP
12    grant but I don't remember the specifics of it.
13         Q.   Okay.  Do you remember anything about the
14    meeting?
15         A.   I do not.
16         Q.   Was it at that meeting that Artie Fields stated
17    that in his prior position or experience with the City
18    of Salinas he had modified the CHRP grant from one of
19    hiring new police officers to retaining police officers?
20         A.   I don't specifically remember if it was at that
21    meeting.
22         Q.   Okay.  But do you recall him making that
23    statement, I believe, is what you indicated?
24         A.   I recall him making that statement to me that,
25    you know, this is something they had done in Salinas.  I
```

**EXHIBIT C**

James T. Butts
July 18, 2016                                                     48

1    BY MR. AVRAHAMY:

2        Q.   Okay.  Did you have an understanding of why

3    Mr. Sissac felt that the manner that it was suggested

4    to -- well, let me -- let me reask it so I don't put any

5    words in your mouth.

6        A.   Okay.

7        Q.   Did you have any -- did you have an

8    understanding that Martin Sissac believed that the way

9    that it was suggested to modify the CHRP grant from

10   hiring new officers to retaining officers could not be

11   done?

12       A.   Actually, this is my recollection.

13       Q.   Okay.

14       A.   That he felt that it could not be turned into a

15   retention grant.  Okay?  And as the Mayor my job was to

16   ask questions, and that was oversimplified.  Of course

17   you can't take a hiring grant and unilaterally turn it

18   into a retention grant.  You would have to have

19   authorization from the granting authority and it would

20   have to fall in line with whatever parameters they

21   suggested.  And so I sought to find out or have people

22   find out is such a thing possible if we are forced to

23   lay off police officers, which we intended to do, could

24   this be accomplished, would there at least be a chance

25   that it could be turned into a retention grant.

James T. Butts
July 18, 2016                                                    54

1    BY MR. AVRAHAMY:

2        Q.   Okay.

3        A.   I recall that that was part of the rubric of

4    our discussions about this grant becoming a retention

5    grant as a requirement that it could not be a

6    supplanting of intended funding that was going to be

7    used for police officers now substituted with the CHRP

8    grant as a retention grant.  But as far as Mr. Sissac's

9    involvement, that I don't recall.

10       Q.   Okay.  After the modification request was

11   denied by the -- by the federal government, I believe

12   Department of Justice --

13       A.   Uh-huh.

14       Q.   -- were you involved in any meetings of how to

15   reapply for the CHRP grant?

16       A.   I was.

17       Q.   And who did you meet with to discuss the --

18       A.   I went to Washington, met with the director of

19   the Community Oriented Policing program, met with his

20   No. 2 person and received, you know, guidelines that

21   they absolutely were interested in allowing us to, you

22   know, use this as a retention mechanism if we were going

23   to lay off officers and we followed their guidelines.

24       Q.   Okay.  And who did you meet with in Washington?

25       A.   I don't remember the name of the No. 2 person.

**EXHIBIT C**

James T. Butts
July 18, 2016                                                          56

```
1              THE REPORTER:  For what?

2              THE WITNESS:  FAA funding, Federal Aviation

3    Administration funding for our residential sound

4    insulation program, to seek a TIGER grant, which is a

5    transportation grant for a grade separation for one of

6    our proposed Metro train sites, and to be clear,

7    personally clear that any application that we made for a

8    modification of the CHRP hiring grant to a retention

9    grant was done in a lawful and proper manner so that I

10   didn't depend on my staff's interpretation of what could

11   and could not be done, so that I would know personally

12   we were doing the proper thing, and I received that

13   information.

14   BY MR. AVRAHAMY:

15       Q.   Do you recall when you went to Washington to

16   receive that -- to discuss these matters?

17       A.   I do not, but it was before, you know, we made

18   the final application.

19       Q.   Do you recall going to Washington on

20   October 4th of 2011?

21       A.   I don't recall when it was.  I know that it was

22   before our final application was made.

23              MR. AVRAHAMY:  Can we just take a second break?

24   I think there is an exhibit that I left in my office.

25              MS. GOLDSMITH:  Sure.  Of course.
```

**EXHIBIT C**

James T. Butts
July 18, 2016                                                    61

```
 1        Q.   Okay.   Did you ever find out that Captain
 2    Sissac maintained that the manner that the City was
 3    modifying the CHRP grant to secure the $3 million funds
 4    was done unlawfully?
 5        A.   No.
 6             MS. GOLDSMITH:  Objection.  Vague and ambiguous
 7    as to secure.  They were already ours.
 8             THE WITNESS:  Okay.
 9             MS. GOLDSMITH:  Vague and ambiguous as to time.
10             THE WITNESS:  Right.  But no, I didn't receive
11    information that Martin Sissac -- I don't know what time
12    period are you talking about but if you're talking about
13    after the retention grant was allowed, do I have any
14    knowledge that he still had objection, no.
15    BY MR. AVRAHAMY:
16        Q.   Okay.
17        A.   And let me rephrase that.  Initially the
18    only -- I didn't even take it that he had objection,
19    that he felt that it could not -- the only meeting I
20    recall him being there, he felt that it could not,
21    contrary to Mr. Fields' experience, he felt that it
22    could not be turned into a retention grant, but he was
23    proven to be wrong.
24        Q.   Okay.  And as --
25        A.   Completely wrong, I might add.
```

James T. Butts
July 18, 2016                                        65

1        MS. GOLDSMITH:  Objection.  Asked and answered.

2        You can answer again.

3        THE WITNESS:  That was never discussed and

4   there would be no need to discuss such a minor

5   reassignment of duties, if indeed they occurred.  That's

6   nothing that would be brought to the Mayor's attention.

7   BY MR. AVRAHAMY:

8        Q.   Did you ever -- at the time in October of 2011

9   who was the City Attorney?  Was that Cal Sanders?

10       A.   It was.

11       Q.   Okay.  Were you ever notified that Captain

12   Sissac met with Cal Sanders to advise him that he

13   believed that the manner that the CHRP grant was being

14   modified or used was not lawful?

15       A.   I was not.

16       Q.   Were you aware that Mr. Sissac met with anyone

17   to inform them that he believed that the manner that the

18   CHRP modification was going to take place was not

19   lawful?

20       A.   No, I was not.

21       Q.   Did you ever learn that Mr. Sissac expressed

22   that because the department was laying off police

23   officers for the CHRP grant, that that made it an

24   unlawful use of the CHRP grant?

25       MS. GOLDSMITH:  Objection to the extent it

**EXHIBIT C**

James T. Butts
July 18, 2016                                          83

1       A.    His son Kevin, Jr., was killed, I think in

2   2010, in a drive-by shooting on 118th Street.

3       Q.    And there is an ongoing investigation about the

4   matter?

5       A.    There is.

6       Q.    And do you know if Kevin Harris had a --

7   developed a relationship with Martin Sissac?

8       A.    No, I do not.

9       Q.    At any point do you recall telling Kevin Harris

10   that Martin Sissac had severe deficits in his

11   performance?

12       A.    No, I did not.

13       Q.    Do you recall Kevin Harris ever stating that

14   he -- that Martin Sissac was the only one that had

15   responded to his question about the investigation of his

16   son's murder?

17       A.    No.  And in fact he never said such a thing.

18   He's discussed with me -- Kevin Harris calls me, up

19   until recently, very frequently and he talked about the

20   investigators that have been kind to him, kept him

21   informed.  Whenever he feels that he's not getting

22   enough information he calls me, I call the Chief, say

23   could someone call Kevin.

24          So no, he has never expressed to me that Martin

25   Sissac is the only person that responds to him.  He has

**EXHIBIT C**

James T. Butts
July 18, 2016                                                89

