GREGORY M. BERGMAN (SBN 065196)
MICHELE M. GOLDSMITH (SBN 178222)
JASON J. BARBATO (SBN 301642)
BERGMAN DACEY GOLDSMITH
10880 Wilshire Blvd. Suite 900
Los Angeles, California 90024-4101
Telephone: 310.470.6110
Facsimile: 310.474.0931

Attorneys for Defendants, CITY OF INGLEWOOD
MAYOR JAMES BUTTS; CHIEF OF POLICE MARK FRONTEROTTA

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| MARTIN SISSAC<br><br>                    Plaintiffs,<br><br>v.<br><br>CITY OF INGLEWOOD; MAYOR JAMES BUTTS; CHIEF OF POLICE MARK FRONTEROTTA AND DOES 1 THROUGH 10, INCLUSIVE,<br><br>                    Defendants. | Case No. 2:15-cv-01741-JAK-FFM<br><br>**DECLARATION OF MICAH HERD IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**<br><br>Date:     September 26, 2016 [Reserved]<br>Time:     8:30 a.m.<br>Ctrm:     750<br><br>[Filed Separately but concurrently herewith:<br>  1.  Motion For Summary Judgment;<br>  2.  Separate Statement;<br>  3.  Declaration of Michele Goldsmith;<br>  4.  Declaration of Cal Saunders; and<br>  5.  Declaration of Kevin Harris]<br><br>Trial:  December 6, 2016 |

BERGMAN DACEY GOLDSMITH
10880 Wilshire Blvd. Suite 900
Los Angeles, California 90024
Telephone: (310) 470-6110, Facsimile: (310) 474-0931

## DECLARATION OF MICAH HERD

I, Micah Herd, declare:

1.      I am a resident of Los Angeles, California.  If called as a witness in this action, I could and would testify competently, under oath, from my own personal knowledge, to each and all of the following facts.

2.      This Declaration is made in support of Defendants' Motion for Summary Judgment, or in the alternative, Partial Summary Judgment.

3.      I am employed with the City of Inglewood ("City") as a Police Grants Coordinator.  The City hired me in this capacity in August 2007.  In the capacity of a Police Grants Coordinator, it is my responsibility to assist in the application, processing, reporting, collecting reimbursements, monitoring responsibilities, and closing out of various grants for the City.  I am also familiar with and have been trained on the Federal Funding Accountability and Transparency Act of 2006 (FFATA).  At any given time, I am handling between 8-12 grants.  Plaintiff Martin Sissac was my supervisor and I reported to him while he was the Captain over of the Office of Administrative Services for the Inglewood Police Department ("IPD").

4.      Attached as **Exhibit K** is a true and correct copy of the July 28, 2009, COPS Hiring Recovery Program ("CHRP") grant award letter.  I read the letter on or near the time that the City received the letter.

5.      The CHRP grant is a reimbursement grant.  However, the CHRP grant was only a partial reimbursement of total costs for the hiring of officers.  The CHRP grant could be modified from its intended purpose by an approved request from the DOJ.  A manual was provided regarding applying for, maintaining and modifying the grant.  From 2009 to July 2011 the City did not take advance of the CHRP grant.  From 2009 to July 2011 the City did not take advantage of the CHRP grant because of the drain on City general fund resources.   I would submit a reimbursement request to the Department of Justice ("DOJ") for approved expenditures that were incurred in a fiscal reporting period.  I submitted the requests for reimbursement through the

BERGMAN DACEY GOLDSMITH
10880 Wilshire Blvd. Suite 900
Los Angeles, California 90024
Telephone: (310) 470-6110, Facsimile: (310) 474-0931

DOJ CHRP electronic portal.

6.      In the Spring of 2011, the City was adamant of additional and necessary layoffs.  I had received a layoff notice myself.  In meetings, it was discussed that laying off police officers was not "ideal" but that the City needed to close the gap between revenue and expenditures, and police salaries were a large expenditure.

7.      There were no General Funds available in the IPD budget for the retention of the eight police officers to be laid off.  I am personally aware that the City Manager, Chief of Police and Mayor had extensive conversations with the DOJ about CHRP.

8.      Attached as **Exhibit L** is a true and correct copy of the August 3, 2011 CHRP Award Modification Request, with attachments.  I personally read the letter and attachments, verified the letter, and electronically submitted the modification request through the DOJ portal.

9.      Attached as **Exhibit M** is a true and correct copy of the denial of the August 3, 2011 Modification Request Denial that was received by the City from the DOJ.  I read the letter on or near the time that the City received the letter. The modification request denial's rationale for rejection was specific.  The DOJ stated that "To be considered for a post-application modification …, an agency must demonstrate that the officers … are officially *scheduled for layoff* on a specific date as the result of financial reasons unrelated to the receipt of CHRP funding."

10.      Attached as **Exhibit N** is a true and correct copy of the October 12, 2011, second modification request submitted by the City to the DOJ, with attachments.  I personally read the letter and attachments, verified the letter, and electronically transmitted modification request through the DOJ portal.

11.      Attached as **Exhibit O** is a true and correct copy of the October 19, 2011, e-mail that I received from Chief of Police Jacqueline Seabrooks notifying various City personnel that the DOJ had tentatively approved the modification request.

BERGMAN DACEY GOLDSMITH
10880 Wilshire Blvd. Suite 900
Los Angeles, California 90024
Telephone: (310) 470-6110, Facsimile: (310) 474-0931

BERGMAN DACEY GOLDSMITH
10880 Wilshire Blvd. Suite 900
Los Angeles, California 90024
Telephone: (310) 470-6110, Facsimile: (310) 474-0931

1    12.    On October 19, 2011, the DOJ approved the request for a grant award

2 modification.   The DOJ notified the City that it approved the grant modification

3 request because, in part, (1) the layoffs could have occurred even in the absence of

4 the CHRP grant because of the local financial reasons as documented in the City's

5 request; and (2) the City will use the CHRP funds only after the scheduled lay-off

6 date.   Attached as **Exhibit P** is a true and correct copy of the October 19, 2011,

7 Approval Notification.   Attached as **Exhibit Q** is a true and correct copy of the

8 November 9, 2011, DOJ grant letter of the CHRP modification request.

9    13.    I attended a course called "DOJ Financial Management Training" in

10 connection with DOJ grants.   It was a 2-day course held in Sacramento on October

11 20-21, 2010.   The seminar is designed for people responsible for the financial

12 administration of formula and/or discretionary grants and cooperative agreements

13 awarded from Federal grant-in-aid programs administered by DOJ and OJP Bureaus

14 and Offices.   The seminar covered topics such as:

15 - Application review process

16 - Payment methods

17 - Monitoring responsibility

18 - Grant fraud awareness

19 - Federal Funding Accountability and Transparency Act of 2006 (FFATA)

20 - Grant closeout process

21    14.    I do not recall any time when Mr. Sissac complained about the City's

22 use of the CHRP program being illegal.

23 //

24 //

25 //

26 //

27 //

28 //

DECLARATION OF MICAH HERD IN SUPPORT OF MSJ

1    15.    In February 2012, the City requested reimbursement from the CHRP

2  program, which was granted.

3        I declare under penalty of perjury under the laws of the United States that the

4  foregoing is true and correct.   Executed at Los Angeles, California on August 28,

5  2016.

6

7                                                    Micah Herd

8

BERGMAN DACEY GOLDSMITH
10880 Wilshire Blvd. Suite 900
Los Angeles, California 90024
Telephone: (310) 470-6110, Facsimile: (310) 474-0931



**U.S. Department of Justice**
Office of Community Oriented Policing Services (COPS)

*Office of the Director*
*1100 Vermont Avenue, N.W.*
*Washington, DC  20530*

July 28, 2009

Chief of Police Jacqueline Seabrooks
Inglewood, City of
One West Manchester Boulevard
Inglewood, CA 90301

Re: COPS Hiring Recovery Program Grant # 2009RKWX0119
    ORI#: CA01933

Dear Chief of Police Seabrooks:

Once again, I would like to congratulate you on receiving a COPS Hiring Recovery Program (CHRP) award. Your award is for 10 officer positions and $3,029,500 in federal funds over a three-year grant period. Your agency may now begin hiring or rehiring officers to fill CHRP grant-funded positions.

Enclosed in this package is your grant award. **The Award Document must be signed and returned to the COPS Office within 90 days to officially accept your grant.** The Frequently Asked Questions (FAQ) document included in this package should be helpful in answering any questions you may have about accepting your award, or requesting additional time to do so. Beginning on the reverse side of your Award Document, you will find a total of three pages of CHRP Grant Terms and Conditions. You should read and familiarize yourself with all 16 terms and conditions that apply to your CHRP award.

A supplemental online award package for CHRP grantees can be found at http://www.cops.usdoj.gov/Default.asp?Item=2271. We strongly encourage you to visit this site immediately to access a variety of important and helpful documents associated with your award, including the CHRP Grant Owner's Manual, which specifies the terms, conditions, and requirements of your grant. Also, within a few weeks you should receive an important package from the Office of the Chief Financial Officer, Office of Justice Programs, which will contain the forms and instructions necessary to begin drawing down funds for your grant.

As mentioned at the time of announcement, each CHRP application was subject to a thorough review, and some of your application information may have been updated or corrected from the original version submitted to COPS. If you have not yet done so, please access your application at http://www.cops.usdoj.gov/Default.asp?Item=464, and print and maintain a final copy for your records (if you are unable to print a copy of your application, please contact the COPS Office at 800.421.6770).

The Financial Clearance Memorandum (FCM) and Final Funding Memorandum (FFM) included in this package reflect allowable costs and amounts under your award. The FCM specifies the amount of COPS Hiring Recovery Program funds awarded to your agency for officer salaries and approved benefits, while the FFM contains the final officer salary and fringe benefit categories and

**EXHIBIT K**

COI_000890

**006**

amounts for which your agency was approved. Please review both documents carefully, as your agency may only be reimbursed for the amounts and approved cost categories indicated.

As a reminder, under CHRP all positions awarded (or an equal number of veteran officers) must initiate or enhance community policing in accordance with the community policing plan as described within Section 5 of your application. If for any reason your agency finds that your community policing plans have significantly changed from those outlined in your application (e.g., because you received fewer officers than originally requested and thus must alter the scope of your community policing plans), please revise the plan accordingly and submit it to the COPS Office for review and approval. You should also contact the COPS Office if, for any reason, you need to modify your grant award. This includes any reallocation of your awarded positions across the three primary hiring categories (i.e., new hires, rehires of officers laid off pre-application, and rehires of officers laid off or scheduled to be laid off post-application).

As explained at the time of grant application, there are significant reporting requirements on the use of CHRP funds. In addition to quarterly financial and programmatic progress reports submitted to the COPS Office, CHRP grantees are also required to submit quarterly Recovery Act reports within 10 days after the end of each calendar quarter to www.FederalReporting.gov. These Recovery Act reports will be made available to the public on www.Recovery.gov. All grantees must be registered as authorized users prior to submitting reports to www.FederalReporting.gov. The registration function on www.FederalReporting.gov will be available no later than August 26, 2009. Please note that registration with this website also requires users to be registered with the Central Contractor Registration (CCR) and have a Dun & Bradstreet Data Universal Numbering System (DUNS) number. Registering with CCR and obtaining a DUNS number take additional processing time, so your agency should take immediate steps to meet these requirements in advance of registration with www.FederalReporting.gov. For additional information on CCR and DUNS, please refer to the CHRP Grant Owner's Manual at http://www.cops.usdoj.gov/Default.asp?Item=2270.

Finally, please remember that grantees must retain all sworn officer positions awarded under the CHRP grant for a minimum of 12 months following the 36-month federal funding period. The retained CHRP-funded position(s) should be added to your law enforcement budget with state and/or local funds, over and above the number of locally-funded positions that would have existed in the absence of the grant. In your CHRP grant application, your agency was required to affirm that it plans to retain the additional officer positions awarded following the expiration of the grant, and to identify the planned sources of retention funding. If, during the life of the grant, you have questions regarding the retention requirement or your retention funding sources, please contact the COPS Office for assistance.

Once again, congratulations on your CHRP award. If you have any questions about your grant, please do not hesitate to call the COPS Office Response Center at 800.421.6770.