```
 1    allegations related to him improperly retrieving an
 2    e-mail?
 3        A.   No, I did not.  Well, that's excluding
 4    attorney-client privileged communications.
 5        Q.   Okay.  Thank you for that.  Yes.
 6             MS. GOLDSMITH:  Right.
 7    BY MR. AVRAHAMY:
 8        Q.   But in no conversations with Martin -- excuse
 9    me, with Mark Fronterotta, with Chief Fronterotta,
10    excuse me, did he advise you that he was going to be
11    recommending termination for Martin Sissac for
12    allegations related to him retrieving an e-mail?
13        A.   No, I did not.
14        Q.   Were you aware that Martin Sissac was served
15    with a written reprimand for failure to attend a
16    training seminar by Chief Fronterotta?
17        A.   No, I did not.  I was not aware.
18        Q.   Okay.  Were you aware that Martin Sissac
19    retrieved an e-mail which showed Mark Fronterotta that
20    the written reprimand was beyond the one-year statute of
21    limitations?
22        A.   No.
23        Q.   And you're not aware that Martin Sissac ended
24    up being served Notice of Termination as a result of
25    retrieving that e-mail; correct?
```

**EXHIBIT C**

Mark Fronterotta
July 15, 2016

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION


MARTIN SISSAC,                         CERTIFIED ORIGINAL
            Plaintiff,

      vs.                              Case No.
                                       2:15-CV-01741-JAK-FFM
CITY OF INGLEWOOD; MAYOR JAMES
BUTTS; CHIEF OF POLICE MARK
FRONTEROTTA AND DOES 1 THROUGH
10, INCLUSIVE,
            Defendants.
_____


VIDEOTAPED DEPOSITION OF

MARK FRONTEROTTA



Friday, July 15, 2016

10:11 a.m. - 5:36 p.m.


16530 Ventura Boulevard, Suite 208

Encino, California




REPORTED BY:

Jean F. Holliday

CSR No. 4535, RPR, CRR

Mark Fronterotta
July 15, 2016                                                    28

1          MS. GOLDSMITH:  Vague and ambiguous as to time.

2   You're still referring to the January 2009 to

3   January 2011 --

4          MR. AVRAHAMY:  Yes.

5          MS. GOLDSMITH:  -- time period?

6          THE WITNESS:  No.

7   BY MR. AVRAHAMY:

8      Q.   At a certain point in the summer of 2011 did

9   you become aware that Martin Sissac expressed his

10  opinion that the manner that the Mayor wanted to modify

11  the CHRP was not legal?

12     A.   I'm sorry.  The time frame again?

13     Q.   Summer of 2011.

14     A.   No.

15     Q.   In the summer of 2011 was Martin Sissac still

16  in charge of the Administrative Bureau?

17     A.   I believe so, yes.

18     Q.   And at that time the Administrative Bureau

19  oversaw the finance department?

20         MS. GOLDSMITH:  Objection.  Vague and ambiguous

21  as to "finance department."  The City has a finance

22  department.

23  BY MR. AVRAHAMY:

24     Q.   Okay.  Let me ask it this way:  In 2011 do you

25  recall what was under the Administrative Bureau?

Mark Fronterotta
July 15, 2016                                    40

1    press that he was going to figure out a way to get the

2    CHRP funds?

3        A.    No.

4        Q.    When did you become aware, or if you became

5    aware, that Martin Sissac expressed concern about the

6    manner that the City was going to be modifying the CHRP?

7            MS. GOLDSMITH:   Objection to the extent it

8    calls for an attorney-client privilege.

9            So excluding any conversations you had with me,

10   did you ever become aware of that?

11           THE WITNESS:   Not specifically, no.

12   BY MR. AVRAHAMY:

13       Q.    At any point did you become aware that Martin

14   Sissac raised concerns about that the manner that the

15   City was going to be modifying the CHRP was not legal?

16       A.    No, not that I recall.

17       Q.    You never heard of that, besides any

18   conversations with your counsel; is that correct?

19       A.    Not that I recall.

20       Q.    And you never saw that in any grievances

21   written by Martin Sissac at any point?

22       A.    I don't recall seeing that in a grievance.

23       Q.    Do you ever recall Martin Sissac stating in any

24   grievance that he was being retaliated against because

25   of his opposition to the manner that the City was going

Mark Fronterotta
July 15, 2016                                46

1    BY MR. AVRAHAMY:

2         Q.   There was a separate police budget from the

3    City budget; is that correct?

4         A.   Correct.

5         Q.   And did you ever hear that there were deficits

6    in the police budget as opposed to the City budget?

7         A.   Deficits, no.

8         Q.   So what is it that you heard about the police

9    budget in reference to this period?

10        A.   What little I knew about the budget in those

11   days, it was more about that we would need to make cuts,

12   maybe reel in some of our expenditures, specifically I

13   recall in overtime expenditures, you know, those

14   belt-tightening measures that would have to be done at a

15   time when the overall City budget was in dire straits or

16   stress.

17        Q.   You then engaged or participated in a meeting

18   with Chief Seabrooks and the eight police officers

19   sometime in early October of 2011; is that correct?

20        A.   I did.  I'm not specific on the date, but yes,

21   I did.

22        Q.   And what do you recall about that meeting?

23        A.   Well, the eight officers, they were our newest

24   or least seniority police officers were called into the

25   Chief's conference room.  The Chief called me prior to

Mark Fronterotta
July 15, 2016
47

1   that and asked me to be there, and they were ultimately

2   served with notices that they would be laid off at a

3   specific date.

4       Q.   At any point during the meeting do you recall

5   the Chief advising them that they were not really going

6   to be laying them off and that they needed to do this in

7   order to secure CHRP grant funds?

8       A.   No.

9       Q.   What was the reaction of these eight police

10  officers?

11      A.   Very emotional.   There was even -- I would even

12  describe one or two's eyes welled up.   I believe one of

13  them asked them if -- asked Chief Seabrooks if the

14  department would assist them in future employment in all

15  likely other agencies.

16      Q.   These officers were not laid off; correct?

17      A.   No.

18      Q.   And do you recall how -- and why were they not

19  laid off?

20      A.   I don't know specifically.   I shouldn't assume

21  but I have to assume we somehow were able to manage

22  something, something in the budget.

23      Q.   Do you know that they were not laid off as a

24  result of being able to secure the CHRP modification

25  grant?

Mark Fronterotta
July 15, 2016                                                   101

1    depending on what it is, how egregious it is and all

2    that.   And then if that doesn't -- either it's either in

3    writing, you know, or there may be some interaction.

4    And then at some point if that does not resolve the

5    issue then it's going to be elevated up into human

6    resources and they will further, you know, review that

7    issue or what have you.

8        Q.   Are grievances generally investigated?

9            MS. GOLDSMITH:   Objection.   Overbroad.   Vague

10   and ambiguous.

11           THE WITNESS:   It could, because if an employee

12   raises some issues that may -- we may not, you know, in

13   the process may not have known about or aware of and we

14   need to go back and look at and see if in fact what that

15   employee has raised, that issue, that point, are they