Sincerely,

David M. Buchanan
Acting Director

**EXHIBIT K**

COI_000891

007





**U. S. Department of Justice**
*Community Oriented Policing Services*

## Grants Administration Division
## COPS Hiring Recovery Program
Treasury Account Symbol (TAS) 15-09/10-0412



|  |  |
|---|---|
| *Grant #:* | 2009RKWX0119 |
| *ORI #:* | CA01933 |
| Applicant Organization's Legal Name: | Inglewood, City of |
| *OJP Vendor #:* | 956000728 |
| DUNS#: | 074118456 |

**Law Enforcement Executive:** Chief of Police Jacqueline Seabrooks
*Address:* One West Manchester Boulevard
*City, State, Zip Code:* Inglewood, CA 90301
*Telephone:* (310) 412-5200
*Fax:* (310) 412-8798

**Government Executive:** Mayor Roosevelt F. Dorn
*Address:* One West Manchester Boulevard
*City, State, Zip Code:* Inglewood, CA 90301
*Telephone:* (310) 412-5300
*Fax:* (310) 330-5733

| | | | |
|---|---|---|---|
| Award Start Date: | 7/1/2009 | Award End Date: | 6/30/2012 |
| **Full Time Officers Funded:** | 10 | | |
| New Hires: | 10 | | |
| Rehires - Pre-Application Layoffs: | 0 | | |
| Rehires - Post-Application Layoffs: | 0 | | |
| **Award Amount:** | **$ 3,029,500.00** | | |

_____

David Buchanan
Acting Director

JUL 1 5 2009
Date

By signing this Award Document, the grantee agrees to abide by all 16 Grant Terms and Conditions on the reverse side of this document and the attached pages:

| | | |
|---|---|---|
| _____ Signature of Law Enforcement Official with the Authority to Accept this Grant Award | _____ Typed Name and Title of Law Enforcement Official | _____ Date |
| _____ Signature of Government Official with the Authority to Accept this Grant Award | _____ Typed Name and Title of Government Official | _____ Date |

False statements or claims made in connection with COPS grants may result in fines, imprisonment, debarment from participating in federal grants or contracts, and/or any remedy available by law to the Federal Government.

Award ID: 94826

## EXHIBIT K

COI_000892

008

U. S. Department of Justice
*Office of Community Oriented Policing Services*
**COPS Hiring Recovery Program Grant Terms and Conditions**

By signing the Award Document to accept this COPS Hiring Recovery Program (CHRP) grant, the grantee agrees to abide by the following grant terms and conditions:

1.  The grantee agrees to comply with the terms and conditions in this COPS Hiring Recovery Program Grant Owner's Manual; COPS statute (42 U.S.C. § 3796dd, et seq.); 28 C.F.R. Part 66 or 28 C.F.R. Part 70 as applicable (governing administrative requirements for grants and cooperative agreements); 2 C.F.R. Part 225 (OMB Circular A-87), 2 C.F.R. Part 220 (OMB Circular A-21), 2 C.F.R. Part 230 (OMB Circular A-122) and 48 C.F.R. Part 31.000 et seq. (FAR 31.2) as applicable (governing cost principles); OMB Circular A-133 (governing audits); American Recovery and Reinvestment Act (Recovery Act) of 2009, P.L.111-5; representations made in the COPS Hiring Recovery Program grant application; and all other applicable program requirements, laws, orders, regulations, or circulars.

2.  The grantee agrees to comply with the Assurances and Certifications forms that were submitted as part of its COPS Hiring Recovery Program application.

3.  The funding under this project is for the payment of approved full-time entry-level sworn officer salaries and fringe benefits over three years (for a total of 36 months of funding) for new or rehired additional, career law enforcement officer positions, hired on or after the award start date. The Financial Clearance Memorandum included in your award packet specifies the costs that the grantee is allowed to fund with your CHRP award. It will also describe any costs which have been disallowed after review of your proposed budget. The grantee may not use CHRP funds for anything not identified as allowable in the Financial Clearance Memorandum.

4.  CHRP grant funds may not be used to replace state or local funds (or, for tribal grantees, Bureau of Indian Affairs funds) that would, in the absence of federal aid, be made available for hiring and/or rehiring full-time career law enforcement officer positions.

5.  At the time of grant application, the grantee committed to retaining all CHRP officer positions awarded with state and/or local funds for a minimum of 12 months at the conclusion of 36 months of federal funding for each position, over and above the number of locally-funded positions that would have existed in the absence of the grant. You cannot satisfy the retention requirement by using CHRP positions to fill vacancies from attrition.

6.  The grantee may request an extension of the grant award period to receive additional time to implement the grant program. Such extensions *do not* provide additional funding. Only those grantees that can provide a reasonable justification for delays will be granted no-cost extensions. Reasonable justifications may include delays in COPS-funded positions, officer turnover, or other circumstances that interrupt the 36-month grant funding period. An extension allows the grantee to compensate for such delays by providing additional time to complete the full 36 months of funding for each position awarded. *Extension requests must be received prior to the end date of the award, as extension requests received after an award has expired will be approved only under very limited circumstances.*

7.  During the CHRP grant award period, it may become necessary for an agency to modify its CHRP grant award due to changes in an agency's fiscal or law enforcement situation. For instance, modification requests should be submitted to the COPS Office when an agency determines that it will need to shift officer positions awarded in one hiring category into a different hiring category or reduce the total number of positions awarded. Grant modifications under CHRP are evaluated on a case-by-case basis. All modification requests must be approved, in writing, by the COPS Office prior to their implementation. In addition, please be aware that the COPS Office will not approve any modification request that results in an increase of federal funds.

8.  The COPS Office may conduct monitoring or sponsor national evaluations of the COPS Hiring Recovery Program. The grantee agrees to cooperate with the monitors and evaluators.

9.  To assist the COPS Office in the monitoring of your award, the grantee agrees to submit quarterly programmatic progress reports and quarterly financial reports in addition to any reports required by the Recovery Act. The grantee also agrees to submit all requested reports in a timely manner.

10. The COPS Office performs various functions to ensure compliance with all grant requirements, to assess the implementation of community policing in awarded jurisdictions, and to provide technical assistance to grantees. Grant monitoring activities are routine during the grant period and may occur up to three years following the official closure of the grant award. These functions, and others, often require the production of grant-related documentation and other materials. As a COPS CHRP grantee, you agree to cooperate with any such requests for information.

11. The grantee agrees to comply with the federal regulations pertaining to the development and implementation of an Equal Employment Opportunity Plan (28 C.F.R. Part 42 subpart E). For assistance, grantees should consult the Office of Justice Programs, Office for Civil Rights website at www.ojp.usdoj.gov/about/ocr/eeop.htm.

12. The grantee agrees to complete and keep on file, as appropriate, a Bureau of Citizenship and Immigration Services Employment Eligibility Verification Form (I-9). This form is to be used by recipients of federal funds to verify that persons are eligible to work in the United States.

13. All newly hired, additional officers (or an equal number of redeployed veteran officers) funded under CHRP must engage in community policing activities.  Community policing activities to be initiated or enhanced by the grantee were identified and described in your CHRP grant application, with reference to each of the following elements of community policing: a) community

COI_000893

**009**

U. S. Department of Justice
*Office of Community Oriented Policing Services*
**COPS Hiring Recovery Program Grant Terms and Conditions**

partnerships and support; b) related governmental and community initiatives that complement the grantee's proposed use of CHRP funding; and c) how the grantee will use the funds to reorient its mission or enhance its commitment to community policing.

14. Grantees that provide law enforcement services to another jurisdiction through a contract must ensure that officers funded under this CHRP grant do not service the other jurisdiction, but will only be involved in activities or perform services that exclusively benefit the grantee's own jurisdiction. Grantees cannot use CHRP funds to pay for a contract to receive law enforcement services from another agency.

15. False statements or claims made in connection with COPS grants may result in fines, imprisonment, or debarment from participating in federal grants or contracts, and/or any other remedy available by law.

16. The grantee understands that the COPS Hiring Recovery Program is funded through the American Recovery and Reinvestment Act (Recovery Act) of 2009 and agrees to comply with the extensive accountability and transparency requirements on the use of Recovery Act funds:

(A) Recovery Act Transactions Listed in Schedule of Expenditures of Federal Awards and Recipient Responsibilities for Informing Subrecipients

(1) To maximize the transparency and accountability of funds authorized under the American Recovery and Reinvestment Act of 2009 (Public Law 111-5) (Recovery Act) as required by Congress and in accordance with 28 C.F.R. 70 "Uniform Administrative Requirements for Grants and Agreements for Institutions of Higher Education, Hospitals and Other Non-Profit Organizations" and 28 C.F.R. 66 "Uniform Administrative Requirements for Grants and Agreements for State and Local Governments," the recipient agrees to maintain records that identify adequately the source and application of Recovery Act funds.

(2) For a recipient covered by the Single Audit Act Amendments of 1996 and OMB Circular A-133, "Audits of States, Local Governments, and Non-Profit Organizations," the recipient agrees to separately identify the expenditures for federal awards under the Recovery Act on the Schedule of Expenditures of Federal Awards (SEFA) and the Data Collection Form (SF-SAC) required by OMB Circular A-133. This shall be accomplished by identifying expenditures for federal awards made under the Recovery Act separately on the SEFA, and as separate rows under Item 9 of Part III on the SF-SAC by CFDA number, and inclusion of the prefix "ARRA-" in identifying the name of the federal program on the SEFA and as the first characters in Item 9d of Part III on the SF-SAC.

(3) The recipient agrees to separately identify to each sub-recipient (if any) and document at the time of sub-award and at the time of disbursement of funds, the federal award number, CFDA number, and amount of Recovery Act funds. When a recipient awards Recovery Act funds for an existing program, the information furnished to sub-recipients shall distinguish the sub-awards of incremental Recovery Act funds from regular sub-awards under the existing program.

(4) The recipient agrees to require their sub-recipients (if any) to include on their SEFA information to specifically identify Recovery Act funding similar to the requirements for the recipient SEFA described above. This information is needed to allow the recipient to properly monitor sub-recipient expenditure of Recovery Act funds as well as oversight by the Department of Justice, Office of the Inspector General and Government Accountability Office.

(B) Recipient Reports and Central Contractor Registration

(1) The recipient agrees to complete projects or activities which are funded under the Recovery Act and to report on use of Recovery Act funds provided through this award. Information from these reports will be made available to the public.

(2) The reports are due no later than ten calendar days after each calendar quarter in which the recipient receives the assistance award funded in whole or in part by the Recovery Act.

(3) The recipient and their first-tier recipients (if any) must maintain current registrations in the Central Contractor Registration (www.ccr.gov) at all times during which they have active federal awards funded with Recovery Act funds. A Dun and Bradstreet Data Universal Numbering System (DUNS) Number (www.dnb.com) is one of the requirements for registration in the Central Contractor Registration.

(4) The recipient shall report the information described in section 1512(c) of the Recovery Act using the reporting instructions and data elements that will be provided online at www.FederalReporting.gov and ensure that any information that is pre-filled is corrected or updated as needed.

(C) Data Elements of Recipient Reports

In accordance with section 1512(c) of the Recovery Act, the recipient agrees that not later than 10 days after the end of each calendar quarter, each recipient that received Recovery Act funds from a federal agency shall submit a report to that agency that contains —

(1) the total amount of recovery funds received from that agency;

(2) the amount of recovery funds received that were expended or obligated to projects or activities; and

(3) a detailed list of all projects or activities for which recovery funds were expended or obligated, including —

    (a) the name of the project or activity;
    (b) a description of the project or activity;

**EXHIBIT K**
Page 5 of K

COI_000894

**010**

U. S. Department of Justice
*Office of Community Oriented Policing Services*
**COPS Hiring Recovery Program Grant Terms and Conditions**

(c) an evaluation of the completion status of the project or activity;

(d) an estimate of the number of jobs created and the number of jobs retained by the project or activity; and

(e) for infrastructure investments made by state and local governments, the purpose, total cost, and rationale of the agency for funding the infrastructure investment with funds made available under this Act, and name of the person to contact at the agency if there are concerns with the infrastructure investment.

(4) Detailed information on subcontracts or subgrants (if any) awarded by the recipient to include the data elements required to comply with the Federal Funding Accountability and Transparency Act of 2006 (Public Law 109-282), allowing aggregate reporting on awards below $25,000 or to individuals, as prescribed by the Director of the Office of Management and Budget.

These reports are in addition to other financial and programmatic reports required by the COPS Office.

(D) Access to Records and Interviews

The recipient agrees that the Department of Justice (DOJ) and its representatives (including COPS and the Office of the Inspector General (OIG)) and the Government Accountability Office (GAO) shall have access to and the right to examine all records (including, but not limited to, books, papers, and documents) related to this Recovery Act award. The recipient also agrees that DOJ and the GAO are authorized to interview any officer or employee of the recipient regarding transactions related to this Recovery Act award.

(E) Reporting Potential Fraud, Waste, and Abuse, and Similar Misconduct

The recipient agrees to promptly refer to the Office of the Inspector General (OIG) any credible evidence that a principal, employee, agent, contractor, sub-grantee, subcontractor, or other person has submitted a false claim under the False Claims Act or has committed a criminal or civil violation of laws pertaining to fraud, conflict of interest, bribery, gratuity, or similar misconduct involving Recovery Act funds.   The OIG may be contacted at OIG.hotline@usdoj.gov, www.usdoj.gov/oig/FOIA/hotline.htm, and 800.869.4499.

(F) Protecting State and Local Government and Contractor Whistleblowers

The recipient agrees that the Recovery Act provides certain protections against reprisals for employees of non-federal employers (state and local governments or private contractors) who disclose information to federal officials reasonably believed to be evidence of gross management, gross waste, substantial and specific danger to public health or safety, abuse of authority, or violations of law related to contracts or grants using Recovery Act funds.