16   correct, are they off base or whatever, because that

17   could impact the outcome of it.

18   BY MR. AVRAHAMY:

19       Q.   Now, does the department have any policies with

20   regards to retaliation?

21       A.   Sure.   Yes.

22       Q.   And what's your understanding of what the

23   policy is regarding retaliation?

24       A.   Well, it's forbidden.   You know, it's not

25   acceptable.   It's a policy violation.   I mean it just --

Mark Fronterotta
July 15, 2016

153

1    Lieutenant Kirk, showing the people that were -- had

2    missed the days?

3        A.   Yes, I believe so, yes.

4        Q.   Okay.  And once he showed you that e-mail, what

5    did you do with that written reprimand?

6        A.   Well, I needed to look at it and then, you

7    know, determine if, you know, the dates -- I was looking

8    at it strictly from dates at that point because if he

9    was correct, then yeah, we had a procedural mistake as

10   it related to the one-year statutory compliance, POBAR,

11   and that would overturn the discipline.

12       Q.   You didn't want to violate POBAR by giving him

13   a written reprimand that was not timely; correct?

14       A.   No.

15       Q.   Okay.

16       A.   It wasn't my intent.

17       MS. GOLDSMITH:  Hold on a sec.  You said

18   "correct?" and he answered "No," so we had a double

19   negative again.

20       THE WITNESS:  It was -- no, I don't violate

21   POBAR.  It was not my intent.

22   BY MR. AVRAHAMY:

23       Q.   Okay.  You believed it was timely and then he

24   showed you that it was not timely, and then what did you

25   do with the written reprimand?

Mark Fronterotta
July 15, 2016                                                                 154

1          A.    Well, at that point I, you know, reviewed it

2     and then based on what he had given to me I was looking

3     at that point in time just clearly as dates and yeah,

4     clearly we were -- we mistook the dates is what

5     happened.  My IA lieutenant just gave me a wrong date,

6     and so we were clearly out of -- out of the statutory

7     compliance.  At that point I realized it and then I

8     overturned the discipline.

9          Q.    Now, once you overturned the discipline did the

10    written reprimand remain in his personnel file?

11         A.    The paperwork did, yes.

12         Q.    And what is the policy and procedure once a

13    written reprimand is rescinded or withdrawn?

14         A.    Well, we just house it in the Internal Affairs

15    files and, you know, and five, five and a half years we

16    conduct, you know, purges, in the time frame of five,

17    five and a half years, and they are purged eventually.

18         Q.    Well, if a written reprimand is withdrawn, why

19    does it remain in -- well, if the written reprimand that

20    you gave to Captain Sissac was withdrawn, why did it

21    remain in his personnel file?

22              MS. GOLDSMITH:  Objection.  Calls for legal

23    opinion.

24              If you know you can answer.

25              THE WITNESS:  Well, that is our practice to --

**EXHIBIT D**

Mark Fronterotta
July 15, 2016

155

1   to -- you know, maintain these records.  We don't

2   destroy records without, you know, official approval,

3   usually it takes City -- you know, purging process

4   through City Council or a court order or something like

5   that.  We just -- that's -- that's a -- that's a

6   dangerous area for us, I think even law firms and

7   everybody, you just don't summarily just destroy

8   records.

9   BY MR. AVRAHAMY:

10      Q.   Now, does the department have an e-mail policy

11   in place?

12      A.   There is an e-mail policy that's covered by --

13   citywide, it encompasses the department, yes.

14      Q.   And if a -- somebody at a captain level wants

15   to retrieve an old e-mail, does he have the ability to

16   go to the IT department to try to retrieve an old

17   e-mail, of a subordinate?

18           MS. GOLDSMITH:  Thank you.  Objection.  Vague

19   and ambiguous regarding to whom and for what purpose.

20           But you can answer.

21           THE WITNESS:  Yeah, I was going to say, there

22   is a lot involved there.  Depends the reason.  It can't

23   be a fishing expedition.  Can't be for their own

24   self-purpose or self-furtherance of whatever they are

25   doing, unless it's their own, I guess, you know, they

Mark Fronterotta
July 15, 2016                                      243

1              THE VIDEOGRAPHER:   We are now off the record.

2     The time is 5:24 p.m.

3              (Recess)

4              THE VIDEOGRAPHER:   We are now back on the

5     record.   The time is 5:27 p.m.

6     BY MR. AVRAHAMY:

7         Q.   Chief, before you decided to terminate Martin

8     Sissac for these matters that we've been discussing, did

9     you have any discussions with Mayor Butts about the

10    matter?

11             MS. GOLDSMITH:   What matter?

12    BY MR. AVRAHAMY:

13        Q.   About your decision to terminate Mr. Sissac.

14        A.   No, not that I recall.

15        Q.   Did you -- when was the last time -- well, at

16    any time between his return from the school district to

17    the time that he was terminated do you recall any

18    conversation that you had with Mayor Butts about Martin

19    Sissac?

20        A.   I'm trying to think if I had -- maybe one or a

21    couple -- maybe -- I don't remember anything

22    specifically but nothing real heavy.  No, I don't, not

23    specific to Mr. Sissac.

24        Q.   Okay.  When you received the lawsuit and you

25    saw that you and Mayor Butts were named in it, did you

Michael Falkow
July 22, 2016

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

MARTIN SISSAC,

        Plaintiff,

vs.                                    Case No.: 2:15-CV-01741-JAK-FFM

CITY OF INGLEWOOD; MAYOR
JAMES T. BUTTS; CHIEF OF
POLICE MARK FRONTEROTTA,
and DOES 1 through 10,
Inclusive,

        Defendants.

_____

DEPOSITION OF

MICHAEL FALKOW

Friday, July 22, 2016

10:10 a.m.

Law Offices of Joseph Y. Avrahamy

16530 Ventura Boulevard, Suite 208

Encino, California

REPORTED BY:

Julee Sokol

CSR No. 11319

EXHIBIT E

Michael Falkow
July 22, 2016                                                        22

1    that I had that there was a problem.  And I directed him to

2    the City Attorney at the time.

3         Q    And that would have been Cal Sanders at the time?

4         A    Cal Sanders.  That's correct.

5         Q    And what did Martin Sissac express to you in your

6    initial conversation with him about his concerns about the

7    CHRP grant?

8         A    His initial concerns were that the CHRP grant was

9    very restrictive in terms of how federal funds can be utilized

10   by a local government.

11        And that they may not be supplant -- they may not be

12   used to supplant local government funds.

13        And the contention is that the City somehow made it

14   happen such that we could take advantage of these funds in

15   violation of these particular rules and guidelines.

16        That is what he contended.

17        Q    And when he came to you and contended that, you told

18   him that he should speak to Cal Sanders about that?

19        A    Yes.

20        Q    And do you know one way or the other if he spoke to

21   Cal Sanders?

22        A    I believe, yes, he did.

23        Q    And how did you find out he spoke to Cal Sanders

24   about that?

25        A    Because I took him there.

Michael Falkow
July 22, 2016                                                    39