(G) Separate Tracking and Reporting of Recovery Act Funds and Outcomes

The recipient agrees to maintain accounting systems and records that adequately track, account for, and report on all funds from this Recovery Act award (including officers hired, salaries and fringe benefits paid, and the number of jobs created and jobs preserved) separately from all other funds (including other COPS and federal grants awarded for the same or similar purposes).

(H) Additional Requirements and Guidance

The recipient agrees to comply with any modifications or additional requirements that may be imposed by law and future COPS (including government-wide) guidance and clarifications of Recovery Act requirements.

COI_000895

**011**

# *Inglewood Police Department*

JACQUELINE SEABROOKS
*CHIEF OF POLICE*

MARK FRONTEROTTA
*CAPTAIN*
MARTIN J. SISSAC
*CAPTAIN*

August 3, 2011

Martin U. Onwu
Associate General Counsel
USDOJ:  COPS Office – Legal Division
Two Constitution Square
145 N Street, N.E.
Washington, DC 20530

**RE:    COPS Hiring Program – Award Modification Request**
**       Inglewood (CA) Police Department – CA01933**

Dear Mr. Onwu:

The City of Inglewood is seeking to modify the COPS Hiring Program award initially granted to the City for the hiring of ten (10) police officers in July 2009.

This request is the result of an in-depth analysis of the City's fiscal condition and whether the City will be able to maintain existing police officer staffing levels.  Despite the implementation of a series of expenditure reduction measures, to include the declaration of a municipal fiscal emergency, the implementation of a comprehensive, city-wide Workforce Reduction Plan which also impacted the Police Department, the City will be unable to avoid additional workforce reductions.

The existing sworn staffing in the Police Department has been reduced by almost 20% in the past eighteen months.  Primarily, these reductions have resulted from decisions to eliminate vacant positions and by attrition stemming from retirements and other employee separations.  In order for the City to realize further costs savings, it may be necessary to lay off as many as fifteen (15) additional police officers.   Modifying the terms of the COPS Hiring Program award enables the Police Department to retain as ten (10) sworn officers.

To assist you in your decision to authorize a post-application change in the program award, I have included various municipal documents reflecting the City's economic position, actions by the City Council, and other supporting documents.

**EXHIBIT L**

COI_001039

012

**Mr. Martin Onwu**
**COPS Hiring Program – Award Modification Request**
**Inglewood (CA) Police Department – CA01933**
**Page 2 of 2**

Should you have any questions or should you require any additional information, do not
hesitate to contact me at (310) 412.5540.

**Sincerely,**

**JACQUELINE SEABROOKS**

**Enclosures (6)**

cc:     Hon. Mayor and Council
        Mr. Artie Fields, City Manager
        Micah Herd, Grants Coordinator
        Christy Anderson, Fiscal Services
        Shanelle Chambers, DOJ/COPS Office Monitoring Specialist

**EXHIBIT L**

COI_001040
**013**

## COPS Hiring Program Award Modification Request
### (for post-application lay-offs)

COPS grantees that wish to modify their original COPS hiring award to move funding into the category of *Rehiring Officers Laid Off Post-Application* must complete this form. To be considered for a post-application lay-off modification into the rehire category, the grantee must be seeking to use COPS hiring funds to rehire officers who were officially laid off after the date the hiring application was submitted *or* to rehire officers who are now scheduled for lay-off on a specific date. The COPS Office will only consider a modification request after an agency has made final, approved budget and/or personnel decisions. If approved, COPS hiring grant funds may only be applied to the salary and benefits of officers following the scheduled lay-off date.

Please answer each of the following questions and fax this form with the required supporting documentation (see below) to the COPS Office Legal Division at 202.514.3456, Attention: COPS Hiring Modification Request. Please contact the Legal Division at 202.514.3750 if you have any questions.

1. Agency Name: **CITY OF INGLEWOOD**
2. Agency ORI: **CA01933**
3. Agency Law Enforcement Executive: **JACQUELINE SEABROOKS, CHIEF**
4. Name of Person Completing Form: **MICAH HERD, POLICE GRANTS COORDINATOR**
5. Agency Contact Phone Number: **(310) 412-5506**
6. Agency Contact Fax Number: **(310) 412-8798**
7. Total Number of COPS Positions Awarded: **10**
8. Total Number of Positions to be Modified into this Rehiring Category: **10**
9. Category where these Modified Positions were Originally Awarded:
   - **x** New Hires (# of positions to be modified: **10** )
   - ☐ Rehires (laid off prior to application) (# of positions to be modified: _____ )
10. Date(s) of Post-Application Lay-off(s): **TBD**

### Required Supporting Documentation (Submit to the COPS Office Legal Division):

☐  Grantees must submit documentation showing the specific date(s) of the lay-off(s).

**x**  Grantees must submit documentation showing the reason(s) for the lay-offs or scheduled lay-offs (a modification request will only be approved if the lay-offs occurred or will occur for reasons unrelated to the receipt of COPS funding). *Examples of supporting documentation follow, please check all that apply*:

   **x** ☐ Council or Departmental Meeting Minutes
   **x** Agency memoranda, notices, orders or other official documents
   ☐ Notices provided to the individual officers regarding their lay-offs
   **x** Documents ordering agency lay-offs or related budget cuts
   **x** Budgets showing funding and/or personnel cuts in other departments
   ☐ Other: _____

### Required Certifications (Signature below acknowledges agreement with each Certification):

☐  My agency certifies that the officers we wish to move into the category *Rehiring Officers Laid Off Post-Application* were officially laid off and/or are now scheduled for lay-off on a specific date as the result of financial reasons unrelated to the receipt of COPS funding and therefore would have occurred even in the absence of the grant.

☐  My agency will use COPS hiring funds to rehire the laid off officers only on or after the scheduled lay-off date;

☐  My agency recognizes that the COPS hiring funding is based on our entry-level salary and benefit package and that any additional costs beyond entry-level for rehired officers are our responsibility to pay with other sources of funding.

Law Enforcement Executive Signature: _____ Date: _8-3-2011_

**EXHIBIT L**

COI_001041

014



# CITY OF INGLEWOOD
## OFFICE OF ADMINISTRATION



**DATE:**     April 1, 2010

**TO:**       The Honorable Members of the City Council

**FROM:**     Administration/Finance Department

**THRU:**     Sheldon Curry, Acting City Administrator/Executive Director

**SUBJECT:**  Comprehensive Budget Review and Financial Forecast

1.   **PROPOSAL:**
     It is recommended that the Honorable Members of the City Council take the following actions:

     a. Receive and file the attached written Comprehensive Budget Review and Financial Forecast report; and

     b. Receive an oral presentation from the Assistant City Administrator/Chief Financial Officer; and

     c. Adopt the attached Resolution amending the FY 2009-10 annual budget.

2.   **BACKGROUND INFORMATION:**
     As directed by the City Council, this comprehensive report has been prepared to provide an update on the current and projected future budget situation of the City. The budget amendment will allow for a more realistic comparison of actual results to budget estimates.

     The attached report provides and in-depth analysis of the City's General Fund, including actual results for FY 2008-09, estimates for FY 2009-10 and a five year forecast. The results of this review are not encouraging, as it shows the actual deficit between revenues and expenditures for FY 2008-09 was over $13 million, the estimated deficit for FY 2009-10 remains at approximately $13 million, and without significant action this level of deficit will continue for the foreseeable future. The Assistant City Administrator/Chief Financial Officer will make an oral presentation of the report and other relevant financial information at the meeting.

     Additionally, it is requested that City Council adopt the attached resolution that will amend the FY 2009-10 budget to reflect the updated estimated revenues and expenditures based on the report. The attached amendments will decrease the revenue budget by $3.198 million and increase the expenditure budget by $4.5 million.

3.   **Previous Legislative Action;**
     City Council approved the FY 2009-10 budget on September 29, 2010.

**EXHIBIT L**

COI_001042

015

Honorable Council Members                                          Page 2 of 2
Comprehensive Budget Update and Forecast
April 1, 2010

4.    **Description of Any Attachments:**
      Attachment # 1: Comprehensive Budget Review and Financial Forecast Report
      Attachment # 2: Resolution and Exhibits A and B

5.    **Legal Review Verification:**
      This report, in its entirety, has been submitted, reviewed and approved by the Legal Department.

6.    **Finance Review Verification:**
      This report in its entirety, has been submitted, reviewed and approved by the Finance Department.


**PREPARED BY:**          Jeff Muir, Assistant City Administrator/CFO

**Council Presenter:**    Jeff Muir, Assistant City Administrator/CFO

**PROOFREAD FOR ACCURACY:** Jeff Muir

**ACA APPROVAL:** N/A

**ACTING CITY ADMINISTRATOR  APPROVAL:** _____

**EXHIBIT L**

COI_001043

016

1       RESOLUTION NO. _____

2   A RESOLUTION OF THE CITY COUNCIL OF THE CITY OF

3    INGLEWOOD, CALIFORNIA, AMENDING THE 2009/10

4        ANNUAL BUDGET

5   **WHEREAS,** a comprehensive budget review and forecast has

6 been complete and submitted to the City Council; and

7   **WHEREAS,** it is necessary to amend the budget to reflect

8 corrected revenue projections, to include funding for the 2010

9 special election, and to modify amounts budgeted for overhead

10 charges through the City.

11   **NOW THEREFORE, BE IT RESOLVED** by the City Council of the

12 City of Inglewood, California, that the Fiscal Year 2009/10 City

13 Budget be amended to reflect the adjustments as shown in

14 Exhibits "A" and "B".

15   **BE IT FURTHER RESOLVED,** that the City Clerk shall certify

16 to the adoption of this resolution and the same shall be in full

17 force and effect immediately upon adoption.

18   Passed, approved and adopted this _____ day of

19 _____.

20         _____

21         MAYOR OF THE CITY OF INGLEWOOD

22         CALIFORNIA

23 ATTEST:

24 _____

25 CITY CLERK

26 (SEAL)

27

28

**EXHIBIT L**

COI_001044

## Exhibit A - Amendments to the FY2009/2010 General Fund Budget

**Fund 001  Revenue**

| Budget Code | Account Name | Current Budget | Amended Budget | Increase / (Decrease) |
|---|---|---|---|---|
| 001.001.0101.1051.00 | UUT - Cable | 1,100,000 | 970,000 | (130,000) |
| 001.001.0101.1053.00 | UUT - Electric | 6,080,000 | 5,900,000 | (180,000) |
| 001.001.0101.1054.00 | UUT - Gas | 2,000,000 | 1,730,000 | (270,000) |
| 001.001.0101.1055.00 | UUT - Telephone | 7,500,000 | 6,900,000 | (600,000) |
| 001.001.0101.1001.00 | Property Tax - Secured | 7,385,000 | 7,170,000 | (215,000) |
| 001.001.0101.1025.00 | Sales Taxes | 9,930,000 | 9,230,000 | (700,000) |
| 001.001.0101.5005.00 | VLF - Motor In Lieu | 9,700,000 | 9,900,000 | 200,000 |
| 001.001.0101.2050.00 | Card Club Fees | 4,900,000 | 4,750,000 | (150,000) |
| 001.001.0101.1041.00 | Business License | 4,000,000 | 4,200,000 | 200,000 |
| 001.001.0101.3013.00 | Parking Fines - DMV | 750,000 | 680,000 | (70,000) |
| 001.001.0101.1033.00 | Refuse Franchise Tax | 1,330,000 | 530,000 | (800,000) |
| 001.001.0101.1028.00 | TOT - Transient Occup | 2,300,000 | 2,500,000 | 200,000 |
| 001.001.0101.4001.00 | Investment Earnings | 1,300,000 | 871,700 | (428,300) |
| 001.001.0101.6923.00 | Police Special Services | 350,000 | 180,000 | (170,000) |
| 001.001.0101.5011.00 | POST Reimbursement | 250,000 | 150,000 | (100,000) |
| 001.001.0101.6401.00 | Rogers - Physical Fitness | 23,400 | 33,400 | 10,000 |
| 001.001.0101.6301.00 | Darby - Physical Fitness | 52,650 | 57,650 | 5,000 |

Net Revenue Changes                                                    (3,198,300)

**Fund 001 Expenditure for City Clerk for Special Election**

| Budget Code | Account Name | Current Budget | Amended Budget | Increase / (Decrease) |
|---|---|---|---|---|
| 001.001.1120.45011.00 | Special Expense -Elections | 0 | 250,000 | 250,000 |