```
 1   meet and confer over impact and so forth.

 2           It's typically a last resort that you would lay off

 3   sworn.

 4       Q   Why is that?

 5       A   Because there is the perspective that public safety

 6   is one of the most important things in a community.

 7           And I've done several workforce reductions at the

 8   City.  So if you want to show me specific documents, I can

 9   probably tell you exactly what occurred when and what the

10   process was behind it.

11       Q   How many -- how many work reductions plans have you

12   been involved in?

13       A   At least three or four.

14       Q   And in those three or four work reduction plans,

15   have you ever had to lay off sworn officers?

16       A   Yes.

17       Q   And when do you recall having to lay off sworn

18   officers?

19       A   I believe it was the fiscal year '10/'11.  I believe

20   we had eight sworn that were filled and then there were a

21   number of vacancies also.

22           The intent is to always try to eliminate vacancies

23   first, any -- whether it's sworn or not.  I mean we always

24   refer to it as a warm body.  The Council would prefer you not

25   lay off a warm body if you have a vacancy.
```

EXHIBIT 1    SUPPORT
(800) 993-4464

Michael Falkow
July 22, 2016

40

1          Some of our MOU's require us to eliminate vacancies

2   before you can eliminate an actual warm body in a position.

3          And then there is a whole host of processes that go

4   along with a lay off because certain people with certain

5   levels of seniority may be able to bump other employees, maybe

6   even in different departments and different classifications if

7   they held that before.

8          In the sworn ranks it's very simple because if you

9   were to eliminate, say, a sergeant, by default the sergeant

10  has more seniority then everyone below him that has less

11  seniority.

12         You have a scenario where all of those positions are

13  in a series unlike perhaps in Public Works, you know, an

14  engineer is not the same as, you know, a secretary.  So you

15  wouldn't have an issue with that because that's not in a

16  series.

17         But in the sworn ranks if you were to eliminate a

18  higher ranking person that has a lot of seniority, they would

19  simply bump down to the next rank or the next level and

20  ultimately it would be a trickle down effect and you would

21  have the bottom person -- the newest officer you brought in

22  would be the one that was laid off.

23         So, typically, you would eliminate a vacancy if

24  there is one at a -- at a higher level.  And then whatever is

25  left that you have to eliminate, then you simply go to the

Michael Falkow
July 22, 2016                                                                    44

```
 1    gap-closure measure, to close the gap, to close that deficit,

 2    I'm recommending the freezing of these "X" positions to shrink

 3    the amount of money that we will expend so that it equals the

 4    amount of money that we receive.  Thus having a balanced

 5    budget.

 6              Should something change, Council, and we somehow get

 7    more revenues, then perhaps you will allow us to unfreeze the

 8    position.  The difference being we don't then have to go back

 9    and do a budget amendment and do all the things I described

10    prior.

11       Q    Do you recall when the plan to lay off police

12    officers in 2011 first came about?

13       A    We -- because of our budget crisis that we had.

14    Sure.  We had a 18 point -- we started with in April of 2010

15    with I believe a $13.4 million or 13.1 -- I don't recall

16    without looking at the documents -- million dollar deficit,

17    which means our expenditures exceeded our revenues by

18    $13 million.  More than $13 million.

19              And as a result, we were declining rapidly, and by

20    the time we got to the end of our fiscal year, which we're on

21    an October 1, September 30 fiscal year.

22              So by -- by the end of September we projected an

23    $18.6 million shortfall, which was dramatic beyond

24    comprehension.  So we had no choice but to recommend to the

25    Council a very significant workforce reduction.  We were also
```

Michael Falkow
July 22, 2016                                                                          45

```
 1   on furlough.

 2        Q   And this shortfall, was that an overall City budget

 3   shortfall?

 4        A   When we talk about the shortfall, we're talking

 5   about the General Fund.  The difference between the General

 6   Fund is that everything that is non-restrictive versus

 7   anything that might be restrictive like, you know, funds being

 8   received by Proposition.  Funds we receive by granting source.

 9   Or funds that we might receive from another agency, county, or

10   state that's -- that's specifically earmarked, like HUD funds,

11   or residential sound insulation funds.

12             Those are very restrictive use.  You can only use

13   for that particular purpose or that department versus General

14   Fund you can use for basically any of your operations.

15   Salary, benefits.  And you can even use it for the granting

16   funds as well.

17        Q   And do you recall how it was determined that there

18   would be eight sworn officers that needed to be laid off as

19   opposed to ten or five or why -- why that number?

20        A   That was the least number of sworn officers that we

21   wanted to reduce to try to get the budget back to a balanced

22   stage and we reduced, you know, many, many other positions.

23             I don't even recall but I believe it was somewhere

24   in the neighborhood of 120-plus positions both filled and

25   vacant.
```

Michael Falkow
July 22, 2016

46

1    Q    And prior to laying off officers in 2011, was -- did

2    you insure that all vacant positions would first be

3    eliminated?

4    A    We would either freeze them or we would eliminate

5    them.  Remember, the difference is important.

6         If you eliminate a position from your budget, then

7    you -- it's very difficult to come back and get that position

8    put back in.  It's much easier to have the position in the

9    budget just not funded.  Or have it in the budget and then

10   freeze it.  It's easier from a budgetary perspective and it's

11   also easier for the departments to operate that way.

12   Q    So you -- by freezing the position, you still have

13   to, at least as far as the budget is concerned, show an

14   allocation towards that position; is that correct?

15   MS. GOLDSMITH:  Objection.  Misstates his testimony.

16   THE WITNESS:  That's not what I said.

17   MS. GOLDSMITH:  Okay.  Hold on.  The answer is no.

18   THE WITNESS:  Okay.

19   MS. GOLDSMITH:  Ask the next question.

20   THE WITNESS:  Sorry.

21   Q    BY MR. AVRAHAMY:  Okay.  In the budget for a frozen

22   budget, does the budget still need to allocate funds on paper

23   towards those positions?

24   A    It shows the position itself in the budget, but it

25   does not provide for expenditure capability.  In other words,

Michael Falkow
July 22, 2016

47

1   you can't -- you can't fill the position because there is no

2   money allocated to it.  It's been frozen without some form of

3   action taken like the City Manager asking -- and we ask the

4   Council, yes, you can unfreeze that position.

5        Q   Was the -- do you know in -- going back -- I know

6   it's a few years ago -- if the proposal to lay off officers

7   occurred before Artie Fields became City Manager or after

8   Artie Fields became City Manager?

9        A   Artie Fields became the City Manager on July 18th,

10  2011.  We were not working on a workforce reduction I don't

11  think until after he started.

12       So I believe he had -- he had started -- it could

13  have been within weeks or a month because we -- he literally

14  came in less than three months away from us needing to produce

15  a budget.  And it was, obviously, going to be a very difficult

16  time given the financial situation.

17       Q   And --

18       A   As a matter of fact, let me also tell you that just

19  prior to his arrival, we had concluded negotiations with our

20  bargaining groups and implemented a 10 percent furlough across

21  all units and ultimately closed City Hall to -- for civilians

22  on the Fridays that we used to work.

23       We're on a 9/80 schedule, which means we work every

24  other Friday and one Friday is a regular day off.  We work

25  nine hours, Monday through Thursday, and then the alternating

EXHIBIT 1
PAGE SUPPORT
(800) 993-4464

Michael Falkow
July 22, 2016

58

1          MR. AVRAHAMY:  No.  He didn't respond.  So we wouldn't

2    get into that.

3          THE WITNESS:  I wasn't sure if he was going to ask open

4    session or closed session.

5          MS. GOLDSMITH:  Right.

6          Q    BY MR. AVRAHAMY:  Well, let me ask that in the open

7    session --

8          A    No.

9          Q    -- did you --

10         MS. GOLDSMITH:  Hold on.  Let him ask the whole

11   question.

12         THE WITNESS:  I apologize.

13         Q    BY MR. AVRAHAMY:  Okay.  It is it your testimony

14   that in open session there was no discussion about Martin

15   Sissac's concerns with the modification of the CHRP grant?

16         A    There was nothing in open session.  Correct.

17         Q    Okay.  When was the first time that you recall

18   having a conversation with Mayor Butts about Martin Sissac's

19   concerns about the CHRP grant?

20         A    I recall having a conversation with him when I was

21   trying to -- I think I testified to this earlier this morning.

22   When I was trying to understand what the concern -- what was

23   the basis of the concern.

24         Because I had read about it and I didn't

25   understand -- remember.  I had testified to the fact that

EXHIBIT 9  LEGALE SUPPORT
(800) 993-4464

Michael Falkow
July 22, 2016

76