**EXHIBIT L**

COI_001045

018

**EXHIBIT B - CHANGES TO OVERHEAD FOR FY2009-2010**

| 001 | GENERAL FUND | | CURRENT FY09/10 BUDGET | AMENDED FY09/10 BUDGET | INCREASE / (DECREASE) |
|---|---|---|---|---|---|
| 001.010.1000.45999.00 | OVERHEAD | | 61,143.00 | - | (61,143.00) |
| 001.010.1001.45999.00 | OVERHEAD | | 14,582.00 | - | (14,582.00) |
| 001.010.1002.45999.00 | OVERHEAD | | 14,203.00 | - | (14,203.00) |
| 001.010.1003.45999.00 | OVERHEAD | | 16,228.00 | - | (16,228.00) |
| 001.010.1004.45999.00 | OVERHEAD | | 14,614.00 | - | (14,614.00) |
| 001.010.1020.45999.00 | OVERHEAD | | 56,895.00 | - | (56,895.00) |
| 001.011.1110.45999.00 | OVERHEAD | | 23,966.00 | - | (23,966.00) |
| 001.012.1200.45999.00 | OVERHEAD | | 24,339.00 | - | (24,339.00) |
| 001.015.1510.45999.00 | OVERHEAD | | 23,240.00 | - | (23,240.00) |
| 001.015.1530.45999.00 | OVERHEAD | | 85,137.00 | - | (85,137.00) |
| 001.035.3510.45999.00 | OVERHEAD | | 149,552.00 | - | (149,552.00) |
| 001.035.3570.45999.00 | OVERHEAD | | 195,527.00 | - | (195,527.00) |
| 001.045.4510.45999.00 | OVERHEAD | | 191,472.00 | - | (191,472.00) |
| 001.045.4512.45999.00 | OVERHEAD | | 127,475.00 | - | (127,475.00) |
| 001.045.4520.45999.00 | OVERHEAD | | 346,652.00 | - | (346,652.00) |
| 001.045.4523.45999.00 | OVERHEAD | | 16,077.00 | - | (16,077.00) |
| 001.045.4525.45999.00 | OVERHEAD | | 33,083.00 | - | (33,083.00) |
| 001.045.4526.45999.00 | OVERHEAD | | 101,019.00 | - | (101,019.00) |
| 001.045.4527.45999.00 | OVERHEAD | | 248,753.00 | - | (248,753.00) |
| 001.045.4529.45999.00 | OVERHEAD | | 145,900.00 | - | (145,900.00) |
| 001.045.4530.45999.00 | OVERHEAD | | 933,190.00 | - | (933,190.00) |
| 001.045.4531.45999.00 | OVERHEAD | | 79,646.00 | - | (79,646.00) |
| 001.045.4532.45999.00 | OVERHEAD | | 37,892.00 | - | (37,892.00) |
| 001.045.4534.45999.00 | OVERHEAD | | 218,979.00 | - | (218,979.00) |
| 001.045.4540.45999.00 | OVERHEAD | | 222,064.00 | - | (222,064.00) |
| 001.045.4547.45999.00 | OVERHEAD | | 419,808.00 | - | (419,808.00) |
| 001.045.4550.45999.00 | OVERHEAD | | 2,291,428.00 | - | (2,291,428.00) |
| 001.045.4551.45999.00 | OVERHEAD | | 269,106.00 | - | (269,106.00) |
| 001.045.4553.45999.00 | OVERHEAD | | 288,796.00 | - | (288,796.00) |
| 001.050.5010.45999.00 | OVERHEAD | | 75,287.00 | - | (75,287.00) |
| 001.050.5020.45999.00 | OVERHEAD | | 67,136.00 | - | (67,136.00) |
| 001.050.5030.45999.00 | OVERHEAD | | 57,926.00 | - | (57,926.00) |
| 001.050.5040.45999.00 | OVERHEAD | | 47,130.00 | - | (47,130.00) |
| 001.050.5050.45999.00 | OVERHEAD | | 41,258.00 | - | (41,258.00) |
| 001.050.5060.45999.00 | OVERHEAD | | 30,690.00 | - | (30,690.00) |
| 001.050.5070.45999.00 | OVERHEAD | | 56,336.00 | - | (56,336.00) |
| 001.050.5071.45999.00 | OVERHEAD | | 15,935.00 | - | (15,935.00) |
| 001.050.5080.45999.00 | OVERHEAD | | 60,123.00 | - | (60,123.00) |
| 001.050.5083.45999.00 | OVERHEAD | | 31,014.00 | - | (31,014.00) |
| 001.060.6010.45999.00 | OVERHEAD | | 6,888.00 | - | (6,888.00) |
| 001.060.6021.45999.00 | OVERHEAD | | 48,784.00 | - | (48,784.00) |
| 001.060.6030.45999.00 | OVERHEAD | | 22,945.00 | - | (22,945.00) |
| 001.060.6032.45999.00 | OVERHEAD | | 20,361.00 | - | (20,361.00) |
| 001.060.6033.45999.00 | OVERHEAD | | 46,427.00 | - | (46,427.00) |
| 001.060.6035.45999.00 | OVERHEAD | | 78,425.00 | - | (78,425.00) |

**EXHIBIT L**

COI_001046

019

### EXHIBIT B - CHANGES TO OVERHEAD FOR FY2009-2010

| 001          GENERAL FUND | | CURRENT FY09/10 BUDGET | AMENDED FY09/10 BUDGET | INCREASE / (DECREASE) |
|---|---|---|---|---|
| 001.060.6053.45999.00 | OVERHEAD | 191,514.00 | - | (191,514.00) |
| 001.070.7010.45999.00 | OVERHEAD | 72,224.00 | - | (72,224.00) |
| 001.070.7021.45999.00 | OVERHEAD | 347,266.00 | - | (347,266.00) |
| 001.070.7031.45999.00 | OVERHEAD | 91,731.00 | - | (91,731.00) |
| 001.070.7032.45999.00 | OVERHEAD | 68,051.00 | - | (68,051.00) |
| 001.070.7034.45999.00 | OVERHEAD | 51,582.00 | - | (51,582.00) |
| 001.070.7039.45999.00 | OVERHEAD | 34,470.00 | - | (34,470.00) |
| 001.070.7042.45999.00 | OVERHEAD | 35,782.00 | - | (35,782.00) |
| 001.070.7043.45999.00 | OVERHEAD | 2,433.00 | - | (2,433.00) |
| 001.070.7045.45999.00 | OVERHEAD | 95,164.00 | - | (95,164.00) |
| 001.070.7049.45999.00 | OVERHEAD | 33,486.00 | - | (33,486.00) |
| 001.070.7050.45999.00 | OVERHEAD | 24,087.00 | - | (24,087.00) |
| 001.070.7053.45999.00 | OVERHEAD | 137,703.00 | - | (137,703.00) |
| 001.070.7090.45999.00 | OVERHEAD | 503.00 | - | (503.00) |
| 001.099.9981.45999.00 | OVERHEAD | (21,930,854.00) | (8,954,736.00) | 12,976,118.00 |
| 050.045.4554.45999.00 | OVERHEAD | 47,048.00 | 68,253.00 | 21,204.75 |
| 060.060.6036.45999.00 | OVERHEAD | 68,181.00 | 83,552.00 | 15,370.74 |
| 062.070.7054.45999.00 | OVERHEAD | 112,455.00 | 160,401.00 | 47,945.66 |
| 062.070.7057.45999.00 | OVERHEAD | 22,404.00 | 35,931.00 | 13,526.90 |
| 062.100.P600.45999.00 | OVERHEAD | 34,000.00 | - | (34,000.00) |
| 062.100.P606.45999.00 | OVERHEAD | 17,000.00 | - | (17,000.00) |
| 062.100.P612.45999.00 | OVERHEAD | 13,000.00 | - | (13,000.00) |
| 062.100.P615.45999.00 | OVERHEAD | 6,000.00 | - | (6,000.00) |
| 062.100.P620.45999.00 | OVERHEAD | 100,000.00 | - | (100,000.00) |
| 062.100.P636.45999.00 | OVERHEAD | 755,000.00 | - | (755,000.00) |
| 062.100.P648.45999.00 | OVERHEAD | 125,703.00 | - | (125,703.00) |
| 062.100.P670.45999.00 | OVERHEAD | 57,000.00 | - | (57,000.00) |
| 062.100.P683.45999.00 | OVERHEAD | 62,000.00 | - | (62,000.00) |
| 062.100.P697.45999.00 | OVERHEAD | 440,000.00 | - | (440,000.00) |
| 064.100.P600.45999.00 | OVERHEAD | 43,000.00 | - | (43,000.00) |
| 070.060.6052.45999.00 | OVERHEAD | 1,388,329.00 | 1,835,139.00 | 446,810.13 |
| 080.060.6037.45999.00 | OVERHEAD | 186,029.00 | 256,930.00 | 70,901.35 |
| 080.060.6056.45999.00 | OVERHEAD | 31,853.00 | 32,064.00 | 211.21 |
| 080.060.6057.45999.00 | OVERHEAD | 50,827.00 | 72,582.00 | 21,755.09 |
| 080.070.7023.45999.00 | OVERHEAD | 177,557.00 | 247,018.00 | 69,460.86 |
| 090.060.6027.45999.00 | OVERHEAD | 70,451.00 | 103,239.00 | 32,787.97 |

## EXHIBIT L

## EXHIBIT B - CHANGES TO OVERHEAD FOR FY2009-2010

| 001        GENERAL FUND | | CURRENT FY09/10 BUDGET | AMENDED FY09/10 BUDGET | INCREASE / (DECREASE) |
|---|---|---|---|---|
| 090.060.6042.45999.00 | OVERHEAD | 67,218.00 | 96,494.00 | 29,276.35 |
| 090.060.6050.45999.00 | OVERHEAD | 22,400.00 | 30,092.00 | 7,692.01 |
| 090.060.6051.45999.00 | OVERHEAD | 90,257.00 | 113,139.00 | 22,881.92 |
| 090.100.P500.45999.00 | OVERHEAD | 83,000.00 | - | (83,000.00) |
| 090.100.P503.45999.00 | OVERHEAD | 33,588.00 | - | (33,588.00) |
| 110.025.2524.45999.00 | OVERHEAD | 64,246.00 | 103,493.00 | 39,247.00 |
| 110.060.6020.45999.00 | OVERHEAD | 52,776.00 | 77,053.00 | 24,276.60 |
| 110.060.6025.45999.00 | OVERHEAD | 1,241,098.00 | 1,619,636.00 | 378,537.81 |
| 110.060.6026.45999.00 | OVERHEAD | 63,340.00 | 96,465.00 | 33,124.71 |
| 110.060.6028.45999.00 | OVERHEAD | 33,319.00 | 47,503.00 | 14,184.23 |
| 110.060.6038.45999.00 | OVERHEAD | 70,400.00 | 99,745.00 | 29,345.25 |
| 110.060.6041.45999.00 | OVERHEAD | 179,338.00 | 252,657.00 | 73,318.87 |
| 110.060.6079.45999.00 | OVERHEAD | 11,799.00 | 16,036.00 | 4,237.00 |
| 110.100.P802.45999.00 | OVERHEAD | 100,000.00 | - | (100,000.00) |
| 110.100.P804.45999.00 | OVERHEAD | 120,000.00 | - | (120,000.00) |
| 110.100.P808.45999.00 | OVERHEAD | 97,300.00 | - | (97,300.00) |
| 110.100.P816.45999.00 | OVERHEAD | 100,000.00 | - | (100,000.00) |
| 125.024.2410.45999.00 | OVERHEAD | 38,627.00 | 73,226.00 | 34,598.62 |
| 125.024.2420.45999.00 | OVERHEAD | 208,441.00 | 274,451.00 | 66,010.39 |
| 125.024.2430.45999.00 | OVERHEAD | 36,228.00 | 69,287.00 | 33,059.11 |
| 125.024.2440.45999.00 | OVERHEAD | 152,512.00 | 198,261.00 | 45,749.01 |
| 125.024.2450.45999.00 | OVERHEAD | 117,228.00 | 157,881.00 | 40,652.50 |
| 125.024.2460.45999.00 | OVERHEAD | 558,234.00 | 768,897.00 | 210,663.13 |
| 125.024.2470.45999.00 | OVERHEAD | 47,903.00 | 82,864.00 | 34,960.75 |
| 125.024.2480.45999.00 | OVERHEAD | 95,451.00 | 149,421.00 | 53,970.13 |
| 125.060.6023.45999.00 | OVERHEAD | 62,417.00 | 86,330.00 | 23,912.54 |
| 160.030.3040.45999.00 | OVERHEAD | 43,187.00 | 323,877.00 | 280,690.04 |
| 160.100.P357.45999.00 | OVERHEAD | 110,505.00 | - | (110,505.00) |
| 169.030.3049.45999.00 | OVERHEAD | 4,843.00 | 27,074.00 | 22,231.43 |
| 170.030.3051.45999.00 | OVERHEAD | 172,914.00 | 267,013.00 | 94,098.70 |
| 220.070.7051.45999.00 | OVERHEAD | 152,860.00 | 201,642.00 | 48,782.06 |
| 220.070.7056.45999.00 | OVERHEAD | 28,586.00 | 24,184.00 | (4,401.85) |
| 220.070.7058.45999.00 | OVERHEAD | 20,631.00 | 31,109.00 | 10,478.46 |
| 220.070.7060.45999.00 | OVERHEAD | 3,821.00 | 5,320.00 | 1,499.00 |
| 220.070.7061.45999.00 | OVERHEAD | 57,008.00 | 79,263.00 | 22,254.87 |
| 220.100.P400.45999.00 | OVERHEAD | 7,000.00 | - | (7,000.00) |
| 220.100.P404.45999.00 | OVERHEAD | 2,800.00 | - | (2,800.00) |
| 221.030.3055.45999.00 | OVERHEAD | 64,699.00 | 81,206.00 | 16,507.19 |