```
 1   says -- "in a budgeted position (existing personnel) and could
 2   not be the last eight hired being unauthorized and not in the
 3   budget, although, the" -- quote, unquote -- "'pink slip'
 4   employees they notified are the last hired.  The whole pink
 5   slip issue seems to be a priority with the feds, so I would
 6   think the unauthorized status at some point will be an issue
 7   with them, correct?"
 8           Do you have an understanding of what is being -- of
 9   that statement?
10       A   Part of it, I do.
11       Q   Okay.  Let me -- let me ask you.
12           The -- first of all, the eight 514's, what is "514"?
13       A   "514" is a classification code for a police officer.
14       Q   Okay.  And it says, "moved from 4550 to 4578."
15           What is that?
16       A   That would be a reference to the budget line item
17   4550 versus the budget line item for 4578.  Usually that is a
18   division within a department.
19       Q   Okay.
20       A   And I would have to look at the police budget to
21   give you an exact answer as to what they reference.
22       Q   That's fine.
23           And it says it has to be, "in a budgeted position
24   (existing personnel) and could not be the last eight hired
25   being unauthorized and not in the budget."
```

Michael Falkow
July 22, 2016

192

```
 1    can wrap up our questioning.

 2                 (Off the record from

 3              4:02 p.m. to 4:04 p.m.)

 4         MR. AVRAHAMY:  Back on the record.

 5              I have no further questions.

 6         MS. GOLDSMITH:  Thank you.  I have some clarifying

 7    questions for this witness.

 8

 9                       EXAMINATION

10    BY MS. GOLDSMITH:

11         Q    Did Mayor Butts ever tell you that he was out to get

12    Marty Sissac or words that that effect?

13         A    No.

14         Q    Did the Chief of Police, Chief Seabrooks, ever tell

15    you that she was out to get Marty Sissac or words that that

16    effect?

17         A    No.

18         Q    Did Chief Fronterotta ever tell you that he was out

19    to get Marty Sissac or words to that effect?

20         A    No.

21         Q    Did you ever say or tell to Mayor Butts that Martin

22    Sissac was claiming retaliation against the City?

23         A    No.

24         Q    Did you ever say or tell Mayor Butts that Martin

25    Sissac was claiming that he was being retaliated against
```

Michael Falkow
July 22, 2016

193

1    because of his concern regarding the CHRP grant funding?

2        A    No.

3        Q    Did Mayor Butts and you discuss originally the

4    concerns that Martin raised concerning how to modify the CHRP

5    grant?

6        A    Yes.

7        Q    And did you tell the Mayor your opinion regarding

8    the modification of the CHRP grant?

9        A    Yes.

10       Q    What did you tell the Mayor?

11       A    I told the Mayor that my understanding of the CHRP

12   grant, like all federal and state and local, you know,

13   non-Inglewood funding sources, had guidelines.

14            And that I had looked up the guidelines and that the

15   guidelines were very specific based on what I had come up with

16   in terms of what monies could be used and how the monies could

17   used and what the guidelines for their use.

18            The issue at hand --

19       Q    Hold on.   Okay.

20            Do you remember saying anything else to the Mayor at

21   that time?

22       A    Yes.

23       Q    Okay.   What else did you tell the Mayor?

24       A    That I believed the concern over the concept of

25   supplanting funds was not an issue because the way the

Michael Falkow
July 22, 2016
195

1    Q    Okay.  At any time did you tell Chief Fronterotta

2    that Martin Sissac was claiming retaliation against him?

3    A    No.

4    Q    At any time did you tell Chief Fronterotta that

5    Martin Sissac was claiming that he was being retaliated

6    against because he had concerns over the CHRP grant?

7    A    No.

8    Q    You heard from Martin Sissac directly that he had

9    concerns regarding the CHRP grant; correct?

10   A    Yes.

11   Q    Was that based on the information that you read,

12   learned about, asked about, at that time was that a reasonable

13   belief for Martin Sissac to have?

14   A    I don't think so.

15   Q    What is your experience with grants?

16   A    I have -- I have quite a bit of experience with

17   grants both administering them, receiving them, going to

18   Council and asking for permission to apply for grants.

19        I have applied for grants on behalf of the City.  I

20   would say I understand grants fairly well both from a granting

21   source as well as the utilization and the guidelines of them.

22   Q    Are you aware if Martin Sissac has municipal finance

23   experience?

24   A    I don't know.

25   Q    Why do you believe it was unreasonable for Martin

Michael Falkow
July 22, 2016                                            197

1          Q    Did he have a concern that he expressed to you that

2     he thought the way the City was going to use the funds was

3     supplanting City funds?

4          A    Yes.  He believed that.

5          Q    And based on your knowledge and experience with your

6     application of receiving and administering of grants, do you

7     understand the concept when it's in regards to grants

8     concerning the issue of supplanting?

9          A    Yes.  I do.

10         Q    And based upon your knowledge and extensive

11    experience in applying and receiving and administering grants,

12    what is your understanding of the word "supplanting" in

13    connection with municipal finance?

14         A    The term "supplanting" means to utilize federally

15    provided funds -- in this case we're talking about federal

16    funds -- to use federally provided funds in place of or in

17    lieu of available general funds.

18              That would be the term or definition of "supplant."

19              In the case of the CHRP grant, that would be a

20    violation of the guidelines provided by that grant.

21         Q    And so you and Mr. Sissac were on the same page that

22    the City could not supplant funds; correct?

23         A    Yes.

24         Q    Okay .  Was the difference between yours and

25    Mr. Sissac's opinion regarding whether or not the City was, in

Michael Falkow
July 22, 2016

198

```
1    fact, supplanting federal funds?