# EXHIBIT L

COI_001048

021

## EXHIBIT B - CHANGES TO OVERHEAD FOR FY2009-2010

| 001 | GENERAL FUND | | CURRENT FY09/10 BUDGET | AMENDED FY09/10 BUDGET | INCREASE / (DECREASE) |
|---|---|---|---|---|---|
| 221.030.3058.45999.00 | OVERHEAD | | 174,172.00 | 289,958.00 | 115,786.43 |
| 221.070.7035.45999.00 | OVERHEAD | | 11,396.00 | 13,127.00 | 1,730.53 |
| 221.070.7063.45999.00 | OVERHEAD | | 8,021.00 | 9,154.00 | 1,132.63 |
| 221.070.7065.45999.00 | OVERHEAD | | 9,401.00 | 11,185.00 | 1,784.11 |
| 221.100.P207.45999.00 | OVERHEAD | | 1,000,000.00 | - | (1,000,000.00) |
| 221.100.P220.45999.00 | OVERHEAD | | 35,000.00 | - | (35,000.00) |
| 221.100.P229.45999.00 | OVERHEAD | | 50,000.00 | - | (50,000.00) |
| 221.100.P232.45999.00 | OVERHEAD | | 63,550.00 | - | (63,550.00) |
| | | | | | |
| 222.032.3259.45999.00 | OVERHEAD | | 157,043.00 | 214,914.00 | 57,870.75 |
| 222.032.3261.45999.00 | OVERHEAD | | 42,533.00 | 67,670.00 | 25,136.83 |
| 222.100.P175.45999.00 | OVERHEAD | | 2,500.00 | - | (2,500.00) |
| 222.100.P176.45999.00 | OVERHEAD | | 2,500.00 | - | (2,500.00) |
| 222.100.P177.45999.00 | OVERHEAD | | 2,500.00 | - | (2,500.00) |
| 222.100.P178.45999.00 | OVERHEAD | | 2,500.00 | - | (2,500.00) |
| 222.100.P179.45999.00 | OVERHEAD | | 2,500.00 | - | (2,500.00) |
| 222.100.P180.45999.00 | OVERHEAD | | 300,000.00 | - | (300,000.00) |
| 222.100.P181.45999.00 | OVERHEAD | | 300,000.00 | - | (300,000.00) |
| 222.100.P182.45999.00 | OVERHEAD | | 300,000.00 | - | (300,000.00) |
| 222.100.P183.45999.00 | OVERHEAD | | 300,000.00 | - | (300,000.00) |
| 222.100.P184.45999.00 | OVERHEAD | | 300,000.00 | - | (300,000.00) |
| 222.100.P185.45999.00 | OVERHEAD | | 300,000.00 | - | (300,000.00) |
| 222.100.P186.45999.00 | OVERHEAD | | 300,000.00 | - | (300,000.00) |
| 222.100.P187.45999.00 | OVERHEAD | | 300,000.00 | - | (300,000.00) |
| 222.100.P188.45999.00 | OVERHEAD | | 300,000.00 | - | (300,000.00) |
| 222.100.P189.45999.00 | OVERHEAD | | 300,000.00 | - | (300,000.00) |
| 222.100.P190.45999.00 | OVERHEAD | | 300,000.00 | - | (300,000.00) |
| 222.100.P191.45999.00 | OVERHEAD | | 300,000.00 | - | (300,000.00) |

**EXHIBIT L**

COI_001049

# City of Inglewood

# COMPREHENSIVE BUDGET REVIEW AND FORECAST



Inglewood

All-America City

2009

**EXHIBIT L**

COI_001050

**023**

**CITY OF INGLEWOOD**
**COMPREHENSIVE BUDGET REVIEW AND FORECAST**
**FY 2008-09 Results, FY 2009-10 Estimates and Five-Year Forecast**
**General Fund**

# Table of Contents

INTRODUCTION ................................................................................................. 2

FY 2008-09 BUDGET-TO-ACTUAL SUMMARY ........................................ 2

   REVENUES .................................................................................................. 2

   EXPENDITURES ......................................................................................... 4

FY 2008-09 EXPENDITURE BUDGET COMPARISON........................... 6

FY 2008-09 OPERATING SUMMARY ......................................................... 8

   REVENUES .................................................................................................. 10

   EXPENDITURES ......................................................................................... 10

   OPERATING DEFICIT ............................................................................... 10

FY 2009-10 BUDGET & PROJECTION ...................................................... 10

   REVENUES .................................................................................................. 10

   EXPENDITURES ......................................................................................... 11

ADDITIONAL COST PRESSURE FOR THE CITY ................................. 13

FIVE YEAR PROJECTION.............................................................................. 14

EXPENDITURE ITEMS NOT INCLUDED ................................................ 17

WHAT OTHER "RESERVES" EXIST? ....................................................... 19

CONCLUSION.................................................................................................. 20

**EXHIBIT L**

COI_001051

**024**

## INTRODUCTION

FY 2008-09 year-end results for the City are not encouraging.  For the first time in several years, the City's General Fund will end the year with a significant operating deficit.  This report was prepared prior to the finalized audited financial statements for FY 2008-09 being available, however the results discussed within this report are substantially final.  Given the magnitude of the deficit, this report will focus only on the General Fund.  A subsequent report will provide more detail on the City's other operating funds.

For FY 2008-09, **General Fund** preliminary year-end revenues are **$82.118 million**, or **94.4%** of adopted budget projections.  General Fund preliminary year-end expenditures are **$95.464 million**, or **98.2%** of the modified budget.  The current gap between revenues and expenditures is approximately **$13.346 million (deficit)**.

| | | |
|---|---|---|
| General Fund Year-end Revenues | $82.118 | million |
| General Fund Year-end Expenditures | $95.464 | million |
| **Operating Deficit** | **($13.346)** | **million** |

This is a very substantial swing in the General Fund results compared to the previous fiscal year (2007-08) where the City saw an operating surplus of slightly over $3 million.  This report will endeavor to explain this significant swing in results.  As expected, the economy played a significant role in certain declining revenues, but there have also been significant increases in expenditures that have further compounded the issue.

Unfortunately, projections show a persistent and continual General Fund operating deficit of roughly 15% that will continue until significant reduction actions are taken.  For FY 2009-10, this means a deficit of approximately $13 million, and the five-year forecast projects the deficit will remain at this level in the coming years despite the predictions for a slow economic recovery beginning in the next year or so.

## FY 2008-09 BUDGET-TO-ACTUAL SUMMARY

### *REVENUES*

The following table provides a summary of projected revenues at the time of the development of the 2008-09 budget versus the actual revenues received.  As might be expected, there is a dramatic difference.  FY 2007-08 represents essentially the last full fiscal year before the economy went into significant recession.  This is when the FY 2008-09 revenue projections were developed.  The effects of the economy can be seen in the nearly $4.9 million shortfall in revenues in FY 2008-09 versus the adopted budget.  Variances over $300,000 will be discussed in more detail.

**EXHIBIT L**

COI_001052

025

| Category | FY09 Budget | FY09 Actuals | Surplus/ (Deficit) | Percent Realized |
|---|---|---|---|---|
| UTILITY USERS TAX | 19,350,000.00 | 17,294,773.08 | (2,055,226.92) | 89.4% |
| PROPERTY TAX | 15,430,000.00 | 15,454,256.64 | 24,256.64 | 100.2% |
| SALES TAXES | 11,700,000.00 | 10,911,984.54 | (788,015.46) | 93.3% |
| MOTOR VEHICLE IN-LIEU | 9,900,000.00 | 9,965,148.29 | 65,148.29 | 100.7% |
| CARD CLUB | 4,970,000.00 | 4,966,155.44 | (3,844.56) | 99.9% |
| BUSINESS LICENSE TAX | 4,300,000.00 | 3,966,113.98 | (333,886.02) | 92.2% |
| TRANSIENT OCCUPANCY TAX | 3,250,000.00 | 2,501,608.68 | (748,391.32) | 77.0% |
| FRANCHISE TAX | 2,890,000.00 | 2,087,765.09 | (802,234.91) | 72.2% |
| PARKING FINES | 2,570,000.00 | 3,098,823.34 | 528,823.34 | 120.6% |
| OTHER TAXES | 1,884,000.00 | 1,833,084.04 | (50,915.96) | 97.3% |
| USE OF MONEY & PROPERTY | 1,828,300.00 | 1,251,252.78 | (577,047.22) | 68.4% |
| CONTRUCTION PERMITS | 1,768,723.00 | 972,631.67 | (796,091.33) | 55.0% |
| VEHICLE CODE FINES | 1,605,000.00 | 858,235.27 | (746,764.73) | 53.5% |
| COMMUNITY DEVELOPMENT | 1,470,292.00 | 1,829,243.49 | 358,951.49 | 124.4% |
| PARI-MUTUEL TAX | 1,050,000.00 | 840,613.14 | (209,386.86) | 80.1% |
| PUBLIC SAFETY | 719,570.00 | 730,894.85 | 11,324.85 | 101.6% |
| HEALTH | 576,450.00 | 594,333.32 | 17,883.32 | 103.1% |
| OTHER | 625,700.00 | 1,596,162.26 | 970,462.26 | 255.1% |
| PARKING METERS | 480,000.00 | 293,472.13 | (186,527.87) | 61.1% |
| CULTURE AND LEISURE | 273,568.00 | 299,080.55 | 25,512.55 | 109.3% |
| OTHER LICENSES AND PERMITS | 200,000.00 | 419,782.88 | 219,782.88 | 209.9% |
| OTHER INTERGOVERNMENTAL | 135,000.00 | 352,538.33 | 217,538.33 | 261.1% |
| **Grand Total** | **86,976,603.00** | **82,117,953.79** | **(4,858,649.21)** | **94.4%** |

**Utility Users' Tax –** Overall, UUT revenue was approximately $2 million under the FY 2008-09 budget estimate.  There were several factors contributing to this.  Electrical UUT was $510,000 under budget.  This was primarily a result of lower consumption due to the very mild summer of 2009.  Natural gas UUT was down $375,000, due both to lower overall consumption in 2009, as well as a decrease in cost.  Finally, telephone UUT (cellular and landline) was down $943,000, due to the lowering of the rate from 10% to 8% for the telecommunications tax as part of Measure UUT, which was approved by the voters in 2008.

**Sales Tax –** Sales Tax fell short of budgeted projections by $788,000.  This is directly attributable to the recession and the dramatic slowdown in retail activity.

**Business Tax –** This revenue source also mirrors the economic cycle like sales tax, and it was $334,000 less than the budget figure.

**Transient Occupancy Tax (TOT) –** This revenue source is very dependent upon a healthy travel and tourism industry in the Southern California region.  One of the immediate byproducts of a recession is a decrease in travel and tourism.  TOT for FY 2008-09 was $748,000 less than budgeted.

**Franchise Tax –** This revenue source includes annual franchise payments from the various utility companies that operate within the City, and it was $802,000 less than budgeted.  The reason for this, however, has nothing to do with the economy.  The budget for FY 2008-09 included an assumption of a $1 million increase in this revenue source based on a percentage of commercial refuse charges being considered as "Franchise Tax" and moved from the Sanitation Fund to the

---

**EXHIBIT L**

COI_001053

026

General Fund.  This was based on the fact that the City applies a mark-up to the rates charged by Waste Management to cover certain direct and indirect administrative functions related to the management of the refuse activity within the City.  However, it was determined that the City was already recovering eligible revenues to the General Fund through the application of indirect cost charges to the Sanitation Fund.  Therefore, this assumption of an additional $1 million in Franchise Tax could not be achieved.

**Parking Fines –** This was one of few revenue categories that came in stronger than budget, in this case by about $529,000.  This was due to several factors including an increase in the ticket amounts, a slight increase in issuance, and better than anticipated results from the DMV registration hold process and collection activities.

**Use of Money & Property –** This revenue category consists primarily of investment earnings. Interest rates declined fairly substantially as part of the economic downturn.  As a result, this revenue source was $577,000 under budget.

**Construction Permits –** A significant factor in the recession was the collapse of the credit markets.  Construction financing was a casualty of this trend, and building activity throughout the state and nation has slowed dramatically.  With a significant decrease in activity, this revenue category was under budget by $796,000.

**Vehicle Code Fines –** This category includes traffic citations issued by the Inglewood Police Department, as well as red light camera enforcement citations.  This revenue category was under budget by $747,000 in large part due to a temporary shut-down of the red light camera system while a contract extension was being processed.

**Community Development –** This category includes primarily plan checking revenues.  Although construction activity decreased in FY 2008-09, there were still a number of projects (a number of them Redevelopment-related) that went through the plan check phase.  This revenue source exceeded the budget by $359,000.

**Pari-Mutuel Tax –** The decline of the horse-racing industry, especially in Inglewood, continues to manifest itself.  This revenue was under budget by $209,000 for FY 2008-09, although the budget projection may have been a little too optimistic.

**Other Revenues –** This combination of various miscellaneous revenue sources exceeded the budgeted amount by $970,000 in FY 2008-09.  The primary reasons were liability claim reimbursements and worker's compensation subrogation claim revenues exceeding budget projections by $400,000.