2         A    Yes.

3         Q    And the fact -- was the City supplanting funds?

4         A    No.

5         Q    And is that based on a financial understanding of

6    the City's condition or an interpretation of the CHRP grant?

7         A    Both.

8         Q    Okay.  So why was the City not supplanting funds?

9         A    The City of Inglewood at that time budgetarily was

10   approaching insolvency and had a budget deficit that was only

11   growing, which means that there were insufficient revenues

12   coming in to pay the expenses or expenditures that would be

13   expected to go out.

14               Therefore, you can't have -- it would be illogical

15   to draw a conclusion that you are supplanting available local

16   government funds if there is not even enough of them to go

17   around.

18               And, hence, we had a massive workforce reduction.

19   We had furloughs that we implemented across all bargaining

20   units in order to try to reduce the gap or deficit between

21   revenues and expenditures.

22               So any time you have a deficit, you, therefore,

23   don't have enough revenue, and it's within the City Council's

24   purview to determine what services or what maintenance and

25   operations or what infrastructure or any expenditure that the
```

Michael Falkow
July 22, 2016                                                          206

1    downturn, there was a report that was generated in April

2    of 2010 that, in essence, told the Council and the public that

3    we were thirteen plus million dollars upside down.

4           And in preparation for the 2010, 2011 budget, there

5    were significant gap closure measures that needed to take

6    place and the freezing of vacant sworn positions was clearly

7    one of them.

8        Q    So just so we're clear.

9           For the 2011, 2012 budget, there were no vacant

10   frozen, unfunded or funded, police officer positions; right?

11   Well, withdrawn.

12          For the 2011, 2012, there were no vacant police

13   officer positions; correct?

14       A    There were no funded vacancies.  Correct.  We -- we

15   froze all of the vacancies.

16          Again, I want to make sure everybody understands.

17   The reason that we don't take them out of the budget is

18   because it's very difficult to put them back in.

19       Q    Right.

20       A    So what we do is we simply freeze them.  The City

21   Manager says to the Council, hey, let's freeze all these.

22          And we had some -- somewhere in the neighborhood of

23   twenty -- twenty-two, twenty-three, something like, positions

24   that we froze --

25       Q    Right.

Michael Falkow
July 22, 2016

208

```
 1          THE WITNESS:  Yes.  This looks like it.

 2      Q    BY MS. GOLDSMITH:  Are there any 514 positions?

 3      A    No.

 4      Q    So even in the 2011, 2012 budget, there were no

 5  vacant 514 positions?

 6      A    Correct.

 7      Q    Do you know how many police officers -- 514 police

 8  officers there were in 2011, 2012?

 9      A    No.  But I could probably find it in the budget.

10      Q    Do you know if the 514 sworn personnel increased or

11  decreased since 2009?

12      A    We saw a decrease.

13      Q    And do you know if that decrease -- was that

14  decrease associated with the City's budget deficit?

15      A    Yes.  They were also, you know, attrition and some

16  other things.

17      Q    Right.  But when people left and people --

18      A    We didn't fill them because we didn't have the

19  money.  So, yes.  I mean ultimately it sort of goes down to

20  that.

21      Q    When Martin brought -- withdrawn.

22          When Martin Sissac brought to you a concern

23  initially that there was supplanting, you had mentioned that

24  that was a -- quote, unquote -- "big concern."

25          Why was it a big concern to you?
```

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

CERTIFIED ORIGINAL

MARTIN SISSAC,

        Plaintiff,

vs.                       Case No.: 2:15-CV-01741-JAK-FFM

CITY OF INGLEWOOD; MAYOR
JAMES T. BUTTS; CHIEF OF
POLICE MARK FRONTEROTTA,
and DOES 1 through 10,
Inclusive,

        Defendants.

_____

DEPOSITION OF

ARTIE FIELDS

Tuesday, July 19, 2016

10:18 a.m.

Law Offices of Joseph Y. Avrahamy

16530 Ventura Boulevard, Suite 208

Encino, California

REPORTED BY:

Julee Sokol

CSR No. 11319

EXHIBIT F

Artie Fields
July 19, 2016                                                    7

```
 1        Q    And what position are you employed?

 2        A    City Manager.

 3        Q    And from when -- when did you first become employed

 4   with the City of Inglewood?

 5        A    July 2011.

 6        Q    Okay.  And prior to working for the City of

 7   Inglewood, where did you work?

 8        A    City of Salinas.

 9        Q    And what was your position there?

10        A    City Manager.

11        Q    And how long did you work for the City of Salinas?

12        A    Three years.

13        Q    And prior to working for Salinas, where did you

14   work?

15        A    West Covina.

16        Q    And were you also City Manager there?

17        A    Assistant City Manager.

18        Q    And how long did you work in that capacity?

19        A    Ten years.

20        Q    As a City Manager for the City of Inglewood, can you

21   briefly describe what your duties are?

22        A    Yes.  I'm hired by the Mayor and City Council to

23   manage the day-to-day operations of the City.

24        Q    Okay.  And what's your role with regards to the

25   Inglewood Police Department?
```

Artie Fields
July 19, 2016                                                    16

1   done prior to you coming on board the City of Inglewood to

2   address this fiscal crisis caused by the economic downturn?

3        A    Yes.

4        Q    Okay.  And what was done when you -- what did you

5   learn had been done?

6        A    That they had first gone through all the reserves.

7   About $30 million in reserves.  That positions had been

8   eliminated.  There were positions that were laid off.  They

9   were on furloughs.  Programs were cut.

10       Q    Did you learn that as of July of 2011 that there

11  were no sworn officers that had been laid off as part of any

12  type of reduction -- workforce reductions?

13       A    Laid off?

14       Q    Yes.

15       A    I was not aware of any that had been laid off.

16       Q    There are other City personnel that were laid off

17  from other departments?

18       A    Yes.

19       Q    Was it your understanding that the City sought to

20  retain police officers and not let the workforce reduction

21  affect the Police Department?

22       A    Oh, yeah.  Of course.  We would have liked to retain

23  our police officers.  Yes.  But it got to the point to where

24  that was obviously not -- it was going to be a challenge for

25  us.

Artie Fields
July 19, 2016                                              17

```
 1       Q    Did you have an understanding of why sworn officers

 2   had not been laid off as part of earlier workforce reductions

 3   prior to you coming on board?

 4       A    I would suspect that there were police officer

 5   positions that were eliminated, and so that was -- probably

 6   the first phase of trying to balance the budget was to

 7   eliminate all vacant positions, as many vacant positions as

 8   they could throughout the City.   And there were a number of

 9   vacant positions in the Police Department, sworn and

10   non-sworn, that they eliminated.

11       Q    And when you eliminate a vacancy when there is a

12   vacant position on the budget, you still have to allocate

13   funds for that vacant position?