## *EXPENDITURES*

The table below provides a summary of FY 2008-09 expenditures versus the modified budget.  It also includes the original adopted budget figures and any budget adjustments made during the fiscal year.  The City spent $1.7 million less than the modified budget amount; however, there were $10.9 million in expenditure budget increases for the year.  $5.7 million of these budget adjustments were for the rollover of prior fiscal year encumbrances and did not require 'new' appropriated dollars.

---

Comprehensive Budget Review And Forecast

**EXHIBIT L**

COI_001054

027

| DEPARTMENT | FY09 Adopted Budget | FY09 Budget Adjustments | FY09 Modified Budget | FY09 Actuals | Savings/ (Overrun) |
|---|---|---|---|---|---|
| CITY COUNCIL | 1,355,877 | 19,642 | 1,375,519 | 1,325,048 | 50,471 |
| CITY CLERK | 1,376,365 | (26,543) | 1,349,822 | 930,950 | 418,872 |
| CITY TREASURER | 187,034 | 2,831 | 189,865 | 146,078 | 43,787 |
| CITY ATTORNEY | 2,041,823 | 155,728 | 2,197,551 | 1,901,084 | 296,468 |
| CITY ADMINISTRATOR | 1,263,289 | 78,011 | 1,341,300 | 1,302,091 | 39,209 |
| HUMAN RESOURCES | 1,190,967 | 52,192 | 1,243,159 | 1,280,350 | (37,191) |
| FINANCE DEPARTMENT | 4,066,985 | 230,831 | 4,297,816 | 4,070,248 | 227,568 |
| PLANNING & BUILDING | 2,651,862 | 1,486,255 | 4,138,117 | 3,137,493 | 1,000,625 |
| LIBRARY | 3,658,749 | 306,298 | 3,965,047 | 3,629,452 | 335,595 |
| PARKS, REC & COMM SVCS | 7,226,343 | 1,477,992 | 8,704,335 | 7,775,032 | 929,303 |
| POLICE DEPARTMENT | 45,248,042 | 1,992,299 | 47,240,341 | 46,023,441 | 1,216,899 |
| PUBLIC WORKS DEPARTMENT | 11,535,217 | 2,257,495 | 13,792,712 | 12,002,543 | 1,790,169 |
| NON-DEPARTMENTAL | 4,453,661 | 2,871,402 | 7,325,063 | 11,637,242 | (4,312,179) |
| CAPITAL PROJECTS | - | 19,129 | 19,129 | 302,884 | (283,756) |
| GRAND TOTAL | 86,256,214 | 10,923,562 | 97,179,776 | 95,463,935 | 1,715,840 |

A summary of the $10.9 million in expenditure budget adjustments are as follows:

- $5.7 million for the rollover of prior year encumbrances.  These are contracts or purchase orders that were already entered into but not completed in the prior fiscal year, and the budgetary authority must be rolled into the current year to allow completion / payment. These adjustments did not require 'new' General Fund dollars, as they were already reserved in the prior year.
- $1.6 million increase for raises for the two police bargaining units that were accidentally left out of the budget.
- $1.3 million increase for salary increases and bonuses for civilian bargaining groups.
- $1.1 million for increases to the liability budget due to increases in legal and settlement costs.
- $0.7 million increase for costs relating to processing of Hollywood Park project.  Completely offset by revenues from Hollywood Park.
- $0.4 million increase for budget restorations to the Library and Parks, Recreation & Community Services Departments.
- $100,000 in miscellaneous amendments.

Generally speaking, departments were able to spend well under their appropriated budgets.  This was primarily due to either personnel vacancies or contractual/equipment allocations that were not spent.  The area that went significantly over budget was in the Non-Departmental functions.  This will be discussed in more detail below.  Also to be explained further below is how General Fund expenditures increased from $81.9 million in FY 2007-08 to $95.5 million in FY 2008-09.

**EXHIBIT L**

COI_001055

028

## FY 2008-09 EXPENDITURE BUDGET COMPARISON

The following table represents a comparison of the adopted expenditure budgets for Fiscal Years 2007-08 and 2008-09.

| DEPARTMENT | FY08 Adopted Budget | FY09 Adopted Budget | Increase/ (Decrease) |
|---|---|---|---|
| CITY COUNCIL | 1,346,710.21 | 1,355,877.00 | 9,166.79 |
| CITY CLERK | 931,844.23 | 1,376,365.00 | 444,520.77 |
| CITY TREASURER | 190,933.22 | 187,034.00 | (3,899.22) |
| CITY ATTORNEY | 1,916,627.62 | 2,041,823.00 | 125,195.38 |
| ADMIN-CITY ADMINISTRATOR | 1,374,920.38 | 1,263,289.00 | (111,631.38) |
| HUMAN RESOURCES | 1,203,881.74 | 1,190,967.00 | (12,914.74) |
| FINANCE | 3,122,314.99 | 4,066,985.00 | 944,670.01 |
| PLANNING & BUILDING | 2,599,500.62 | 2,651,862.00 | 52,361.38 |
| LIBRARY | 3,712,827.22 | 3,658,749.00 | (54,078.22) |
| PARKS, RECREATION & COMMUNITY SERVICES | 6,504,211.66 | 7,226,343.00 | 722,131.34 |
| PR&CS-DIRECTOR | 416,699.97 | 556,326.00 | 139,626.03 |
| PR&CS-PARK MAINTENANCE | 2,613,505.81 | 2,584,541.00 | (28,964.81) |
| PR&CS-RECREATION & CULTURAL | 2,142,891.01 | 2,162,587.00 | 19,695.99 |
| PR&CS-HUMAN&SENIOR SERVICES | 457,768.69 | 438,397.00 | (19,371.69) |
| PR&CS-CODE ENFORCMENT & GRAFFITI | 873,346.18 | 1,484,492.00 | 611,145.82 |
| POLICE DEPARTMENT | 37,039,270.09 | 45,248,042.00 | 8,208,771.91 |
| OFFICE OF THE CHIEF | 1,485,003.99 | 1,480,529.00 | (4,474.99) |
| COMMUNITY AFFAIRS | 479,072.10 | 936,903.00 | 457,830.90 |
| ADMINISTRATIVE SERVICES BUREAU | 5,768,314.30 | 6,637,232.00 | 868,917.70 |
| DETECTIVE BUREAU | 9,746,896.08 | 9,700,516.00 | (46,380.08) |
| SPECIAL ENFORCEMENT BUREAU | - | 4,806,526.00 | 4,806,526.00 |
| PATROL BUREAU | 19,559,983.62 | 21,686,336.00 | 2,126,352.38 |
| PUBLIC WORKS DEPARTMENT | 11,619,679.05 | 11,535,217.00 | (84,462.05) |
| PUBLIC WORKS-DIRECTOR | 248,917.30 | 263,466.00 | 14,548.70 |
| PUBLIC WORKS-ENGINEERING | 900,319.56 | 728,230.00 | (172,089.56) |
| P/W-STREETS/SIDEWALKS/TRAFFIC PAINT/METERS | 2,514,711.70 | 2,375,194.00 | (139,517.70) |
| PUBLIC WORKS-GENERAL SERVICES | 4,250,433.30 | 4,581,212.00 | 330,778.70 |
| P/W-FLEET MANAGEMENT | 3,705,297.19 | 3,587,115.00 | (118,182.19) |
| NON-DEPARTMENTAL | 11,880,541.00 | 4,453,661.00 | (7,426,880.00) |
| NON-DEPTL-FIRE | 12,277,000.00 | 12,277,000.00 | - |
| NON-DEPTL-MISCELLANEOUS | 7,689,000.00 | 7,686,168.00 | (2,832.00) |
| NON-DEPTL-INTERFUND TRANSFERS | (8,085,459.00) | (15,509,507.00) | (7,424,048.00) |
| CAPITAL PROJECTS | 1,423,305.00 | - | (1,423,305.00) |
| | | | |
| GRAND TOTAL | 84,866,567.03 | 86,256,214.00 | 1,389,646.97 |

Looking only at the Grand Total would show only a $1.4 million increase in the adopted expenditure budget for FY 2008-09 over 2007-08. However, a more detailed examination reveals

**EXHIBIT L**

COI_001056

029

significant cost increases in a number of departments, offset by a significant increase in interfund transfers.

A summary the major budget increases follows:

- The $445,000 increase in the City Clerk budget represents the fact that FY 2008-09 included funds for elections, where FY 2007-08 did not.

- The $944,000 increase in the Finance Department represents a change in budgeting practices that was implemented in FY 2008-09.  Previously, many of the Accountant positions throughout the City were budgeted directly in special funds (outside of the General Fund) such as redevelopment funds, grant funds, utility funds, the housing fund, etc.  These positions were centralized within the Financial Reporting Division of the Finance Department with the concept that the increased costs would be recovered through additional "overhead" charges to other funds/departments.  The issue with this concept will be discussed later in this section.

- The $722,000 increase in the Parks, Recreation & Community Services budget represents two positions that were added to staff the information desk on the 1st floor of City Hall and the movement of the Graffiti Abatement function to the General Fund (it was formerly substantially CDBG funded).

- The Police Department budget increased approximately $8.2 million over the prior fiscal year.  This was due primarily to a $3.6 million increase due to the transfer of the Anti-Crime Team from the Special Assessment Fund to the General Fund based on the elimination of the Police Benefit Assessment District; a $1.3 million increase due to the transfer of the Transit Safety Team from the Proposition A Fund to the General Fund (an interfund offset was budgeted under the Non-Departmental category); an approximate $1.5 million increase due to the addition of 1 Captain, 5 Sergeants and 2 Lieutenant positions; a $265,000 increase in police training; an approximate increase of $250,000 due to the loss of grant funding for a Sr. Crime Analyst and Sergeant position; and the balance attributable to salary and benefit increases pursuant to Memorandums of Understanding with the bargaining groups representing sworn police employees.

The increases discussed above amount to nearly $10 million versus FY 2007-08, and are primarily on-going costs.  These increases are offset in the grand total for the General Fund due to a $1.4 million decrease in capital projects, which are considered one-time costs, and by an assumption of a net increase in interfund charges of approximately $7.4 million.  Interfund transfers are basically items that show as an expenditure in one fund and an expenditure reduction (negative expenditure line) in another fund.  There are a number of interfund transfers between various special funds and the General Fund to account for services provided or costs incurred by the General Fund in support of these other funds.  This $7.4 million increase in interfund transfers can be explained by the following major items:

- A $1 million increase in the transfer from the Gas Tax Fund to the General Fund based on available Gas Tax funds to reimburse the General Fund for street and sidewalk repair and replacement.

- A $1.8 million increase in the transfer from the Measure IT Fund to the General Fund to cover the cost of salary and benefit increases to the sworn employee groups of the

---

Comprehensive Budget Review And Forecast

Page 7

EXHIBIT L

COI_001057

030

Police Department. The approval of these MOU's included authority to utilize Measure IT funds as a funding source.

- A $1.6 million increase in the transfer of Proposition A Funds to the General Fund to cover the cost of the Transit Safety Team. For many previous years, 1 Sergeant and 9 Police Officer positions were budgeted in the Transit Safety Team division of the Police Department directly in a grant fund that utilized the local return of Proposition A funds. In FY 2008-09, these positions were transferred into the General Fund (showing as an expenditure increase in the Police Department), and the Proposition A funds were budgeted as a transfer into the Non-Departmental division.

- A $4.2 million increase in the assumption for overhead charges to other funds. Overhead is the allocation of administrative costs in the General Fund (Administration, Legal, Human Resources, Finance, and the General Services function of Public Works) to other funds for the centralized services that are provided. The City had a cost allocation plan that was approved by HUD, which had historically been applied in a consistent manner. In FY 2008-09, the budget assumptions for the overhead charges were changed to include applying overhead to capital projects. The problem with this assumption was that the budget showed all these project's budgets would be spent and completed, when the reality was that many of them were not. Overhead charges cannot be posted against expenditures that didn't take place. The impact of this will be seen in the next section of the report.

- The increases in interfund transfers were somewhat offset by a $500,000 increase in retiree medical costs and a $300,000 increase in employee medical costs.

To conclude this section, there were significant expenditure increases to department budgets in FY 2008-09, which were planned to be offset primarily by increased charges to other funds.

## FY 2008-09 OPERATING SUMMARY

The previous section establishes the major changes in the expenditure budget between FY 2007-08 and FY 2008-09. With that information, a comparison of actual financial results for those two years becomes more meaningful.

The following table provides this comparison for the General Fund. As might be expected, there is a dramatic difference. As mentioned previously, FY 2007-08 represents the last full year before the economy went into significant recession. Revenues were still strong at $85.4 million and expenditures were fairly consistent with the previous two years at $81.9 million. It was in September of 2008 when Lehman Brothers failed, and then the credit markets collapsed, pushing the economy into a tailspin. Also to be noted, is that there were significant position vacancies within the Police Department, the Planning and Building Department and the Public Works Department in FY 2007/08 and prior years that helped to artificially deflate expenditures due to salary savings. A number of positions were filled in FY 2008/09 that would show as year-over-year increases compared to the previous year.