14       A    No.   No.   That's the whole point of eliminating.

15       MS. GOLDSMITH:   Objection.   Vague and ambiguous.

16   Misstates.

17       THE WITNESS:   Okay.

18       Q    BY MR. AVRAHAMY:   So if there is a position that's

19   on the books --

20       A    Uh-huh.

21       Q    -- that is a vacant one prior to it being

22   eliminated, does that -- does the budget have to allocate

23   funds for that position?   Does that make sense?

24       A    If it's vacant before -- oh, yes.   Yes.   If it's

25   vacant before.   Yeah.   Yeah.
```

Artie Fields
July 19, 2016

22

```
 1        A    Correct.

 2        Q    Okay.  And did -- was that expressed to you by Chief

 3   Seabrooks in any meetings that you had with her?

 4        A    Yes.

 5        Q    And so if the Police Department is spending more

 6   than what they have, does that mean you have to go into the

 7   reserves to make up for --

 8        A    Correct.

 9        Q    -- the expenditures?

10        A    Correct.

11        Q    So there is the General Fund.  Is that the -- well,

12   can you explain what General Fund expenditures are?

13        A    So the General Fund are expenditures that are not --

14   they don't have a specific designation, use for those.  I mean

15   the General Fund can be used for, you know -- I don't know how

16   to explain it -- general purposes.

17             They're not restricted is what I was trying to come

18   up with.  They're nonrestricted funds that the City can use to

19   provide programs and operational funds for each department.

20        Q    And police salaries, would that be -- would the

21   funds come from the General Fund for the police salaries?

22        A    The majority of them, yes.

23        Q    In Salinas, did you have experience working with the

24   CHRP Grant?

25        A    Yes.
```

Artie Fields
July 19, 2016                                                23

1      Q    And what is a CHRP Grant?

2      A    It's basically a grant that's given by the -- it's a

3   federal grant from the office of the COPS Office.  And,

4   originally, I believe the grant was developed to help assist

5   departments in hiring new police officers.

6      Q    Okay.  And what was your experience with the CHRP

7   Grant in Salinas?

8      A    Well, like a lot of cities, we determined that we

9   couldn't -- we couldn't commit to retaining police officers

10  that were hired from the grant.

11         And so that put an extra burden and requirement on

12  the City.  You know, in that time period cities were just

13  trying to figure out how they were going to have money to keep

14  their current officers, let alone buy new ones.  So a lot of

15  new hiring wasn't going on.

16         And so this CHRP Grant was put in place to encourage

17  cities to hire new police officers; however, we just didn't

18  know what the length of the economic downturn was going to be.

19         So our Mayor in Salinas and I came up with the idea

20  of going to the COPS Office and asking them if we can convert

21  that Grant from a hiring -- new hiring grant to a retention

22  grant.

23     Q    Okay.  And how did the retention grant work?

24     A    Well, there are officers that we were contemplating

25  laying off, and the goal was to, you know, encourage cities to

Artie Fields
July 19, 2016                                                    29

```
 1        A    Yes.

 2        Q    And in your meeting with -- well, was there some

 3   type of directive given to you by Mayor Butts or somebody from

 4   City of Inglewood to try to figure out how the City could tap

 5   into the $3 million CHRP Grant?

 6        A    No.  Like I said, I brought that to the Mayor's

 7   attention, you know, and proceed to -- and because I was able

 8   to do it in Salinas, my first conversation with my budget

 9   staff who then suggested that we speak to Sissac.

10             It was only after Sissac agreed -- I mean disagreed

11   on how to move forward with that, that I spoke with the Mayor.

12        Q    Okay.  So you -- you -- when you came on board, you

13   understood that there was a $3 million CHRP Grant allocated

14   to --

15        A    Uh-huh.

16        Q    -- the City that they haven't been able to use --

17        A    Right.

18        Q    -- is that correct?

19             And what was your understanding of why they were not

20   able to use the CHRP Grant?

21        A    My budget staff said they couldn't afford to keep

22   the officers on board if they hired them.  Because there's a

23   requirement after three years that you keep them on that you

24   not lay them off.  I think it might be -- I forgot what the

25   time period was, but there is a time period in which you have
```

Artie Fields
July 19, 2016                                                              30

1    to keep them.

2         Q    I see.  So the CHRP Grant could be used for a

3    limited amount of time --

4         A    Correct.

5         Q    -- for hiring new officers?

6         A    Yeah.  It was only $3.5 million, I think it was.

7         Q    Okay.  So when you met with the budget staff, you

8    informed them of how you were able to modify the CHRP Grant

9    from hiring new officers to retaining officers; is that

10   correct?

11        A    Yeah.  They knew nothing about that option when I

12   brought it to their attention.

13        Q    And what was it that you told them?

14        A    Basically, that in Salinas this is what we did, and

15   I believe we would be successful in doing it here too.

16        Q    And in Salinas did you actually lay off officers as

17   part of the modification of the grant?

18        A    We gave them layoff notices but we got the grant.

19   So they weren't -- we were able to rescind the layoff notices.

20        Q    And did you know before -- at the time that you gave

21   the layoff notices in Salinas, were you aware that the way you

22   modified the grant would allow you to retain the officers?

23        MS. GOLDSMITH:  Objection.  Vague and ambiguous.

24        THE WITNESS:  I'm not -- can you restate?

25        Q    BY MR. AVRAHAMY:  Meaning at the time that you gave

Artie Fields
July 19, 2016                                                        34

```
 1            And remember, we didn't have reserves any longer.
 2    And so, you know, again, the option I would have taken to the
 3    Council is to eliminate departments all together or, you know,
 4    optionally, you know, consider layoffs in the Police
 5    Department with sworn officers.
 6        Q    When you say you didn't have reserves any longer --
 7        A    Right.
 8        Q    -- was there just -- was the reserves completely
 9    gone or was there just a reduction in the reserves?
10        A    They were significantly reduced to a point to where
11    there was not enough reserves to balance the budget at that
12    point.
13        Q    Okay.  So it was your personal assessment in looking
14    at the overall City budget --
15        A    Right.
16        Q    -- that perhaps we need to start looking at the
17    Police Department for additional cuts?
18        A    Correct.
19        Q    But that wasn't told to you by either Chief
20    Seabrooks or --
21        A    Oh, no.  Department -- department heads never put
22    that on the table.
23        MS. GOLDSMITH:  Offer it up.
24        THE WITNESS:  No.
25        MS. GOLDSMITH:  Hey, can you take my police officers?
```

Artie Fields
July 19, 2016

50

1        A    Yes.

2        Q    Did you have any conversations with Chief Seabrooks

3    where she expressed an understanding of the regulations of the

4    CHRP Grant?

5        A    She was open to it, you know, all along.  She was,

6    you know, if we can do this, let's pursue it and do what we

7    need to do to make it happen.

8             So I didn't get any resistance from her.  She may

9    have been talking to Sissac, you know, on her own.  But, you

10   know, as far as I know in our conversations, she was

11   comfortable with the fact that we had done it in Salinas and

12   there shouldn't be any reason why we couldn't do it in

13   Inglewood.

14       Q    And when you say she was open to it, she was open to

15   what?  Just for clarity.

16       A    Open to converting the grant from a new hire to a

17   retention grant.

18       Q    And you explained to her what it would take to do

19   that?

20       A    Yes.

21       Q    And what did you tell her?

22       A    I would have told her that in order to make that

23   happen we would have to petition to the COPS Office to see if

24   they would agree to it.

25       Q    Okay.  And what else did you explain to her?

Artie Fields
July 19, 2016                                                            55

```
 1          MS. GOLDSMITH:  Well, we don't want you to guess or

 2   speculate.  Do you know if he was?