The effects of the economy can be seen in the nearly $3.2 million decrease in revenues in FY 2008-09 versus FY 2007-08. The bigger issue facing the City is the significant increase in expenditures. Some of these are one-time variances; however, many are ongoing costs that will continue into the future.

## EXHIBIT L

## Comparison of General Fund Financial Results for FY 2007-08 to FY 2008-09

| CATEGORY | FY08 Actuals | FY09 Actuals | Increase/ (Decrease) |
|---|---|---|---|
| UTILITY USERS TAX | 18,891,564.85 | 17,294,773.08 | (1,596,791.77) |
| PROPERTY TAX | 15,220,163.97 | 15,454,256.64 | 234,092.67 |
| SALES TAXES | 12,103,165.48 | 10,911,984.54 | (1,191,180.94) |
| MOTOR VEHICLE IN-LIEU | 9,632,764.99 | 9,965,148.29 | 332,383.30 |
| CARD CLUB | 5,042,715.44 | 4,966,155.44 | (76,560.00) |
| BUSINESS LICENSE TAX | 4,415,784.28 | 3,966,113.98 | (449,670.30) |
| PARKING FINES | 2,487,807.93 | 3,098,823.34 | 611,015.41 |
| TRANSIENT OCCUPANCY TAX | 3,164,382.34 | 2,501,608.68 | (662,773.66) |
| FRANCHISE TAX | 1,950,987.61 | 2,087,765.09 | 136,777.48 |
| OTHER TAXES | 2,160,791.79 | 1,833,084.04 | (327,707.75) |
| COMMUNITY DEVELOPMENT | 1,538,131.88 | 1,829,243.49 | 291,111.61 |
| OTHER | 1,054,052.86 | 1,596,162.26 | 542,109.40 |
| USE OF MONEY & PROPERTY | 2,409,418.04 | 1,251,252.78 | (1,158,165.26) |
| CONTRUCTION PERMITS | 1,440,543.56 | 972,631.67 | (467,911.89) |
| VEHICLE CODE FINES | 1,459,187.45 | 858,235.27 | (600,952.18) |
| PARI-MUTUEL TAX | 922,980.51 | 840,613.14 | (82,367.37) |
| PUBLIC SAFETY | 326,961.63 | 730,894.85 | 403,933.22 |
| HEALTH | 115,779.14 | 594,333.32 | 478,554.18 |
| OTHER LICENSES AND PERMITS | 186,503.05 | 419,782.88 | 233,279.83 |
| OTHER INTERGOVERNMENTAL | 234,822.32 | 352,538.33 | 117,716.01 |
| CULTURE AND LEISURE | 304,723.46 | 299,080.55 | (5,642.91) |
| PARKING METERS | 353,209.25 | 293,472.13 | (59,737.12) |
| **Grand Total** | **85,416,441.83** | **82,117,953.79** | **(3,298,488.04)** |

| DEPARTMENT | FY08 Actuals | FY09 Actuals | Increase/ (Decrease) |
|---|---|---|---|
| CITY COUNCIL | 1,279,665.68 | 1,325,048.27 | 45,382.59 |
| CITY CLERK | 593,850.70 | 930,949.55 | 337,098.85 |
| CITY TREASURER | 137,263.20 | 146,077.67 | 8,814.47 |
| CITY ATTORNEY | 1,617,075.49 | 1,901,083.63 | 284,008.14 |
| CITY ADMINISTRATOR | 1,074,310.52 | 1,302,090.84 | 227,780.32 |
| HUMAN RESOURCES | 1,213,738.53 | 1,280,350.13 | 66,611.60 |
| FINANCE DEPARTMENT | 2,929,183.81 | 4,070,248.12 | 1,141,064.31 |
| PLANNING & BUILDING | 2,576,724.17 | 3,137,492.70 | 560,768.53 |
| LIBRARY | 3,527,516.80 | 3,629,452.12 | 101,935.32 |
| PARKS, RECREATION & COMMUNITY SVCS | 6,367,661.00 | 7,775,031.74 | 1,407,370.74 |
| POLICE DEPARTMENT | 39,011,967.35 | 46,023,441.38 | 7,011,474.03 |
| PUBLIC WORKS DEPARTMENT | 11,568,793.49 | 12,002,542.64 | 433,749.15 |
| NON-DEPARTMENTAL | 9,883,079.47 | 11,637,242.22 | 1,754,162.75 |
| CAPITAL PROJECTS | 129,628.20 | 302,884.40 | 173,256.20 |
| | 81,910,458.41 | 95,463,935.41 | 13,553,477.00 |

| Operating Surplus / (Deficit) | 3,505,983.42 | (13,345,981.62) | |
|---|---|---|---|

**EXHIBIT L**

## REVENUES

The FY 2008-09 revenue budget projections were based primarily on activity-to-date in FY 2007-08 with some escalating assumptions. The areas of significant variance are consistent with the budget-to-actual analysis that was provided in some detail previously, and the explanations behind the variances are essentially the same. Therefore, the analysis will not be repeated here. Generally, the decrease in revenues of $3.3 million is attributable primarily to the recession and the decrease of the UUT rate on telecommunications.

## EXPENDITURES

Expenditures were $13.5 million higher in FY 2008-09 than FY 2007-08. Much of the reason for this has already been discussed, with the largest increase in the Police Department. One additional item was a $1 million increase in the debt service amount for the Pension Obligation Bonds that was required in FY 2008-09 but was not included in the budget. The debt service for these bonds was structured to increase gradually to provide some budget relief to the City during the earlier years. As mentioned previously, the biggest unrealized assumption in the FY 2008-09 budget was the overestimation of overhead charges that would be recoverable by the General Fund, by well over $4 million.

## OPERATING DEFICIT

The result of operations for FY 2008-09 was a deficit between revenues and expenditures of $13.3 million. Fortunately, the City was in a position of having built up a healthy level of undesignated reserves as of the end of the fiscal year of approximately $17.5 million. Unfortunately, this operating deficit has greatly depleted that number, and the deficit for FY 2009-10 and future years is very significant as well.

## FY 2009-10 BUDGET & PROJECTION

The table on the following page represents the current General Fund revenue and expenditure estimates for the current fiscal year. While the adopted budget included a recognized deficit between revenues and expenditures of over $5 million, the current projection shows the deficit to be approximately $13 million. Of the $7.7 million increase in the estimated deficit, revenues are responsible for $3.2 million, while expenditures are responsible for $4.5 million.

Highlights of the differences between budget and estimates are as follows:

## REVENUES

**Utility Users' Tax** – Reduction based largely on 2009 actuals, which saw decreases in Telecommunications UUT based on the rate reduction from 10% to 8%, as well as lower consumption in Electricity and Gas.

**Property Tax** – There was just over a 1% decrease in the City's assessed valuation for 2009-10.

**Sales Tax** – This estimate is consistent with projections from our consultant, HdL, and continuing economic issues.

**Motor Vehicle-in-Lieu** – Increased based on information from the State.

**Card Club** – Reduction based on recent actual monthly revenues.

**EXHIBIT L**

**Business License Tax** – Increase based on assumption of receiving business tax from certain utility companies.

**Franchise Tax** – Reduction to be consistent with 2009 actual revenues, reversing assumption of additional charges to the Sanitation Fund included in the adopted budget.

**Use of Money & Property** – Reduction reflects lower interest rates and a reduction in available cash due to the deficit.

**Public Safety** – Anticipated lower revenues for POST reimbursements, and less activity for special events.

## *EXPENDITURES*

**City Clerk** – Based on special election(s) now required for FY 09-10.

**Non-Departmental** – Correction for unrealistic assumption of overhead charges to other funds throughout the City for General Fund administrative services received.

---

**EXHIBIT L**

COI_001061

**034**

| REVENUE CATEGORY | FY10 Budget | FY10 Estimate | Variance |
|---|---|---|---|
| UTILITY USERS TAX | 18,430,000 | 17,250,000 | (1,180,000) |
| PROPERTY TAX | 15,915,000 | 15,700,000 | (215,000) |
| SALES TAXES | 10,730,000 | 10,030,000 | (700,000) |
| MOTOR VEHICLE IN-LIEU | 9,700,000 | 9,900,000 | 200,000 |
| CARD CLUB | 4,962,000 | 4,812,000 | (150,000) |
| BUSINESS LICENSE TAX | 4,000,000 | 4,200,000 | 200,000 |
| PARKING/TRAFFIC FINES | 3,970,000 | 3,900,000 | (70,000) |
| FRANCHISE TAX | 2,890,000 | 2,090,000 | (800,000) |
| TRANSIENT OCCUPANCY TAX | 2,300,000 | 2,500,000 | 200,000 |
| OTHER TAXES | 1,929,000 | 1,929,000 | - |
| USE OF MONEY & PROPERTY | 1,728,300 | 1,300,000 | (428,300) |
| COMMUNITY DEVELOPMENT | 1,268,000 | 1,268,000 | - |
| CONTRUCTION PERMITS | 1,011,000 | 1,011,000 | - |
| OTHER | 881,500 | 881,500 | - |
| PARI-MUTUEL TAX | 850,000 | 850,000 | - |
| PUBLIC SAFETY | 746,000 | 476,000 | (270,000) |
| HEALTH | 594,549 | 594,549 | - |
| PARKING METERS | 300,000 | 300,000 | - |
| CULTURE AND LEISURE | 275,710 | 290,710 | 15,000 |
| OTHER LICENSES AND PERMITS | 170,000 | 170,000 | - |
| OTHER INTERGOVERNMENTAL | 135,000 | 135,000 | - |
| **Revenue Total** | **82,786,059** | **79,587,759** | **(3,198,300)** |

| EXPENDITURES BY DEPARTMENT | 2010 Budget | 2010 Estimate | Increase/ (Decrease) |
|---|---|---|---|
| CITY COUNCIL | 1,296,624 | 1,296,624 | - |
| CITY CLERK | 562,874 | 812,874 | 250,000 |
| CITY TREASURER | 185,902 | 185,902 | - |
| CITY ATTORNEY | 2,527,890 | 2,527,890 | - |
| ADMIN-CITY ADMINISTRATOR | 1,467,703 | 1,467,703 | - |
| HUMAN RESOURCES | 1,239,901 | 1,239,901 | - |
| FINANCE DEPARTMENT | 4,334,140 | 4,334,140 | - |
| PLANNING & BUILDING | 2,582,572 | 2,582,572 | - |
| LIBRARY | 3,387,186 | 3,387,186 | - |
| PARKS, RECREATION & COMMUNITY SVCS | 6,801,213 | 6,801,213 | - |
| POLICE DEPARTMENT | 46,299,851 | 46,299,851 | |
| PUBLIC WORKS DEPARTMENT | 11,278,053 | 11,278,053 | - |
| NON-DEPARTMENTAL | 6,198,041 | 10,448,041 | 4,250,000 |
| CAPITAL PROJECTS | - | - | - |
| **Expenditure Total** | **88,161,948** | **92,661,948** | **4,500,000** |

| **Operating Surplus / (Deficit)** | **(5,375,889)** | **(13,074,189)** | **(7,698,300)** |

**EXHIBIT L**

COI_001062

035

## ADDITIONAL COST PRESSURE FOR THE CITY

Along with poorly performing revenues, the City will be facing another economic challenge with the significant increase in CalPERS rates anticipated to begin in fiscal year 2011-12. The decline in the financial markets took a heavy toll on investors during fiscal year 2008-09. CalPERS, even with its size, was not immune to the decline and experienced an almost 25% loss of its assets during the year. Unfortunately, the large loss could not be entirely attributed to poor market conditions. A few very poor and risky financial decisions made by the board also contributed to the losses.

As a direct result of the substantial losses experienced during the dot.com financial crisis, which shot PERS rates up tremendously for many agencies, CalPERS implemented a "smoothing" approach to guard against such large annual increases (or decreases). The smoothing went into effect a few years ago, and since then rates have been hovering around 10% of salary for miscellaneous employees and 19% of salary for public safety employees.