 3          THE WITNESS:  I know that he was based on previous --

 4   ongoing conversations I was having with both he and the Chief.

 5      Q    BY MR. AVRAHAMY:  So you personally or -- you

 6   personally were not involved in the details of the

 7   modification request?

 8      A    Correct.

 9      Q    You just presented the concept to Chief Seabrooks of

10   what they had to do to seek the modification request --

11      A    Correct.

12      Q    -- based on your experience in Salinas?

13      A    That's correct.

14      Q    Did you have an understanding of what the

15   non-supplanting statutory requirement was of the CHRP Grant?

16      A    I knew that we weren't supplanting.  I mean in order

17   to supplant you would have to have money available -- you

18   would have had to have money available to hire these officers.

19   And we didn't have the money to hire them.

20          So when you supplant, you take money you already

21   have and you decide, oh, since this grant is here, we're going

22   to take that money and do something else with it.

23          That wasn't the case for us.  We didn't have the

24   money to keep these officers on board.

25      Q    And just, in general, what was your understanding of
```

1   the non-supplanting requirement?

2        A    Just that.   That you could not take money that you

3   have and supplant it for grant funds.

4        Q    Okay.  Now, if -- if you take a look at Exhibit 2

5   and look at page three of two.

6        A    Three of --

7        MS. GOLDSMITH:  Three of four.

8        THE WITNESS:  Three of four.

9        Q    BY MR. AVRAHAMY:  Three of four.  I'm sorry.  Thank

10  you for the clarification.

11        And the section with all the points, it says to

12  comply with the non-supplanting requirement modification

13  request.

14        A    Uh-huh.

15        Q    The first one states that the modification request

16  must demonstrate that your agency is not using COPS grant

17  funds to supplant or replace local funds that otherwise would

18  have been used for sworn officers in the absence of the grant.

19        In any of the conversations that you had with

20  Captain Sissac, did he express to you that he was concerned

21  that the way that the grant was going to be used violated that

22  point where by using the COP Grant funds to supplant local

23  funds?

24        A    You know, I think I only had two conversations

25  with -- that I recall two conversations with Sissac.  One was

Artie Fields
July 19, 2016                                                    58

```
 1        A    No.   What I recall is that it seemed that Sissac was

 2   not aware that we could even convert the grant.  And that that

 3   was more of his issue that we weren't able to do that.

 4             I don't recall him giving me details as well if you

 5   are going to do it you -- we need to make sure we're not

 6   supplanting or we need to make sure that we send the layoff

 7   notices first.

 8             I mean, had we been aware of that when we submitted

 9   the first application, you know, we could have taken some

10   action or waited until after the Council took that action.

11             But that was -- I don't recall having any

12   conversation with him about supplanting.

13        Q    Okay.  And did Mayor Butts talk to you about his

14   desire to try to -- well, strike that.

15             Did you share with Mayor Butts your experience in

16   Salinas of being able to modify the CHRP Grant?

17        A    Yes.

18        Q    And when did you do that?

19        A    I did that soon after I met with the budget staff.

20   So within three weeks.  You know, when I talked to the budget

21   staff and found out about the grant as originally proposed the

22   City was sitting on the money.

23             And I gave them the direction to talk to the Police

24   Department about submitting a request to retain.  You know, I

25   went to the Mayor and said, look, this is what we're going to
```

FT VACANT POSITION LISTING AS OF 08/29/2011

| Fund | Dept | Division | Position number | Title | Home dept | Salary group | FTE | SALARY & BENEF |
|------|------|----------|-----------------|-------|-----------|--------------|-----|----------------|
| 001 | 025 | 2510 | 680-008 | ADMINISTRATIVE SECRETARY | 025 | MGMT | 100 | $ 75,000 |
| 001 | 025 | 2522 | 201-005 | ACCOUNT CLERK | 025 | SEIU | 100 | $ 58,000 |
| 001 | 035 | 3510 | 622-002 | PLANNER | 035 | MGMT | 100 | $ 99,000 |
| 001 | 035 | 3570 | 211-001 | BUILDING INSPECTOR TRAINEE | 035 | SEIU | 100 | $ 75,000 |
| 001 | 035 | 3570 | 642-003 | PLAN CHECK ENGINEER | 035 | MGMT | 100 | $ 107,000 |
| 001 | 045 | 4520 | 699-007 | POLICE SERGEANT | 045 | IPMA | 100 | $ 167,000 |
| 001 | 045 | 4527 | 230-015 | PUBLIC SAFETY DISPATCHER | 045 | SEIU | 100 | $ 70,000 |
| 001 | 045 | 4527 | 230-013 | PUBLIC SAFETY DISPATCHER | 045 | SEIU | 100 | $ 70,000 |
| 001 | 045 | 4527 | 819-001 | PUBLIC SAFETY DISPATCH SUPERVI | 045 | MGMT | 100 | $ 78,000 |
| 001 | 045 | 4529 | 341-001 | POLICE RECORDS ASSISTANT | 045 | SEIU | 100 | $ 58,000 |
| 001 | 045 | 4529 | 366-002 | CUSTODY OFFICER | 045 | SEIU | 100 | $ 66,000 |
| 001 | 045 | 4530 | 699-011 | POLICE SERGEANT | 045 | IPMA | 100 | $ 167,000 |
| 001 | 045 | 4530 | 699-012 | POLICE SERGEANT | 045 | IPMA | 100 | $ 167,000 |
| 001 | 045 | 4530 | 516-015 | POLICE DETECTIVE | 045 | IPOA | 100 | $ 137,000 |
| 001 | 045 | 4530 | 516-006 | POLICE DETECTIVE | 045 | IPOA | 100 | $ 137,000 |
| 001 | 045 | 4547 | 699-016 | POLICE SERGEANT | 045 | IPMA | 100 | $ 167,000 |
| 001 | 045 | 4550 | 699-015 | POLICE SERGEANT | 045 | IPMA | 100 | $ 167,000 |
| 001 | 045 | 4553 | 407-007 | SPECIAL ENFORCEMENT OFFICER | 045 | SEIU | 100 | $ 61,000 |
| 001 | 045 | 4553 | 407-004 | SPECIAL ENFORCEMENT OFFICER | 045 | SEIU | 100 | $ 61,000 |
| 001 | 045 | 4553 | 367-004 | SR SPECIAL ENFORCEMENT OFFICE | 045 | SEIU | 100 | $ 65,000 |
| 001 | 060 | 6080 | 644-001 | FLEET MAINTENANCE COORDINATO | 060 | MGMT | 100 | $ 86,000 |
| 001 | 070 | 7021 | 313-010 | PARK MAINTENANCE WORKER | 070 | SEIU | 100 | $ 68,000 |
| 001 | 070 | 7045 | 272-002 | GRAFFITI ABATEMENT WORKER | 070 | SEIU | 100 | $ 68,000 |

# EXHIBIT G