Beginning in fiscal year 2011-12, rates will once again start climbing, and per reports from CalPERS, Inglewood's rates will be in the neighborhood of 20% of salary for miscellaneous employees and 40% of salary for public safety employees by fiscal year 2014-15 (effectively doubling). Based on information from CalPERS, the estimated rate increases for the Miscellaneous and Safety plans from 2011-12 through 2014-15 are included in the table below. These are the percentages of payroll we would add to our projected 2010-11 Employer Rates.

| Fiscal Year | Miscellaneous | Safety |
|-------------|---------------|--------|
| 2011-12 | 2.1% | 3.9% |
| 2012-13 | 3.5% | 6.5% |
| 2013-14 | 3.7% | 6.8% |
| 2014-15 | 0.5% | 0.8% |
|  | 9.8% | 18.0% |

Including these percentage increases into our projected employer paid retirement costs yields the following results for miscellaneous and public safety employees:

| Miscellaneous | Projected Employer Rate | Estimated Payroll | Amount | Cumulative Increase from 10-11 | GF Share |
|---------------|-------------------------|-------------------|--------|-------------------------------|----------|
| 2009-10 | 10.019% | 31,700,000 | 3,176,023 |  |  |
| 2010-11 | 10.125% | 31,700,000 | 3,209,625 |  |  |
| 2011-12 | 12.210% | 31,700,000 | 3,870,570 | 660,945 | 462,662 |
| 2012-13 | 15.750% | 31,700,000 | 4,992,750 | 1,783,125 | 1,248,188 |
| 2013-14 | 19.455% | 31,700,000 | 6,167,235 | 2,957,610 | 2,070,327 |
| 2014-15 | 19.950% | 31,700,000 | 6,324,150 | 3,114,525 | 2,180,168 |

Comprehensive Budget Review And Forecast

**EXHIBIT L**

COI_001063

036

| Safety | Projected Employer Rate | Estimated Payroll | Amount | Cumulative Increase from 10-11 | GF Share |
|---|---|---|---|---|---|
| 2009-10 | 18.883% | 18,230,000 | 3,442,371 | | |
| 2010-11 | 22.238% | 18,230,000 | 4,053,987 | | |
| 2011-12 | 26.138% | 18,230,000 | 4,764,957 | 1,555,332 | 1,555,332 |
| 2012-13 | 32.638% | 18,230,000 | 5,949,907 | 2,740,282 | 2,740,282 |
| 2013-14 | 39.438% | 18,230,000 | 7,189,547 | 3,979,922 | 3,979,922 |
| 2014-15 | 40.238% | 18,230,000 | 7,335,387 | 4,125,762 | 4,125,762 |

The aggregate estimated annual amounts of the increases are:

| FY | Amount | Incr from 10-11 | GF Share |
|---|---|---|---|
| 2010-11 | 7,263,612 | | |
| 2011-12 | 8,635,527 | 2,216,277 | 2,017,994 |
| 2012-13 | 10,942,657 | 4,523,407 | 3,988,470 |
| 2013-14 | 13,356,782 | 6,937,532 | 6,050,249 |
| 2014-15 | 13,659,537 | 7,240,287 | 6,305,930 |

It should be noted that the estimated CalPERS costs identified in the above tables assume no change in employee salaries through fiscal year 2014-15. To the extent that employee salaries increase (or decrease), the corresponding total PERS estimate will increase (or decrease) accordingly. As the tables above clearly illustrate, not only will the City be facing continuing issues with closing the existing gap between revenues and expenditures over the next several years, but the additional pressure of the increasing CalPERS rates makes the endeavor even more difficult.

The City has engaged an actuary to provide a more detailed analysis and projection to the City for the specific impact of the increased retirement costs. CalPERS has very recently begun public discussion of lowering their assumed earnings rate, which will serve to further increase required contributions from public agencies.

Another factor for consideration is the likelihood that both Social Security and Medicare will need to increase employee and employer contributions in the future. As more and more 'baby boomers' enter retirement, the pressure on these systems will require either increased contributions or lower benefits. The ultimate effect of the national healthcare effort and how it will affect these systems, or our own retiree medical system, is completely unknown at this time.

## FIVE YEAR PROJECTION

As mentioned previously, fiscal year 2009-10 interim projections for both revenues and expenditures have been reviewed and revised in certain categories. Projections for future years in the five-year forecast have also been made assuming a slow recovery beginning in FY 2010-11. To the extent that there is any further erosion in the revenue base after the current fiscal year, the projections below would get worse. The table below summarizes the actual results for FY 2008-

09, the projections for the current fiscal year 2009-10, and then a 'baseline' five-year projection for the General Fund.  The percentage growth rate assumptions are also included in separate tables to clearly show the assumptions made.

| FY 2008-09 Actuals, Current Year Estimate and Five-Year Forecast (In Thousands, 000s) | | | | | | | |
|---|---|---|---|---|---|---|---|
| | 2008-09 | 2009-10 | 2010-11 | 2011-12 | 2012-13 | 2013-14 | 2014-15 |
| Beginning Undesignated Fund Balance | 17,576 | 821 | (5,200) | (19,297) | (32,643) | (47,255) | (63,543) |
| Estimated GF Revenues | 82,117 | 79,588 | 80,917 | 82,345 | 84,237 | 86,602 | 89,130 |
| Ongoing Net Income/(Loss) from HP | - | - | - | (239) | 232 | 1,470 | 2,507 |
| One-Time Construction Revenues from HP | - | - | 28 | 2,113 | 2,115 | 1,614 | 1,262 |
| Net GF Revenue Estimate | 82,117 | 79,588 | 80,945 | 84,219 | 86,584 | 89,686 | 92,899 |
| | | | | | | | |
| Estimated GF Expenditures | 95,464 | 92,662 | 92,662 | 94,662 | 97,262 | 100,740 | 104,731 |
| Add'l PERS Increase Projection | - | - | 800 | 1,360 | 2,307 | 2,414 | 303 |
| Group Insurance & Retiree Medical Increase Projection | - | - | 670 | 690 | 710 | 730 | 760 |
| Maintenance & Operations Increase Projection | - | - | 530 | 550 | 570 | 590 | 610 |
| GF Subsidy for CHRP Grant | - | | 380 | 303 | 347 | 1,500 | 1,500 |
| Net GF Expenditure Estimate | 95,464 | 92,662 | 95,042 | 97,565 | 101,196 | 105,974 | 107,904 |
| | | | | | | | |
| Surplus / (Deficit) | (13,347) | (13,074) | (14,097) | (13,346) | (14,612) | (16,288) | (15,005) |
| | | | | | | | |
| Increase in Reserved / Designated Fund Balance | (3,408) | - | - | - | - | - | - |
| | | | | | | | |
| Use of Emergency Reserves | - | 7,053 | | | | | |
| | | | | | | | |
| Ending Undesignated Fund Balance | 821 | (5,200) | (19,297) | (32,643) | (47,255) | (63,543) | (78,548) |

As can be seen above, the City used almost all of its undesignated fund balance during FY 2008-09.  In the current fiscal year (2009-10), the City is projected to completely use up the $7 million emergency reserve that was established as part of the City's financial policies, and still be left with an unfunded $5.2 million.  There are certain other designated reserves in the General Fund that will also have to be looked at, although this will not be an on-going solution or a sound financial policy decision.  These additional designated reserves will be discussed in more detail in a later section of this report.

The following tables illustrate the current growth assumptions made for future year projections.  These rates will be reviewed on an annual basis and take into account criteria such as average historical revenue trends, current economic trends, and known revenue or expenditure increases that will occur given a corresponding event or action.

**EXHIBIT L**

038

| REVENUE GROWTH RATE ASSUMPTIONS | | | | | |
|---|---|---|---|---|---|
| Category | FY 10-11 % Change | FY 11-12 % Change | FY 12-13 % Change | FY 13-14 % Change | FY 14-15 % Change |
| Utility Users Tax | 3.0% | 2.5% | 2.5% | 2.5% | 2.5% |
| Property Tax | -3.0% | 0.0% | 2.0% | 3.0% | 3.0% |
| Sales Taxes | 3.6% | 3.8% | 3.8% | 4.0% | 4.0% |
| Motor Vehicle In-Lieu | -3.0% | 0.0% | 2.0% | 2.0% | 2.0% |
| Card Club | 0.0% | 0.0% | 0.0% | 4.0% | 5.0% |
| Business License Tax | 10.0% | 3.0% | 4.0% | 4.0% | 4.0% |
| Parking/Traffic Fines | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% |
| Franchise Tax | 2.0% | 2.0% | 3.0% | 3.0% | 3.0% |
| Transient Occupancy Tax | 2.0% | 3.5% | 3.5% | 4.0% | 4.5% |
| Other Taxes | 0.0% | 2.0% | 2.0% | 2.0% | 2.0% |
| Use Of Money & Property | 0.0% | 0.0% | 0.0% | 1.0% | 1.0% |
| Community Development | 0.0% | 2.0% | 3.0% | 3.0% | 4.0% |
| Construction Permits | 0.0% | 2.0% | 3.0% | 3.0% | 4.0% |
| Other | 0.0% | 2.0% | 2.0% | 2.0% | 2.0% |
| Pari-Mutuel Tax | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Public Safety | 0.0% | -10.0% | -5.0% | 0.0% | 0.0% |
| Health | 2.0% | 2.0% | 2.0% | 2.0% | 2.0% |
| Parking Meters | 70.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Culture And Leisure | 0.0% | 2.0% | 2.0% | 2.0% | 2.0% |
| Other Licenses And Permits | 0.0% | 2.0% | 2.0% | 2.0% | 2.0% |
| Other Intergovernmental | 0.0% | 2.0% | 2.0% | 2.0% | 2.0% |

Notes:

1. UUT increase in 10-11 assumes rebound in consumption for electric and gas, as well as inflation.
2. Property Tax decrease in 10-11 based on estimate from City's Property Tax consultant, HdL.
3. Sales Tax increase in 10-11 based on estimate from HdL.
4. Card Club revenues are assumed to be flat during Hollywood Park construction, with some pickup after completion.
5. Business Tax is assumed to increase 10% in FY 10-11 based on the audit project.
6. Parking Meter increase in 10-11 assumes City-wide increase of rates.
7. Decreases in Public Safety in 11-12 and 12-13 due to loss of Hollywood Park parking lot for events due to construction.

| EXPENDITURE GROWTH RATE ASSUMPTIONS | | | | | |
|---|---|---|---|---|---|
| Expenditure Category | 2010-11 | 2011-12 | 2012-13 | 2013-14 | 2014-15 |
| Salary & Related Benefits | 0% | 0% | 0% | 0% | 0% |
| CalPERS Retirement (Employer) | 13% | 19% | 27% | 22% | 2% |
| Group Insurance | 5% | 5% | 5% | 5% | 5% |
| Retiree Medical | 6% | 6% | 6% | 6% | 6% |
| M & O | 1%-2% | 1%-2% | 1%-2% | 1%-2% | 1%-2% |
| GF Subsidy for CHRP Grant | $380,000 | $303,000 | $347,000 | $1,500,000 | $1,500,000 |

Notes:

1. Assumes NO salary increases through September 30, 2015.
2. Assumes CalPERS increases based on information from PERS.
3. Assumes normal growth in medical and other insurance costs.
4. M&O increases assume conservative inflation of between 1% and 2%.
5. City received CHRP Grant from DOJ for 10 Police Officers.  Grant does

**EXHIBIT L**

not cover 100% of costs, and City must pick up costs after year three.

Staff will review and adjust these percentages on an annual basis as needed.  Some items to note: Sales Tax will most likely take until fiscal year 2013-14 or 2014-15 to recover to the level of receipts experienced in fiscal year 2007-08; retiree medical premiums are expected to increase slightly faster than active employees due to an increasing number of retirees relative to active employees; lastly, the projections above include an assumption of no additional salary increases through 2014-15.  Salary increases prior to this will result in a corresponding increase to the expenditure numbers.

As a point of reference, staff has determined that the year-over-year revenue growth, starting from the estimated FY 2009-10 revenues, required for the budget to balance by 2014-15 would be approximately 10%.  Put simply, the City would need to see 10% revenue growth every year for the next five years for revenues to catch up to expenditures.  This still assumes no COLA increases.  Staff does not see this as a likely scenario.

## EXPENDITURE ITEMS NOT INCLUDED

### ACCOUNTING FOR OTHER POST-EMPLOYMENT BENEFITS (GASB 45)

The Governmental Accounting Standards Board (GASB) is the organization that is responsible for providing the standards that apply to financial reports of all state and local governmental entities. In June of 2004, the GASB issued Statement No. 45:  Accounting and Financial Reporting by Employers for Postemployment Benefits Other Than Pensions.

In addition to pensions, many state and local governmental employers provide other postemployment benefits (OPEB) as part of the total compensation offered to attract and retain the services of qualified employees.  OPEB includes postemployment healthcare, as well as other forms of postemployment benefits (for example, life insurance) when provided separately from a pension plan.   This Statement established standards for the measurement, recognition, and display of OPEB in the financial reports of state and local governmental employers.  Inglewood offers postemployment health care benefits to qualifying retirees, and therefore was required to implement GASB 45 into its financial statements ending September 30, 2008.

Postemployment benefits (OPEB as well as pensions) are part of an exchange of salaries and benefits for employee services rendered.  Of the total benefits offered by employers to attract and retain qualified employees, some benefits, including salaries and active-employee healthcare, are taken while the employees are in active service, whereas other benefits, including postemployment healthcare and other OPEB, are taken after the employees' services have ended.  Nevertheless, both types of benefits constitute compensation for employee services.

From an accrual accounting perspective, the cost of OPEB, like the cost of pension benefits, generally should be associated with the periods in which the exchange occurs, rather than with the periods (often many years later) when benefits are paid or provided.  However, in current practice, most OPEB plans are financed on a pay-as-you-go basis, and financial statements generally do not report the financial effects of OPEB until the promised benefits are paid.

Employers, like Inglewood,  that offer defined benefit OPEB plans are required to measure and disclose an amount for annual OPEB cost on the accrual basis of accounting.  Annual OPEB cost

**EXHIBIT L**

COI_001067

040