is equal to the employer's Annual Required Contribution to the plan (ARC). The ARC is defined as the employer's required contributions for the year, calculated in accordance with certain actuarial parameters, and includes (a) the normal cost for the year and (b) a component for amortization of the total unfunded actuarial accrued liabilities of the plan over a period not to exceed thirty years.

For financial reporting purposes, an actuarial valuation is required at least biennially for OPEB plans with a total membership (including employees in active service, terminated employees who have accumulated benefits but are not yet receiving them, and retired employees and beneficiaries currently receiving benefits) of 200 or more, or at least triennially for plans with a total membership of fewer than 200. Inglewood has a total membership exceeding 200, and is therefore required to have biennial actuarial valuations.

An employer's net OPEB obligation is defined as the cumulative difference between annual OPEB cost and the employer's contributions to a plan.

In 2007, the City contracted with Bartel Associates, LLC to perform an actuarial study associated with the implementation of Governmental Accounting Standards Board (GASB) Statement No. 45. The primary purpose of this study was to determine the long-term costs of the City's medical insurance for retirees. The draft report was provided to the Finance and HR Departments. The report analyzed the cost to provide the benefits currently offered over the next thirty years, based on current active and retired employees, and using actuarial assumptions and trends. The City currently funds this benefit on a pay-as-you-go basis, and the estimated amount for Fiscal Year 2009-10 is $3.5 million. The report showed that this cost will continuously rise at a fairly significant rate, doubling from the current amount by 2017 and more than doubling again by the end of the thirty years. If the City wanted to pre-fund this benefit today, it would need to invest $110 million into a trust account earning a 7.75% rate-of-return (similar to what CalPERS assumes for their portfolio). If the City chose to fund the benefit pursuant to GASB 45 over the thirty years, and deposit funds annually into an irrevocable trust fund, it would require $7.9 million annually in a trust earning 7.75% (lower earnings would require a higher amount). This means basically doubling the current amount the City pays. While there is not a legal requirement to fund this amount, the issue facing the City is that in about ten years this is the amount the City will need to fund on a pay-as-you-go basis, and it will continue to rise. Additionally, the City will be required to report the difference between the Actuarially Required Contribution and what it actually funds on its financial statements. The financial statements for the year ended September 30, 2009 reflect a $14.7 million liability for unfunded OPEB benefits.

There are only two legitimate ways to control the future costs of retiree medical coverage. Prefunding these future costs or limiting liability. There are several ways the future liabilities can be limited: curbing (reducing) benefits, capping employer contributions, converting to a defined contribution plan or increasing vesting requirements. For reference, the average present value of the current retiree medical benefit is over $200,000 per employee. Further pre-funding of the existing benefits will require identifying significant new revenues or expenditure reductions in other areas.

Bartel Associates, LLC is currently completing the biennial update of this report and will be delivering the results directly to City Council within the next few months.

---

Comprehensive Budget Review And Forecast

COI_001068

041

**EXHIBIT L**

## DEFERRED MAINTENANCE

Deferred maintenance issues exist both with City public facilities as well as with infrastructure, such as streets and sidewalks. Most City facilities were constructed thirty to forty or more years ago. Most of these buildings have not received the upgrades they probably should have over time due to the difficulty of deciding between reserving monies for this purpose or spending them on programs. Like many cities, Inglewood has not elected to create or fund an on-going reserve over the years to handle these types of upgrades. There are now a number of significant improvements or renovations required at many City facilities. Examples include the need to replace elevators in City Hall and the Library, fire suppression needs in City Hall and other facilities, seismic retrofitting of City facilities and ensuring ADA standards are met throughout the City. Additionally, the City has deferred technology needs such as the replacement of the proprietary Computer-Aided Dispatch system, as well as replacement of police radios and mobile display computers. In light of the current budget situation, it will be important for the City Council to consider not only making the sacrifices necessary to cure the operating budget deficit, but to also consider sacrifices that will allow for funding these improvements.

Additional deferred maintenance issues are prevalent in our streets and sidewalks. The City has generally not dedicated General Fund resources to street replacement or improvement. The allocations the City receives from state Gas Tax are used mainly for repair and minor replacements. The City has traditionally sought outside funding (e.g., county, state, or federal) for projects on its major streets. However, these outside funding sources are typically not available for neighborhood street projects. While street replacement is an eligible use of Redevelopment Agency funds, it can only be used for streets within the project area. Most of our residential streets are not within a Redevelopment project area. This is another area the City is going to have to consider dedicating future resources to in order to address the deteriorating condition of many of these streets.

## WHAT OTHER "RESERVES" EXIST?

The budget deficit identified in this report is significant and on-going. The fact it is an on-going deficit means the use of reserves will only be a temporary solution that delays the inevitable. In the end, either revenues must go up, or expenditures must go down. It has already been established that by the end of the current fiscal year, undesignated fund balance, as well as the funds designated for emergency by the City's financial policy, will be exhausted. In terms of additional funds that are designated for a particular use, the following items exist:

| Designated for: | $ Millions |
|---|---|
| Equipment Replacement | $0.8 |
| General Liability | $7.1 |
| Worker's Comp | $3.7 |
| Accrued Vacation | $4.7 |
| Accrued Sick | $4.7 |
| **Total Designations:** | **$21.0** |

Bear in mind that the figures above no longer include the emergency reserve of 8% of the City's budget. As already explained, the City will need to exhaust this reserve in order to make it through the current fiscal year. This leaves no reserves for any kind of natural or other type of disaster.

**EXHIBIT L**

COI_001069

042

The funds designated for Equipment Replacement represent a set-aside of funding towards the future replacement of vehicles.  The City does not currently operate a formal 'equipment replacement' program, and this was an item the Administration has recommended for future implementation.  If the City is going to invest in vehicles, it also needs to recognize the need for their future replacement and fund the cost over time.  Staff is currently researching whether prior vehicle replacements may have utilized this funding, and if so, the amount will be moved into undesignated fund balance.  If the funds have not already been spent for this purpose, the City Council could 'undesignate' them.

The General Liability and Worker's Compensation designations represent the reserves the City has been able to set-aside through liability charges (mostly to the General Fund) over the years to offset the need for major expenditures due to claims in the future.  While staff strongly recommends that a strong reserve be maintained, the City Council could consider a phased approach to reduce the reserve level over the course of two or three fiscal years to provide some budget relief.  It must also be recognized that if there were ever a significant event, or events, that required the City to exceed what was left in the reserve, it would have to come out of other operating funds.  The City is self-insured for the first $1 million in each lawsuit. Therefore, maintaining an adequate reserve to cover several such potential cases is important.

The funds set aside for Accrued Vacation and Sick time represent a portion of the amounts owed to current employees based on their vested benefit in vacation and sick hours they have earned over their careers.  These funds are set aside to pay employees out for unused leave balances when they retire or leave City service.  The officially recognized estimate of these compensated absences is $11.7 million as listed in the FY 2007-08 CAFR, compared to the $9.4 million currently set aside in designated reserves. It is unlikely that the City would ever need to pay out the full liability at any one time, or even over a short period.  Historically, these reserves have increased slightly each year, meaning there may be some opportunity to use a portion of these funds as a buffer against the deficit.  Again, staff would strongly recommend against completely utilizing these funds for this purpose.

It is recommended that any use of these designated funds only be used as a bridge to restructure the City's expenses and bring annual operating expenses in line with annual operating revenues. Without any other reserves, it would be financially irresponsible to simply use these designated reserves without also enacting significant operating changes as well.  This is especially true when large operating deficits are projected for several more years.

## CONCLUSION

Inglewood is not unlike many other agencies facing the same types of fiscal issues.  Certainly there may be other cities facing equal, or in some cases, more dire circumstances.  There is no argument, however, that the financial future will look completely different in Inglewood – not only with flat or possibly decreasing revenues, but additional expenditure increases the City has little control over without dramatic changes in pensions and retiree health benefits.

This purpose of this report is to give an accurate account of where the City's finances currently sit, and how they project out into the foreseeable future.  There is an on-going deficit that has been identified that is approximately 15% of the General Fund that does not go away.  There are two ways to solve a deficit:  increase revenues or decrease expenditures.  As has been discussed in

**EXHIBIT L**

other reports, the only major increase to revenues that could be achieved would be through a new tax or the increase of an existing one, both of which would have to get voter approval and are extremely unlikely.  That leaves the alternative over which the City does have more control, expenditures.  Since we are a full-service City, more than 80% of our budget is allocated to personnel costs.  Most of the major items that are not personnel costs such as the fire services contract, insurance premiums, etc., which while they may be negotiable to some extent, are largely outside of our direct control.  Therefore, the reality is that balancing the budget will primarily mean reducing personnel costs.  This can be achieved through the elimination of positions, staff and services, or through reducing the overall cost to the City of existing staff, or some combination of both.  Whatever the case, it is critical that everyone understand we are not talking about trimming minor budget items or simply deferring costs; we are talking about significant cuts and reductions if the gap is going to be closed.

Equally important to keep in mind is that if General Fund debt service payments, Police costs, and Fire costs are taken off the table, it leaves only approximately $28 million for everything else such as public works, parks, libraries, and administrative functions.  With a $13 million deficit, it would mean 50% reductions in these areas unless Police and Fire costs are included.

This report will not delve into specific recommendations for these reductions, as this may involve employee bargaining or other issues.  The City Council will be working closely with administration to identify budget balancing measures and implement them.  More information on this will be forthcoming once specific recommendations have been formulated and agreed upon.  Certainly it will require a total team effort between the City Council, administration, employees and residents to solve this issue.

**EXHIBIT L**

COI_001071

044



# CITY OF INGLEWOOD
## Office of the Acting City Administrator



Inglewood
All-America City
2009

**DATE:**      **August 10, 2010**

**TO:**        **The Honorable Members of the City Council**

**FROM:**      **Deputy City Administrator/Chief Information Officer**

**SUBJECT:**   **Discussion Regarding the Initiation of the Process to Offer Two-Year Retirement Incentives to Certain Classifications of Employees in the City of Inglewood**

## RECOMMENDATION

It is recommended that the Honorable Members of the City Council discuss initiating the process of offering a two-year retirement incentive to certain classifications of City employees and provide direction to staff.

## BACKGROUND INFORMATION

The City is a member of the California State Public Employee's Retirement System (CalPERS). The retirement plan and optional amendments as defined in Government Code Section 20903 (attached) provides, by contract amendment, a means to offer an enhanced retirement incentive to employees during times of overall workforce reduction or changes in the manner of doing business. Since the City began the current fiscal year grappling with a severe budget deficit that is likely to lead to staff reductions, changes in the manner in which City services are performed is imminent, thus making this incentive option timely and appropriate.

Several times in the past, the City has offered retirement incentives in the form of additional CalPERS retirement credit in an effort to reduce personnel-related budgetary expenses (e.g., salaries, benefits, etc.) by inducing eligible staff to retire. Since long-tenured, retirement-eligible employees are typically at the top of the pay grade of their positions, the City can incentivize these employees by offering two-years of retirement credit provided that these employees agree to retire during a specified window of time the City and CalPERS agree to (typically 90 days).

Because the cost of the two-year incentive, which is approximately 70% of the employees' annual salary, is spread across two years and simply added to the City's annual CalPERS obligation, the City begins to realize savings of approximately 74% the first and second years followed by 100% savings in the third and subsequent years.

The following table illustrates the approximate cost savings of a hypothetical employee earning a base salary of $75,000:

| Base Salary | Benefits | Total Cost of the Position Per Year | CalPERS Two-Year Cost (70% of Base Salary) | Year 1 Savings (Total Cost minus ½ of Two-Year Cost) | Year 2 Savings | Year 3 and Beyond Savings |
|---|---|---|---|---|---|---|
| $ 75,000 | $ 25,000 | $ 100,000 | $ 52,500 | $ 73,750 | $ 73,750 | $ 100,000 |

It is important to note that the CalPERS guidelines for offering a two-year retirement incentive require that the governing body show that the position (or another position/vacancy within any department or

One W. Manchester Boulevard • Inglewood, CA • 90301 • Phone (310) 412-8751 • www.cityofinglewood.org

**EXHIBIT L**          COI_000072    CA-1

045

organizational unit) be permanently unfilled thereby resulting in an overall reduction in the workforce of that department or organizational unit.  Furthermore, an employee who takes advantage of this opportunity may not re-enter CalPERS covered service with any agency or he or she will forfeit the two years of service credit.  Finally, a retiree cannot receive credit under this program if he or she receives unemployment insurance benefits during the designated window.

## DISCUSSION

An initial survey that was sent to all eligible employees earlier this year resulted in 51 respondents indicating that they were "very interested" (34) or "somewhat interested" (17).  Since this survey was sent out, six (6) staff members are no longer with the City leaving 30 respondents indicating that they were very interested and 15 indicating they might be interested.  Based upon direction from Council, staff will send a second survey to all eligible employees tomorrow requesting to know if those who already responded are in fact still interested and those employees who may now be eligible or didn't respond the first time are interested.  Survey recipients will be given five (5) business days to respond.  Once all responses are tabulated, Human Resources staff will compile a list in order to determine if those positions (or other eligible positions) can be permanently eliminated in accordance with the CalPERS Guidelines.

After review and approval by Administration, a detailed report listing the anticipated early retirements (e.g., the specific classifications), the associated savings, and the specific, permanent eliminations will be brought back to Council for approval along with the appropriate resolution for adoption.

It should be noted that not every retirement-eligible employee that indicates their interest in receiving the two-year incentive may receive it because there is a possibility that their position (or another position) cannot be permanently eliminated.

## FINANCIAL/FUNDING ISSUES AND SOURCES

The costs associated with offering a two-year retirement incentive are added to the City's CalPERS rates and spread over two years resulting in savings to the City.  Provided direction is given to staff to initiate the process, a complete listing of those staff members who are interested in accepting a two-year incentive to retire early will be compiled along with the resultant positions to be permanently eliminated.  At that time, a formal breakdown of savings can be calculated.

## DESCRIPTION OF ANY ATTACHMENTS

- Government Code Section 20903. Grant of Additional Service Credit to Local Members by Contracting Agencies.

## LEGAL REVIEW VERIFICATION   *CPs*

This report, in its entirety, has been submitted to, reviewed, and approved by the Office of the City Attorney.

## FINANCE REVIEW VERIFICATION  *Daf*

This report, in its entirety, has been submitted to, reviewed, and approved by the Finance Department.

**PREPARED AND REVIEWED BY:**        Sheldon Curry, Acting City Administrator
                                                                  Michael D. Falkow, Deputy City Administrator/CIO

**EXHIBIT L**

COI_001073

**046**

Honorable Members of the City Council                                    Page 3 of 3
Discussion Regarding Offering a Two-Year Retirement Incentive
August 10, 2010

PREPARED AND REVIEWED BY:      Sheldon Curry, Acting City Administrator
                               Michael D. Falkow, Deputy City Administrator/CIO

COUNCIL PRESENTER:             Michael D. Falkow, Deputy City Administrator/CIO

ACTING CITY ADMINISTRATOR APPROVAL:    _____

**EXHIBIT L**

COI_001074

047

*Via Facsimile: (310) 412-8789*
_____
(Fax Number)

*Attention:* **City of Inglewood Police Department, Chief Jacqueline Seabrooks**
_____
(Law Enforcement Agency Name, Executive Name)

RECEIVED
AUG 3 0 2011

## MODIFICATION REQUEST DENIAL
### COPS Hiring Program Award Modification Request
### Post-Application Lay-offs

This document is to notify you that your agency's request to modify your COPS Hiring Recovery Program (CHRP) grant to move funding into the category of *Rehiring Officers Laid Off Post-Application* is denied. This decision is based on the following reason(s) (see checked items):

**XX** The documentation provided by your agency did not demonstrate that the lay-off(s) occurred/will occur as a result of local financial distress unrelated to the receipt of CHRP funding;

o Your agency failed to certify to one or more of the three required certifications contained in the Modification Request form;

**XX** Other:

**To be considered for a post-application modification from the new hire category to the rehire category, an agency must demonstrate that the officers to be rehired were officially laid off or are now officially scheduled for lay-off on a specific date as the result of financial reasons unrelated to the receipt of CHRP funding. As noted on the modification request form, the COPS Office will only consider a modification request after an agency has made final, approved budget and/or personnel decisions. Based on the documentation submitted by your agency it does not appear that the lay-off decisions are final. As such, we are unable to consider or approve your modification request.**
**(I am attaching a modification FAQ sheet for your review)**

Accordingly, your agency is not authorized to move CHRP funds into the category of *Rehiring Officers, Laid Off Post-Application*. Instead, it must spend the CHRP funds based on the original award categories. Grant funds must be spent in compliance with the nonsupplanting requirement of the COPS statute, as described in detail in the CHRP Grant Owner's Manual. You may contact your COPS Grant Program Specialist at 800.421.6770 if you have any questions regarding grant implementation.

1. Agency Name:                           **City of Inglewood Police Department**
2. Agency ORI:                            **CA01933**
3. Agency Law Enforcement Executive:      **Jacqueline Seabrooks, Chief**
4. Agency Fax Number:                     **(310) 412-8789**

## MODIFICATION DENIED BY COPS OFFICE LEGAL DIVISION

Attorney Name :     Jonya E. Wagner            *for immediate assistance*
Contact Number*:    (202) 616-9781             *— Legal Division*
Date:               August 30, 2011            *202-514-3750*

*Please contact the COPS Office Legal Division at the contact number listed if you have any questions regarding this decision.

*msg: Ms Wagner 10:15am 9/7*

*general: 2:15pm 9/7*

**EXHIBIT M**

COI_000951

**048**

June 29, 2011

## COPS Hiring Program Modifications for Post-Application Lay-Offs
*(Requesting a Change in Hiring Category from New Hire to Rehire)*
(Frequently Asked Questions)

This FAQ sheet is for COPS grantees who were awarded COPS hiring grant funds to hire new, additional career sworn officers to increase their force but are now required to lay-off officers or have had to lay-off officers because of cuts in their law enforcement budget due to fiscal distress that occurred after applying for the grant. Rather than using COPS grant funds for new hires, your agency may be able to modify the use of your COPS grant funds to rehire the officer who was laid off or the officer who is now scheduled to be laid off. The COPS Office will approve using grant funds to rehire officers who were laid off or who are now scheduled for lay-off if you can demonstrate that the budget cuts and lay-offs are unrelated to the receipt of COPS funds.

Your agency must receive prior written approval from the COPS Office before your grant funds can be used to rehire officers. If your agency's modification request is not approved, you must either implement the COPS hiring grant as originally awarded for new hires or withdraw from the grant.

### What is a modification for post-application lay-offs?

A modification for a post-application lay-off, which is a lay-off that occurs after you submitted your grant application, is a change in hiring category from "new hire" to "rehire" following the award of the grant. If you experienced cuts in your law enforcement budget that resulted in the lay-off or scheduled lay-off of locally-funded officers after you submitted your COPS hiring grant application for new officer positions, you can apply for a modification to use COPS funds under the "rehire" category instead of the "new hire" category. Under the "rehire" category, your agency may hire back an officer who was laid off that the lay-offs are the result of budget cuts and not related to the receipt of the grant. In other words, you would be requesting to save officers from lay-off with COPS funding instead of using the funds to hire new officers.

### When can a grantee be considered for a post-application modification from the new hire category to the rehire category?

To be considered for a post-application lay-off modification into the rehire category, you must be seeking to use COPS hiring funds to:

- rehire an officer who was laid off after the grant application was submitted; or
- rehire an officer who is now scheduled for lay-off on a specific future date that can be documented.

The COPS Office will only consider a modification request *after* your agency has made final, approved budget and/or personnel decisions. In addition, all post-application modification requests must comply with the nonsupplanting requirement of the COPS statute.

## Modifications and Nonsupplanting

### What is the relationship between a post-application lay-off modification request and the nonsupplanting requirement?

Modification requests to change the hiring category from new hire to rehire for an officer laid off or scheduled for lay-off on a specific date post-application must comply with the statutory nonsupplanting requirement of the COPS hiring program.  Under the nonsupplanting requirement, you may not use COPS grant funds to pay for the salary and benefits of officer positions that are funded in your local budget.

To comply with the nonsupplanting requirement, the modification request must:

- demonstrate that your agency is not using COPS grant funds to supplant (replace) local funds that otherwise would have been used for sworn officers in the absence of the grant;
- demonstrate that the officer your agency is seeking to rehire with COPS grant funds was laid off, or will be laid off on a specific date, as a result of financial reasons unrelated to the receipt of COPS grant funding;
- demonstrate that  budget and personnel decisions were not made based on the receipt of the COPS grant award (*i.e.*, the COPS grant award was not considered in the budget deliberations);
- demonstrate that all personnel and budget decisions related to the lay-off are final and approved by the appropriate governing body before submitting modification request; and
- demonstrate the exact date of lay-off since grant funds can only be used on or after the actual date of lay-off.

## Modification Requests

### How does a grantee request a post-application lay-off modification?

To request a modification based on a post-application lay-off, you must complete and submit a post-application award modification request form. (A copy of the modification request form may be obtained at www.cops.usdoj.gov/pdf/COPS_Hiring_Modification_Form.pdf.)  As explained in the modification request form, your agency must also submit:

- documentation showing the specific date(s) of the lay-off(s);
- documentation identifying the specific officer(s) laid off or scheduled for lay-off(s) that your agency is  seeking to rehire; and
- documentation showing the reason(s) for the lay-off(s) or scheduled lay-off(s) (a modification request will only be approved if the lay-offs occurred  for reasons unrelated to the receipt of COPS funding).

*Examples of supporting documentation that may be included with your modification request include, but are not limited to:*

- Council or Departmental Meeting Minutes
- Agency memoranda, notices, orders or other official documents

2 | Page

**EXHIBIT M**

COI_000953

050

- Notices provided to the individual officers regarding their lay-offs
- Documents ordering agency lay-offs or related budget cuts
- Budgets showing funding and/or personnel cuts in other departments

You should fax your completed modification request form and supporting documentation to the COPS Office Legal Division at 202.514.3456. If your modification request is approved, COPS hiring grant funds may only be applied to the salaries and approved fringe benefits of officers following the scheduled lay-off date. Grant funding must be limited to paying your agency's entry-level salary and fringe benefits; any costs higher than entry-level must be paid by your agency with local funds.

## Modification Approvals

### If approved, when can an agency rehire an officer that was laid off or scheduled for lay-off post-application with COPS hiring funding?

If approved, your agency may use COPS grant funds to rehire the officers who were laid off post-application on or after the grant award start date. You may rehire the officers who are scheduled for lay-off on a specific future date on or immediately after the date of the scheduled lay-off.

Unless required by your jurisdiction, your agency is not required to formally complete the administrative steps associated with the lay-off of the individual officers you are seeking to rehire so long as your agency can document that a final, approved budget decision was made to lay off those particular individual officers on the identified lay-off date(s). For example, unless required by your agency, you are not required to formally terminate an officer, discontinue benefits or strip seniority, as long as you are able to demonstrate, through supporting documentation, the official date the lay-off would occur without the grant.

### If the request for modification for post-application lay-off(s) is approved, will the grantee receive a Modified Award Document?

Yes. The COPS Office will send a Modified Award Document to the grantee and the grantee must sign and return the Modified Award Document to the COPS Office to confirm the modification, but implementation of the modified award may begin upon notification of approval by the Legal Division.

If you have any questions regarding this process, please call the Legal Division at 202.514.3750.



# CITY OF INGLEWOOD

### Office of the Mayor

**James T. Butts, Jr.**
Mayor

**All-America City**
**2009**

October 12, 2011

Martin U. Onwu
Associate General Counsel
U.S. Department of Justice
Office of Community Oriented Policing - Legal Division
Two Constitution Square
145 N Street, N.E.
Washington, DC 20530

**RE:    Award Modification Request (Reconsideration)**
       **2009COPS Hiring and Recovery Program (CHRP) Grant**
       **Inglewood (CA) Police Department**
       **Agency ORI:      CA01933**
       **Grant #:          2009RKWX0119**

Dear Mr. Onwu:

In July 2009, The City of Inglewood and its Police Department were awarded CHRP grant funding for ten (10) new/additional sworn police officer positions; however, due to evolving budgetary shortfalls and the accompanying uncertainty associated with the City's financial picture, these funds were not utilized.  New municipal leadership is in place and the true extent of the City's financial challenges are known. The City of Inglewood is now requesting a modification in the hiring category from "new hires" to "rehires" to prevent the lay-off of eight (8) police officers.

As you know, many states across the country are in dire fiscal straits; the State of California is no exception.  Revenues normally accruing to municipalities in California are being withheld by the State in order to remedy the State's economic woes.  As a result of State "take-backs" and the significant decline in sales and property tax revenues, the City of Inglewood faced significant budgetary shortfalls in FY 2010-11 and will continue to face significant shortfalls in FY 2011-2012.   In order to close the shortfall, the City implemented an array of expenditure reduction measures following the declaration of a municipal fiscal emergency.   These spending reduction measures included the implementation of a comprehensive City-wide Workforce Reduction Plan, employee concessions, and service elimination/reduction plans.    The City also expended designated reserves and one-time funds to close the budget deficit.

One W Manchester Boulevard • Inglewood, CA • 90301 • Phone (310) 412-5300 • Fax (310) 412-5763 • www.cityofinglewood.org

**EXHIBIT N**

COI_013303

052

October 12, 2011
U.S. Department of Justice
Office of Community Oriented Policing – Legal Division
Page 2 of 3

In the latter part of August 2011, the City was notified that in order to be considered for a post-application modification from the new hire category to the rehire category, the City must "demonstrate that the officers to be rehired were officially laid off *or* are now officially scheduled for lay-off on a specific date as a result of financial reasons unrelated to the receipt of CHRP funding."  The following information illustrates the need for the grant modification:

- Since the latter part of FY 2008/2009, the City of Inglewood has eliminated 121 full-time and 27 part-time (or full-time equivalent (FTE)) positions, including the sworn positions of Police Captain (1), and Police Sergeant (5).

- In FY 2010/2011, the City of Inglewood implemented a workforce reduction program, an employee furlough program, and a variety of other employee concessions.

  In FY 2010/2011, the City of Inglewood defunded five (5) additional Police Sergeant positions.

- On September 27, 2011, the Inglewood City Council approved a FY 2011/2012 Budget which utilizes the savings associated with the lay-off of eight (8) police officers and the freezing of 24 additional (non-Police) positions to balance the FY 2011/2012 budget.

- On October 5, 2011, eight (8) Inglewood Police Officers were served notices of lay-off to become effective November 5, 2011.

The City of Inglewood is requesting a modification of the original CHRP grant terms to prevent the lay-off of sworn police officers that would otherwise occur given the City's financial condition.  Approval of this grant modification request is the only viable way to balance the budget in FY 2011/12.  I have provided various municipal documents reflecting the City's response to its economic position for your consideration; the relevant passages in the documents have been marked for your ease in reference. The Inglewood Police Department and its mission of ensuring public safety are of the highest priority to the Inglewood City Council.

**EXHIBIT N**

COI_013102

053

October 12, 2011
U.S. Department of Justice
Office of Community Oriented Policing – Legal Division
Page 3 of 3


Should you or a member of your staff have any questions or should you require any additional information, do not hesitate to contact our City Manager, Mr. Artie Fields, at (310) 412-5301.

Sincerely,

JAMES T. BUTTS, JR.
Mayor


Enclosures:    *CHRP Award Modification Request:  Post Application Layoffs*
               *City of Inglewood City Council Agenda/Minutes*
               *City of Inglewood Budgetary Staff Report/Budget Message*
               *City of Inglewood Annual Budget Workshop – Powerpoint Presentation*
               *Signed Receipt for Notices of Lay-off*
               *Notices of Lay-off (8)*
               *CD: Inglewood City Council Meeting/Budget Workshop of 9/26/2011 (2 discs)*
               *CD: Inglewood City Council Meeting of 9/27/2011 (1 disc)*


e-cc:    Inglewood City Council
         Mr. Artie Fields, City Manager
         Jacqueline Seabrooks, Chief of Police
         Micah Herd, Police Grants Coordinator
         Christy Anderson, Police Fiscal Services Coordinator

cc:      Bernard K. Melekian, COPS Director
         Jonya E. Wagner, COPS Office Legal Division
         Shanelle Chambers, DOJ/COPS Office Monitoring Specialist


**EXHIBIT N**

COI_013103

**054**

## COPS Hiring Program Award Modification Request
### (for post-application lay-offs)

**COPS grantees that wish to modify their original COPS hiring award to move funding into the category of *Rehiring Officers Laid Off Post-Application* must complete this form. To be considered for a post-application lay-off modification into the rehire category, the grantee must be seeking to use COPS hiring funds to rehire officers who were officially laid off after the date the hiring application was submitted *or* to rehire officers who are now scheduled for lay-off on a specific date. The COPS Office will only consider a modification request after an agency has made final, approved budget and/or personnel decisions. If approved, COPS hiring grant funds may only be applied to the salary and benefits of officers following the scheduled lay-off date.**

Please answer each of the following questions and fax this form with the required supporting documentation (see below) to the COPS Office Legal Division at 202.514.3456, Attention: COPS Hiring Modification Request. Please contact the Legal Division at 202.514.3750 if you have any questions.

1. Agency Name: **CITY OF INGLEWOOD**
2. Agency ORI: **CA01933**
3. Agency Law Enforcement Executive: **JACQUELINE SEABROOKS, CHIEF**
4. Name of Person Completing Form: **MICAH HERD, POLICE GRANTS COORDINATOR**
5. Agency Contact Phone Number: **(310) 412-5506**
6. Agency Contact Fax Number: **(310) 412-8798**
7. Total Number of COPS Positions Awarded: **10**
8. Total Number of Positions to be Modified into this Rehiring Category: **10**
9. Category where these Modified Positions were Originally Awarded:
   - **x** New Hires (# of positions to be modified: **10** )
   - ⌐ Rehires (laid off prior to application) (# of positions to be modified: _____ )
10. Date(s) of Post-Application Lay-off(s): **TBD**

### Required Supporting Documentation (Submit to the COPS Office Legal Division):

☐ Grantees must submit documentation showing the specific date(s) of the lay-off(s).

**X** Grantees must submit documentation showing the reason(s) for the lay-offs or scheduled lay-offs (a modification request will only be approved if the lay-offs occurred or will occur for reasons unrelated to the receipt of COPS funding). *Examples of supporting documentation follow, please check all that apply*:

   **X** ☐ Council or Departmental Meeting Minutes
   **X** ☐ Agency memoranda, notices, orders or other official documents
   ☐ Notices provided to the individual officers regarding their lay-offs
   **X** ☐ Documents ordering agency lay-offs or related budget cuts
   ☒ Budgets showing funding and/or personnel cuts in other departments
   ☐ Other: _____

### Required Certifications (Signature below acknowledges agreement with each Certification):

☐ My agency certifies that the officers we wish to move into the category *Rehiring Officers Laid Off Post-Application* were officially laid off and/or are now scheduled for lay-off on a specific date as the result of financial reasons unrelated to the receipt of COPS funding and therefore would have occurred even in the absence of the grant.

☐ My agency will use COPS hiring funds to rehire the laid off officers only on or after the scheduled lay-off date;

☐ My agency recognizes that the COPS hiring funding is based on our entry-level salary and benefit package and that any additional costs beyond entry-level for rehired officers are our responsibility to pay with other sources of funding.

Law Enforcement Executive Signature: _____ Date: _____

## EXHIBIT N



**INGLEWOOD, CALIFORNIA**
Web Site -- www.cityofinglewood.org



## NOTICE AND CALL OF SPECIAL MEETING OF INGLEWOOD CITY COUNCIL
### AND  REDEVELOPMENT AGENCY
#### (Government Code Section 54956)

### TO THE MEMBERS OF THE CITY COUNCIL AND REDEVELOPMENT AGENCY
### OF THE CITY OF INGLEWOOD

**NOTICE IS HEREBY ORDERED** by the Mayor/Chairman that a special meeting of the Council/Agency of the City of Inglewood will be held on Tuesday, September 27, 2011, commencing at 5:00 P.M. in the Council Chambers, One Manchester Boulevard, Inglewood, California (Government Code Section 54956).

**MAYOR**
 James T. Butts, Jr.
**COUNCIL MEMBERS**
 Michael M. Stevens, District No. 1
 Judy Dunlap, District No. 2
 Eloy Morales, Jr., District No. 3
 Ralph L. Franklin, District No. 4

**CITY CLERK**
 Yvonne Horton
**CITY TREASURER**
 Wanda M. Brown
**CITY MANAGER**
 Artie Fields
**CITY ATTORNEY**
 Cal Saunders

### AGENDA
### CITY COUNCIL/REDEVELOPMENT AGENCY

### CLOSED SESSION ITEMS ONLY – 5:00 P.M.

 Roll Call

### PUBLIC COMMENTS REGARDING CLOSED SESSION ITEMS ONLY

Persons wishing to address the City Council/Redevelopment Agency on closed session items may do so at this time.

 CS-1.    Closed session - Confidential - Attorney/Client Privileged; Potential Litigation, Government Code Section 54956.9(b)(1); Labor and Employment Issues.
**PULLED**
 CS-2.    Closed session – Personnel Exemption; Government Code Section 54957; Review of Employee Discipline/Dismissal/Release; One Case (Police Officer).
**PULLED**

**EXHIBIT N**

City of Inglewood                                                          September 27, 2011

---

**CLOSED SESSION - CONTINUED**

CS-3.     Closed session - Confidential - Attorney/Client Privileged; Potential Litigation, Government Code Section 54956.9(b)(1); Claim of Veritext Los Angeles Court Reporter for services rendered not covered under contract.

**MOTION TO APPROVE PAYMENT OF BILLING APPROVED**

CS-4.     Closed session - Confidential - Attorney/Client Privileged; Potential Litigation, Government Code Section 54956.9(b)(1); Claim of PDA for services rendered not covered under contract.

**MOTION TO APPROVE PAYMENT OF BILLING APPROVED**

CS-5.     Closed session - Confidential - Attorney/Client Privileged; Potential Litigation, Government Code Section 54956.9(b)(1); Claim of Bert Porter for services rendered not covered under contract.

**MOTION TO APPROVE PAYMENT OF BILLING APPROVED**

CS-6 &    Closed session - Confidential - Attorney/Client Privileged; Potential Litigation, Government
CSR-1.    Code Section 54956.9(c); Discussion regarding the proposal to abolish Redevelopment Agencies in the State of California.

**PULLED**

CS-7 &    Closed session - Confidential – Attorney/Client Privileged; Potential Litigation, Government
CSR-2.    Code Section 54956.9(b)(1); Property located at 716 and 720 Beach Avenue (APN 4017-025-902, 903).

**DISCUSSION HELD; NO FINAL ACTION TAKEN**
  **OPENING CEREMONIES – 7:00 P.M.**

Call to Order

Pledge of Allegiance

Roll Call

**PUBLIC COMMENTS REGARDING AGENDA ITEMS**

Persons wishing to address the City Council on any item on today's agendas other than closed session and the public hearing may do so at this time.

**WARRANTS AND BILLS**

1, R-3 &   Warrant Register.
  H-1.     <u>Recommendation</u>:
                 1) Allow for Payment of Bills.

**APPROVED**

---

**EXHIBIT N**

COI_013106

**057**

**PUBLIC HEARING**

PH-1.   Public hearing to consider an appeal of the Planning Commission's approval of Special Use Permit No. 1124 (SP-1124) to allow an abandoned service station to be developed with a privately-owned and operated parking lot that is open to the public on an approximately 15,121 square-foot R-1 (One-family Residential) zoned property at 6500 South La Cienega Boulevard.
Recommendation:
   1) Receive public input; and
   2) Adopt resolution upholding the Planning Commission's decision; or
   3) Direct staff to bring back a resolution to be adopted overturning the Planning Commission's decision (appropriate findings must be found).

**1) PUBLIC INPUT RECEIVED; 2)RESOLUTION NO. 11-26 ADOPTED UPHOLDING THE PLANNING COMMISSIONS DECISION**
**CONSENT CALENDAR – APPROVED AS RECOMMENDED EXCEPT AS NOTED**

These items will be acted upon as a whole unless called upon by a Council member.

2.   Approval of the minutes of the meetings held August 9, 2011 and August 16, 2011.  *
Recommendation:
   1) Approve.

3.   Staff report recommending approving the purchase of four black and whites and two Ford Ranger extended cab pick-up trucks.  * (General Funds and Airport Noise Mitigation Funds)
Recommendation:
   1) Approve.

4.   Resolution establishing per diem for City Officials and employees as well as establishing automobile allowance for City employees. *
Recommendation:
   1) Adopt resolution.

**RESOLUTION NO. 11-27 ADOPTED**

5.   Staff report recommending approval and adoption of a resolution establishing the City's Tax Supported Appropriations Limitation for the 2011-2012 fiscal year as required by the "Gann Amendment" to the Constitution. *
Recommendation:
   1) Approve; and
   2) Adopt resolution.

**RESOLUTION NO. 11-28 ADOPTED**

**EXHIBIT N**

**City of Inglewood**                                                                                  **September 27, 2011**

## ORDINANCE

O-1.    Salary Ordinance for the 2011-2012 fiscal year.
       Recommendation:
          1) Motion to waive further reading; and
          2) Introduce ordinance.

**MOTION TO WAIVE FURTHER READING APPROVED; ORDINANCE NO. 11-11 INTRODUCED**

### REPORTS – CITY MANAGER

CM-1.    Staff report recommending adoption of a resolution approving and adopting the 2011-2012 fiscal year budget.
       Recommendation:
          1)  Adopt resolution.

**RESOLUTION NO. 11-129 ADOPTED**

CM-2 & R-5.    Staff report recommending adoption of a resolution transferring available funds within the Redevelopment Division from salary to contract services, and approve a professional services agreement with Gordon Anderson to provide redevelopment assistance to Administration and the Community Development Department. * (Redevelopment Fund)
       Recommendation:
          1)  Adopt resolution; and
          2)  Approve one-year agreement in an amount not to exceed $100,000.

**RESOLUTION NO. 11-130 ADOPTED; AGREEMENT APPROVED**

CM-3.    Verbal reports – City Manager.

### REPORT – COMMUNITY DEVELOPMENT

CD-1 & H-3.    Staff report recommending adoption of a resolution amending the FY 2010-2011 Housing budget for a revenue increase of $1,604,844 and an expenditure increase of $1,482,646.
       Recommendation:
          1)  Adopt resolution.

**RESOLUTION NO. 11-131/H-11-2 ADOPTED**

CD-2 & H-4.    Staff report recommending adoption of a resolution approving the Housing Internal Control Policies to comply with HUD Regulations. *
       Recommendation:
          1)  Adopt resolution.

**RESOLUTION NO. 11-132/H-11-3 ADOPTED**

### REPORTS – CITY ATTORNEY

A-1.    Report on closed session items.

A-2.    Verbal reports – City Attorney.

### REPORTS – CITY CLERK

**EXHIBIT N**

COI_013108

**059**

CC-1.    Verbal reports – City Clerk.

## REPORTS – CITY TREASURER

CT-2.    Verbal reports – City Treasurer.

## APPOINTMENTS TO BOARDS, COMMISSIONS AND OTHER COMMITTEES

## PUBLIC COMMENTS REGARDING OTHER MATTERS

Persons wishing to address the City Council on any matter connected with City business not elsewhere considered on the agenda may do so at this time.  Persons with complaints regarding City management or departmental operations are requested to submit those complaints first to the City Manager for resolution.

## COUNCIL REMARKS

## MAYOR  REMARKS

## ADJOURNMENT CITY COUNCIL

In the event that today's meeting of the City Council is not held, or is concluded prior to a public hearing or other agenda item being considered, the public hearing or non-public hearing agenda item will automatically be continued to the next regularly scheduled City Council meeting.

## AGENDA
## INGLEWOOD REDEVELOPMENT AGENCY

Call to Order

Roll Call

R-4.    Approval of the minutes of the meetings held August 9, 2011 and August 16, 2011.  *
        Recommendation:
               1) Approve.
**APPROVED**
R-5 &    Staff report recommending adoption of a resolution transferring available funds within the
CM-2.    Redevelopment Division from salary to contract services, and approve a professional
         services agreement with Gordon Anderson to provide redevelopment assistance to
         Administration and the Community Development Department. * (Redevelopment Fund)
         Recommendation:
               1)  Adopt resolution; and
               2)  Approve one-year agreement in an amount not to exceed $100,000.
**THIS WAS NOT A REDEVELOPMENT ITEM COUNCIL ONLY SEE R-5**

**EXHIBIT N**

COI_013109

**060**

**City of Inglewood**                                                                    **September 27, 2011**

**REDEVELOPMENT AGENCY - CONTINUED**

R-6.     Staff report recommending, under protest and subject to reservation, adoption of a resolution approving the Recognized Obligation Payment Schedule (ROP Schedule) to be filed with the State of California Department of Finance establishing certain Agency enforceable obligations.*

Recommendation:
          1) Adopt resolution.

**RESOLUTION NO. R-11-25 ADOPTED**

R-7.     Staff report recommending adoption of a resolution approving and adopting the FY 2011-2012 Redevelopment Agency Budget.

Recommendation:
          1) Adopt resolution.

**RESOLUTION NO. R-11-26 ADOPTED**

**ADJOURNMENT REDEVELOPMENT AGENCY**

In the event that today's meeting of the Redevelopment Agency is not held, or is concluded prior to a public hearing or other agenda item being considered, the public hearing or non-public hearing agenda item will automatically be continued to the next regularly scheduled Redevelopment Agency meeting.

**EXHIBIT N**

COI_013110

**061**

## AGENDA
## INGLEWOOD HOUSING AUTHORITY

Call to Order

Roll Call

H-2.  Approval of the minutes of the meetings held August 9, 2011 and August 16, 2011.  *
      Recommendation:
          1) Approve.

**APPROVED**

H-3 &  Staff report recommending adoption of a resolution amending the FY 2010-2011 Housing
CD-1.  budget for a revenue increase of $1,604,844 and an expenditure increase of $1,482,646.
       Recommendation:
           1) Adopt resolution.

**RESOLUTION NO. 11-131/H-11-2 ADOPTED**

H-4 &  Staff report recommending adoption of a resolution approving the Housing Internal Control
CD-2.  Policies to comply with HUD Regulations. *
       Recommendation:
           1) Adopt resolution.

**RESOLUTION NO. 11-132/H-11-3 ADOPTED**

**ADJOURNMENT HOUSING AUTHORITY**

In the event that today's meeting of the Housing Authority is not held, or is concluded prior to a public hearing or other agenda item being considered, the public hearing or non-public hearing agenda item will automatically be continued to the next regularly scheduled Housing Authority meeting.

**\* Copies to Council, Agency, and Authority**

> **Inglewood City Council Meetings are broadcast on Wednesdays and Fridays at 7:00 p.m. on Time Warner Cable Channel 35.**

**EXHIBIT N**

COI_013111



# CITY OF INGLEWOOD

### Office of the City Manager

**Artie Fields**
City Manager

2009

September 27, 2011

**Honorable Mayor and City Council Members of the City of Inglewood:**

It is my privilege to present the Approved City of Inglewood FY 2011-12 Annual Operating and Capital Improvement Project (CIP) Budgets. These budgets are of particular importance to me because they are my first budgets as the newly appointed Inglewood City Manager. The Operating and CIP Budgets represent a monumental undertaking that could not have been completed without the tireless efforts of the Budget Team, Department Heads, and their respective staff. Their contributions were critical and assisted me in making decisive decisions in order to present a balanced budget.

While Fiscal Years 2008-09 and 2009-10 proved to be two of the most challenging fiscal years in decades, FY 2010-11 ushered in signs that the economy had hit rock bottom and the City was slowly moving out of its dire economic state of affairs. Major signs of this positive trend included revenue reports that began to show sales tax proceeds improving. After nearly two years of sagging sales, (beginning with the 2010 3rd Quarter report), Inglewood sales tax receipts have shown increases over the past four consecutive quarters, increasing 8.4%, 2.4%, 9.3%, and most recently 14%. Used car, automotive-related, fuel, and general consumer sales are proving to be the strongest sectors in Inglewood's retail revival. Continued sales growth should see the City's sales tax revenues move toward pre-recession levels ($12.3 million in FY 2007-08). Although there are small, albeit important, signs that the economy is recovering, the pace of this recovery will still require residents, visitors, and business owners to continue to adjust to fewer and less frequent basic services provided by the City.

Property tax revenues have not similarly rebounded. Due to warnings of rising delinquencies and defaults, anticipated property tax receipts are expected to be reduced by 3.4% or $542,546 in the coming year.

On balance, General Fund revenues are expected to edge up 1.4%, or $1.1 million from the adopted FY 2010-11 budget. This provides General Fund-supported services with a small measure of relief but doesn't fully offset increases in operating costs outside of our control.

In order to balance the proposed FY 11-12 budget it is recommended that 24 positions be frozen at an annual cost savings of approximately $2.3 million and that 8 police officers be laid-off at a cost savings of approximately $1 million. This action is necessary because non-designated reserves have been exhausted and no other alternative funding sources are available. One exception, however, is a grant awarded by the Department of justice (DOJ). The COPS Hiring Recovery Program is a competitive grant program that provides $1 billion in new funding directly to law enforcement agencies to create and preserve jobs and to increase their community policing capacity and crime prevention efforts. COPS funds provide 100% of entry-level police officer salary and benefits for the first three years. In initially awarding the City funds (which have not yet been drawn down) in 2009, DOJ considered the impact of the City's current economic crisis, as well as crime statistics and plans for initiating and advancing community policing. The City has submitted a request to the DOJ to use a $3 million grant to retain the 8 police offers scheduled for lay-off, instead of hiring 10 new police officers. Many cities throughout the

**EXHIBIT N**

COI_013112

063

country have made the same request and have received approval from DOJ. If this is approved, the City will rescind the lay-off notices. . All of the aforementioned personnel reductions are significant because the City has already eliminated 121 fulltime and 27 part-time (or fulltime equivalent [FTE]) positions since FY 2008-09.

Without the benefit of current financial audits, the City balanced the FY 2008-09 General Fund Budget with $13.4 million in reserves and balanced the FY 2009-10 General Fund Budget by using $18.37 million of its reserves. The City balanced the FY 10-11 General Fund Budget by using $2.4 million in reserves. By contrast, the proposed FY 2011-12 General Fund Operating budget recommends the City Council draw down $860,000 from its designated reserves to close the structural shortfall. The City's designated reserves are at dangerously low levels, however, the use of these funds is needed to close the budget shortfall, allow the City to maintain service levels, avoid further lay-offs, and provide additional time to identify cost saving ideas, streamline the organization, become more efficient and identify new revenue sources. The City is not alone in its use of reserves and one-time revenue to balance the budget. Countless cities throughout the State are making similar decisions during the economic downturn. As one can imagine, eliminating 16.4% of the workforce in just over three years can paralyze any organization. Fortunately, employees have stepped up and met the challenge by coming together to ensure that all critical functions of the City are carried out. I am most impressed by their commitment to the City and the professionalism with which they perform their duties. I am sure that the City Council and community share my respect and gratitude for the contributions made by employees in the best interests of the City.

The economic climate that we are in has forced many cities to become more creative and do more with less. As such, it is incumbent upon the City of Inglewood to continue to conduct self-examinations of the organization and understand that the role of municipal government is changing, and therefore, we must change with it if we are to leverage new opportunities.

Although much has been implemented to streamline the organization and identify efficiencies, additional cost-cutting and revenue-generation measures require implementation to secure our financial future. In order to anticipate future economic downturns, it is recommended the City develop a five-year financial plan. It is imperative that we move away from a formal budget cycle that examines our budget on a year-to-year basis, without the insight of the challenges and opportunities ahead. Having a five-year plan is considered a best practice and is an effective tool utilized by most municipalities. Finance staff has indicated they do not recall or have any information to indicate that a five-year plan has been developed in the City over the last ten years or more.

**Summary**

In order to balance the FY 2011-12 General Fund Operating Budget, the City must continue to rely on its reserves and one-time revenues or choose to further reduce services, lay-off staff, or negotiate additional employee concessions. Employee concessions over the last nine months totaled approximately $2.2 million and will generate $3.2 million in savings for FY 2011-12. These savings are significant and will reduce the impact of the economic downturn on the community.

The City's Proposed FY 2011-12 General Fund Operating Budget is $78.4 million or 2.6% *less* than the modified General Fund Operating Budget for FY 2010-11. The overall reduction reflects a myriad of cost-cutting recommendations approved by the City Council during FY 2010-11 to reduce operating costs. The City would have achieved additional savings if it were not for the rising cost of California

ii

Public Employees' Retirement System (CalPERS) contributions, health insurance premiums for active employees and retirees, and workers compensation rates.

The balance of the budget includes Special Revenue Fund ($23,842,296), Proprietary Fund ($19,194,964), Water Enterprise Fund ($22,966,537), Assessment and Maintenance Districts ($2,552,583), HUD (CDBG) Fund ($18,362,336), Grant Fund ($4,295,935), Civic Center and Pension Bond Debt Service ($6,382,397), Redevelopment Agency, including debt service ($77,154,959), Housing Fund ($13,053,828), Noise Mitigation Fund ($15,910,679), and Measure IT Fund ($5,464,000). The total consolidated City Budget is $287,555,543.  Of this amount, a total of $87,768,323 is earmarked for Capital Improvement Projects.

The City's Proposed FY 2011-12 General Fund Estimated Revenue is $77,519,407. The balance of Estimated Revenue includes: Special Revenue Fund ($22,548,766), Proprietary Fund ($18,386,850), Water Enterprise Fund ($13,649,000), HUD (CDBG) Fund ($16,677,831), Grant Fund ($3,629,137), Civic Center and Pension Bond Debt Service ($6,382,397), Redevelopment Agency, including debt service ($41,458,369),  Housing Fund ($13,204,176), Noise Mitigation Fund ($13,918,501), Measure IT Fund ($5,224,000), plus carry over amount of $54,957,109.  The total City Estimated Revenues and use of carry-over funds is $287,555,543.

## Budget Process

The City closed a $17 million FY 2010-11 Budget short-fall by eliminating a number of services, employee lay-offs, early retirements, furloughs, and use of one-time funds from the sale of City property and designated reserves.  Over the past two years, with the adoption of the FY 2009-10 and FY 2010-11 budgets, City Council has implemented many strategic budget-balancing solutions.  These budget-balancing solutions minimized cuts to vital police, fire, and library services.  The bargaining process to negotiate concessions with the City's six employee groups began in July 2010 and concluded in January 2011.  Employee concessions total approximately $4.5 million annually, of which $3.2 million accrue to the General Fund.  In FY 2010-11, these concessions were $2.25 million (e.g., 75% of the fiscal year) and were 15.8% of the reductions required to balance the FY 2010-11 General Fund Budget.  The FY 2011-12 General Fund Operating Budget will be balanced with the use of $3.2 million (a full year) in concessions.  Without employee concessions over the past two years, over 40 more positions would have been lost, including sworn police officers.

The FY 2011-12 budget process began in May 2011.  Certain components of the budget process were delayed in order to give me the opportunity to provide direction on major budget policy decisions.  The Budget Team worked with department heads to diligently and expeditiously collect and analyze budget data, which was critical to the development of a balanced budget.  The Budget Team also worked closely with the budget liaisons in each department to obtain valuable data and figures to create the budget.  At one point, I requested all department heads develop a 10% reduction contingency plan in the event that additional cuts were necessary.  Fortunately, this extreme measure was not implemented because of the disruption it would have caused in the organization's ability to provide critical basic services to the community.   However, the process revealed some cost-saving opportunities that have been included in the FY 11-12 General Fund budget without negatively impacting departmental operations.

**EXHIBIT N**

COI_013114

**065**

The City has also established a Joint Labor-management Employee Efficiency Committee, which is charged with the important task of identifying cost-saving measures and revenue enhancements. These recommendations will be included in the recommended mid-year budget amendment after department heads and I have had a chance to review them.

**FY 2011-12 Inglewood Redevelopment Agency Budget**

The Governor approved legislation on June 28, 2011 to eliminate redevelopment agencies as part of his FY 2011-12 budget. The elimination of the redevelopment agency would have devastating consequences for the Inglewood community. The Inglewood Redevelopment Agency generates approximately $19 million in tax increment funds and transfers in $21,630,521 from unallocated reserves to meet its obligations. Specifically, these funds are used to pay debt service on debt used for the purposes of the redevelopment agency, such as affordable housing and other projects to eliminate blight in the project areas.

The California budget legislation adopted by the Legislature and signed by the Governor in 2009 included a dramatic take from cities of $2.05 billion of redevelopment funds over a two-year period ($1.7 billion in FY 2009-10 and $350 million in FY 2010-11). As a result of Assembly Trailer Bill ABX4-26, Inglewood was forced to pay $6.2 million in May 2010 and another $1.3 million of tax increment to the State's Supplemental Educational Revenue Augmentation Fund (SERAF) in May 2011. In exchange, redevelopment agencies can extend the affected redevelopment plans by one year.

The loss of these funds has compromised the effectiveness of the Redevelopment Agency. Much of the Agency's resources for FY 2011-12 are focused on the following projects: Senior Center, Century Boulevard infrastructure improvements and City owned land development, Regent Square Affordable Housing Project, and Cloudbreak Affordable Housing Project. In addition, there are a number of other affordable housing projects in various stages of pre-development, as well as new economic development and commercial projects being considered.

Governor Brown approved new legislation on June 28, 2011, as part of a package of budget bills intended to close California's budget deficit. The legislation provides for the following:

- ABX1-26 (dissolution legislation) would eliminate RDAs effective October 1, 2011, and transfer responsibility and assets to successor entities.

- ABX1-27 (voluntary program legislation) provides that an RDA can continue to operate and function after the October 1, 2011, elimination date provided certain steps are taken, most notably, if the RDA is able to make substantial remittance payments to local school, fire, and transit districts.

ABX1-27 legislation will require the Inglewood Redevelopment Agency to make an initial "continuation payment" in FY 2011-12 of $7.2 million *and* an annual continuation payment of about $1.7 million thereafter as long as the agency receives tax increment revenue. In addition, the Agency will also be required to make an additional continuation payment "surcharge" on any new debt issued, which could have the effect of adding up to 50% to the cost of any new projects undertaken.

On August 11, 2011, the California Supreme Court issued an order temporarily staying portions of the redevelopment legislation that would eliminate California Redevelopment Agencies (RDAs). The Court

iv

**EXHIBIT N**

COI_013115

**066**

modified the order on August 17, 2011, to clarify some ambiguities in the original order (modified order). While the orders have effectively frozen the ability of RDAs to conduct new business, obligations under existing contracts (including owner participation agreements or other agreements entered into prior to the enactment of the legislation) will remain intact. Furthermore, for the time being, the Court's orders stayed the schedule for eliminating RDAs, transferring RDA assets and responsibilities to successor agencies, and deadlines by which RDAs must elect whether to enter into a new voluntary program.

**State Budget Impacts**

The Governor signed the 2011-12 Budget Act (SB 87) on June 30, 2011.  With budget cuts and fixes already adopted by the Legislature in April 2011 ($13.4 billion), some improvement in projected revenues ($6.6 billion), and a targeted reserve replenishment of $1.2 billion, the budget shortfall for FY 2011-12 is projected to be as high as $13.9 billion. The shortfall will be covered by $5.4 billion of external borrowing and $8.5 billion of internal borrowing. The ongoing structural shortfall is about $10 billion per year thereafter.  Furthermore, if the RDA lawsuit is successful, this shortfall will automatically increase by $1.7 billion in FY 2011-12 and $400 million in out-years.

While monthly State revenues were up earlier in this calendar year, revenues in July, the first month of the fiscal year, ran $539 million (or 10%) below expectations.  On the positive side, the State Controller recently released figures on the State's cash flow for August.  The report indicated that total revenues for the month were $134.9 million (2.1%) above projections from the recently passed State budget.  Of that, income taxes were above projections by $127.4 million (4.1%), sales taxes were up $8.6 million (0.3%), and corporate taxes were up $46.7 million (51.4%).

The State began shifting property tax from local governments in 1992, and these "takes" continue.  On average, the State "takes" $8.8 million annually from Inglewood taxpayers as a result of the net impact of Educational Relief Augmentation Funds (ERAF I, II), Proposition 172, and Citizens Option for Public Safety program.  These funds could have been used for essential City services.

**Federal Budget Impacts**

In early August 2011, Congress completed the debt ceiling/deficit reduction plan.  Addressing a Joint Session of Congress on September 8, 2011, President Obama urged Congress to work quickly to pass the American Jobs Act, his new legislative proposal to stimulate the economy. The President tasked the newly created Joint Deficit Reduction Committee (Super Committee) to come up with at least $1.2 trillion in savings over the next 10 years.

The President's proposal will call for approximately $30 billion to State and local governments to rehire teachers, $5 billion to hire emergency first responders, $25 billion of investment in public school infrastructure, $5 billion to modernize community colleges, $15 billion to rehabilitate vacant homes, and $50 billion for transportation infrastructure projects, including $10 billion to capitalize an infrastructure bank.

Local governments need to be concerned about Super Committee spending cut recommendations due in November. The National League of Cities, together with State leagues, will focus on opposing cuts to the non-military discretionary programs that make up only about 12 percent, or approximately $480

**EXHIBIT N**

COI_013116

billion, of the $3.6 trillion annual federal budget. Cuts in discretionary spending will further threaten our ability to provide services to residents.

Despite the best efforts of States and local governments, cost containment sentiment in the nation's capital may well result in cuts to health, welfare, education, transportation, and homeland security programs over the next three to five years. After suffering a 16% reduction in Community Development Block Grant (CDBG) and Home Ownership Made Easy (HOME) funds in FY 2010-11, cities have apparently escaped an earlier proposal this year by the President to cut these programs once again by 7.5% in FY 2011-12.

**Major General Fund Revenues**

The City's FY 2011-12 proposed budget is built using economic assumptions to estimate revenue. Staff uses a variety of sources to determine revenue assumptions including the Los Angeles County Assessor's Office, HdL Coren & Cone (the City's property tax auditors and sales tax consultants/auditors), the State Controller's office, the State Board of Equalization, and other sources as appropriate.

Two-thirds of all General Fund Revenue in the proposed FY 2011-12 Budget comes from four major revenue sources: Utility Users Tax, Property Tax, Sales and Use Tax, and Vehicle License Fees. A brief history of these major revenues sources can be seen in Tables below.



Utility Users Tax

- The percentage decrease in Utility Users Tax from FY 2006-07 to FY 2011-12 is 20.5%.
- Utility Users Tax revenue estimates are expected to be $15,890,000 for FY 2011-12, which is a decrease of $490,000 or 2.99% less than the FY 2010-11 actual of $16,380,000.

vi

**EXHIBIT N**

COI_013117

068



- The percentage increase in Property Tax over from FY 2006-07 to FY 2011-12 is 4.93%.
- The Property Tax revenue estimate for FY 2011-12 is projected to be $14,909,000, which is $524,546 or 3.4% less than the FY 2010-11 actual of $15,433,546.



- The percentage decrease in Sales and Use Tax from FY 2006-07 to FY 2011-12 is 6.5%.
- Sales and Use Tax revenue for FY 2011-12 are projected to increase by $1,114,000, a 10.58% jump from the FY 2010-11 actual of $10,400,000.



- The Motor Vehicle In-Lieu Tax returned to the FY 2006-07 level.
- The Motor Vehicle In-Lieu Tax estimate fell 4.3% from $9,300,000 for FY 2010-11 to an estimated $8,900,000 (a difference of $400,000) for FY 2011-12.

**EXHIBIT N**

COI_013118

069

**General Fund Expenditures**

The FY 2011-12 General Fund recommended operating budget totals $78,375,028.  Public Safety expenditures represent 65% of the operating budget.  The recommended FY 2011-12 General Fund Operating Budget by department/service activity is as follows:

| City Departments | Proposed FY 2011/12 Budget |
|---|---|
| * Police | $41,664,270 |
| Public Works | $9,372,780 |
| Parks, Recreation & Community Services | $5,470,121 |
| Finance | $3,688,436 |
| Library | $2,604,128 |
| Planning and Building | $2,181,946 |
| Legal | $2,151,742 |
| City Manager's Office | $1,441,293 |
| Mayor and City Council | $1,134,786 |
| Human Resources | $955,512 |
| City Clerk | $560,755 |
| City Treasurer | $159,696 |
| Other (Non-Departmental) | $6,989,563 |
| **TOTAL** | **$78,375,028** |

**\*      The Los Angeles County Fire Department provides fire services to the City of Inglewood. The costs for these services are budgeted in the Non-Departmental account.**

**Retirement Programs**

Most California cities are California Public Employees' Retirement System (CalPERS) members. While CalPERS has developed a method to "smooth out" increases in retirement costs over time, the cost of providing this benefit to employees remains a challenge to cities.  In light of expected CalPERS investment losses in FY 2008-09, during June 2009, CalPERS announced a new smoothing policy of amortizing investment gains and losses over 15 years, which minimized rate increases.  If the local economy and financial markets improve over the next few years, many experts expect the impact of CalPERS investment losses on retirement rates beyond FY 2011-12 to be moderate.  Even with the improved CalPERS return on investments, it is projected the City's Public Safety retirement costs will increase by 6.1% or $1,676,390 in FY 2011-12.

viii

**EXHIBIT N**

In the CalPERS annual report for June 30, 2010, CalPERS reported a net return for the fiscal year of 13.3%.  The upturn exceeded the long-term annualized benchmark target of 12.91%, which CalPERS has attained over the past 20 years.

In January 2011, the City of Inglewood approved a two-tiered retirement formula for new employees. The retirement formula for non-sworn employees hired before December 14, 2010, is 3%@60 and 2.5%@55 for all non-sworn employees hired after that date.   The retirement formula for sworn employees hired before January 7, 2011, is 3%@50 and 3%@55 for all sworn police employees hired after that date.   The City budgets $5,493,870 to pay the annual cost for sworn police employee retirements and $4,326,285 for non-sworn employees.


**Capital Improvement Program (CIP)**

The recommended FY 2011-12 CIP Budget is $87,768,323.  This is a 20.4% decrease over last year. The decrease is due to a more realistic scheduling of projects.  Although the total CIP budget will decrease, expenditures on transportation-related projects will increase by approximately 40%.  In FY 2011-12, it is recommended the City place a sense of urgency on spending more than $21 million in transportation-related funds that are in jeopardy of being lost if not spent before their respective deadlines.  Specifically, the City Council and community have stressed the need to improve Century Boulevard, which has not been substantially upgraded in decades and is in serious need of repair, redesign, and renovation. The design of this project is expected to be complete by September 2012, and construction is expected to begin by the end of 2012 or first quarter of 2013.

A detailed description of all the projects included in the FY 2011-12 Capital Improvement Budget and Capital Improvement Program (FY 2011-12 through FY 2012-13) is contained in a separate budget document and will be presented to the City Council at a later date. Most cities approve a Five-Year CIP; however, the City of Inglewood will have a Three-Year CIP.  It is my goal to present a Five -Year CIP in FY 2012-13.


**General Fund Operating Reserves**

The City's Financial Policies provide that the City "strive" to maintain 8% of the General Fund in Undesignated Operating Reserves.  The 8% reserve is desired primarily for unforeseen developments or emergencies that may occur in any given year.  Reserves above 8% can be characterized more as "rainy day" funds to guard against economic uncertainties.  The final amount that a local government sets aside as a reserve is fundamentally a policy question with very significant impacts.  By contrast, if the City were in a position to fund reserves of at the 8% level, the reserve fund would be approximately $6.3 million.  The FY 2011-12 Budget includes 0.38% ($300,000) in Undesignated Operating Reserves. While this amount is well below what is stated in the City's policy, there are no prudent alternatives at this time other than to reduce personnel costs.  As stated earlier, the City will work with a sense of urgency to identify new revenue sources to rebuild this reserve.

While a prudent reserve is certainly a worthy policy, it must be balanced with the fact that residents pay taxes for one purpose – to benefit from programs and services paid for with those taxes.

**EXHIBIT N**

COI_013120

**071**

The FY 2010-11 Budget was balanced using $2.4 million of designated General Fund reserves, which are earmarked for vacation and sick leave payouts, liability awards, and other such costs. The $860,000 in additional reserves needed to cure the FY 2011-12 General Fund operating budget short-fall is a further erosion of these designated reserves. Reestablishing and growing a reserve at some level is prudent and should be considered as new revenue becomes available.


**Unfunded Liabilities**

As is the case for most cities, the protracted recession forced Inglewood to erode reserves designated for specific obligations, underfund certain long-term expenses, and defer spending in important areas.

The largest of the City's unfunded liabilities is the long-term cost of Other Post-Employment Benefits (OPEB).  OPEB does not include pension costs, but does include post-employment healthcare, as well as other forms of post-employment benefits (e.g., life insurance).  A 2007 study designed primarily to determine the costs of the City's medical insurance for retirees over the next 30 years revealed that the gap between the City's annual budgeted contribution of $3.5 million for its OPEB and the required $7.9 million annual contribution was formidable and should be addressed very soon.

While the 2005 Pension Obligation Bond and CalPERS "smoothing" have largely addressed the City's pension cost obligation, general liability, workers compensation, vacation, and sick leave reserves are all underfunded given current estimates and historical expenditure patterns. These underfunded liabilities are discussed in greater detail in a Financial Report presented to the Mayor and City Council on April 1, 2010, and should be updated during the coming year.

Deferred maintenance on public facilities and infrastructure, an aging fleet, and the need to upgrade or replace technology applications that perform core business functions represent significant unfunded needs.

An accumulated deficit of approximately $4 million in the Housing Fund from prior year's operations is another unfunded liability that the City must address.  As the City has exhausted all avenues with HUD, most other available sources of funding have been excluded to address this retroactive deficit in a timely manner.

Finally, though not traditionally viewed as an "unfunded liability," an expense deferred for some time is the need to raise many City workforce salaries, which now significantly lag behind other local governments in our region. The ability to attract and retain quality employees is essential to maximize productivity and quality as well as sustain a high level of municipal services.


**FY 2012-13 Budget Outlook**

The FY 2012-13 Budget will most likely see an increase in General Fund expenditures of as much as $2.35 million (3%*), without expiration of negotiated labor concessions*.  Revenues are not expected to outpace these increases; therefore, the City will once again have to utilize one-time revenue, draw on dangerously weak reserves, or cut additional staff and services to balance the budget.  There are a number of causes for the increasing budget.  They include increases in CalPERS rates, employee merit increases, and a full slate of insurance policy premiums.

x

**EXHIBIT N**

The City has a number of new potential revenue streams on the horizon.  Should they be realized, they will off-set the need to utilize one-time funds and reserves.  These opportunities will be borne as a result of the possible renovation and use of the Forum as a world class state-of-the-art entertainment venue.  In addition, the City may begin to see additional revenue as a result of Hollywood Park Tomorrow development, which is currently planned to have over 3,000 housing units and 650,000 square feet of retail and commercial space.  It is expected that the Forum and Hollywood Park developments will also generate significant "spin-off" revenue to the City, as surrounding properties increase in value and new developments are constructed. Additionally, new revenue may be expected as a result of updated fees and indirect overhead charges, more efficient employee benefit administration, increased business tax revenue recovery, and potential new user fees designed to capture the cost of providing unique services not typically supported by general taxes.

Economic development is critical to maintaining and enhancing the City's revenue base. Revenue from sales tax and property tax represent 34% of the City's revenue base and are dependent on a healthy and nurturing business environment.  As a cost savings measure, the Council eliminated the Economic Development Division in 2010.  For the aforementioned reasons, it is recommended that the City analyze how to reestablish some level of our past economic development efforts in order to compete with other cities to retain, attract, and expand businesses.


**Conclusion**

While the City faces many challenges ahead, the community has a strong history of perseverance and strength, which will provide the foundation to leverage many new opportunities that are headed our way. I also believe that difficult times are conducive to creativity.  City employees will continue to reinvent the way we do business in order to develop a more efficient, effective, and responsive government.  This budget should be considered as a "living document" that will change over the course of the year in response to economy and priorities of the community.  Inglewood is well positioned to recover from the recession and has begun the process to rebuild and prosper.  We will regain our position as a world class city.


Sincerely,

Artie Fields
City Manager

**EXHIBIT N**

COI_013122

**073**



# City of Inglewood
# Proposed Fiscal Year 2011-2012 Consolidated Budget

## Annual Budget Workshop

September 26, 2011

COI_013123

074

EXHIBIT N





# Acknowledgements

- **Budget Team:**
  - Sharon Koike, Acting Finance Director
  - Jose Cortes, Accounting Manager
  - Keauonna Buckhanon, Senior Budget Analyst
  - Yolanda Douglas, Senior Budget Analyst

- **Department Heads**
- **Department Budget Liaisons**



COI_013124

075

EXHIBIT N

2



# Revenue Discussion

- Utility Users Tax
- Property Tax
- Sales and Use Tax
- Vehicle License Fees

COI_013125

076

EXHIBIT N

3



City of Inglewood
Sales and Use Taxes - in millions



# Sales Tax Chart



COI_013127

078

EXHIBIT N



# Property Tax



COI_013128

079

EXHIBIT N



# Utility Users Tax



COI_013129

080

7

EXHIBIT N



# Motor Vehicle In-Lieu Tax



Chart: Motor Vehicle In-Lieu Tax by Fiscal Years (Millions of Dollars)

- 06-07: $8.9
- 07-08: $9.6
- 08-09: $10.0
- 09-10: $10.0
- 10-11: $9.3
- 11-12: $8.9

COI_013130

081

EXHIBIT N



# General Fund Revenue
## $78,375,028



Police 53.2%

Planning and Building 2.8%

Finance 4.7%

Human Resources 1.2%

City Administration 1.8%

City Attorney 2.7%

City Treasurer 0.2%

City Clerk 0.7%

Mayor and Council 1.4%

Non-Departmental 5.6%

Civic Center 3.3%

Parks and Recreation 7.0%

Public Works 12.0%

Library 3.3%

COI_013131

082

9

**EXHIBIT N**





# FY 2011-12 General Fund Operating Budget By Department
## $77,519,407



**EXHIBIT N**

COI_013132

**083**

10





# Personnel Reductions

- Personnel Reductions
  - FY 11-12 – Freeze 24 positions ($2.3 million)
  - Lay-off eight (8) Police Officers ($1 million)
  - FY 10-11 – Eliminated 121 fulltime and 27 part-time

- Personnel Concessions
  - FY 11-12 – $3.2 million
  - FY 10-11 – $2.2 million
  - Two-tiered Retirement Incentive

COI_013133

084

11

**EXHIBIT N**







# General Fund Operating Reserves

- Reserve Policy – 8% Reserve or $6.3 million
- FY 2011-12 Reserves – .38% or $300,000



COI_013135

**086**

13

**EXHIBIT N**







COL_013136

087

14

EXHIBIT N

# Financial Forecast

- Reduce costs
- Increase revenues
- Develop a five-year financial plan



# Redevelopment Budget

- Governor's Elimination of Redevelopment Agencies
- Redevelopment Agency – $19 million annually
- The Redevelopment Budget – $18.6 million
- Purpose of Redevelopment Agency



COL_013137

088

15

**EXHIBIT N**





# Redevelopment Budget

- **Assembly Trailer Bill – ABX4-26:**

  - City paid the State $6.2 million in May 2010

  - City Paid the State $1.3 million in May 2011

- **Assembly Bill – ABX1-27:**

  - Continuation payment in FY 11-12 - $7.2 million (one-time payment)

  - Continuation payment - $1.7 million (annually)

  - Continuation payment – 50% surcharge on new debt

16

COI_013138

**089**

**EXHIBIT N**



# Redevelopment Budget

- Supreme Court Decision

- Temporary Stay

- Prevents New Agreements

- Extended the Deadline to eliminate RDAs



17

COI_013139

090

EXHIBIT N



# Liabilities

- **Underfunded**
  - Post-Employment insurance
  - All other miscellaneous employee-related costs
    - Workers Compensation
    - General Liability
    - Vacation and Sick Leave

- **Unfunded**
  - Maintenance costs
  - Housing Fund



18

**091**

COI_013140

**EXHIBIT N**



# FY 2012-13 Budget Outlook

- 3% or $2.35 million increase
- Revenues will are not projected to keep up
- Causes of expenditure increases
- New revenue opportunities
- Economic Development

COI_013141

092

19

**EXHIBIT N**







20

COI_013142

**093**

# Departmental Presentations

**EXHIBIT N**





# Mayor & City Council

COI_013143

094

21

EXHIBIT N



# Department Core Services

- Elected legislative body of the City of Inglewood consisting of a Mayor, who is elected at large and four Council Members who are elected by district.

- Establishes City policies and provides direction for the organization through the City Manager and City Attorney.



COI_013144

095

22

EXHIBIT N



# Budget Authority & Staffing

| | FY 2010/2011 | FY 2011/2012 | Difference |
|---|---|---|---|
| **Budget Authority** | $1,084,228 | $1,134,787 | $50,559 |
| | | | |
| **Total Staffing** | | | |
| Part-time (PT) | 0 | 0 | 0 |
| Permanent PT | 7 | 7 | 0 |
| Fulltime or FTE | 3.5 | 3.5 | 0 |

**Notes: Status quo FY 2011-12 budget. Increases due to retirement and healthcare costs.**

EXHIBIT N

COI_013145

096

23



# City Clerk

24

COI_013146

097

EXHIBIT N

# Department Core Services-1

- Record Keeper
- Attend Council Meetings
- Distribute Council Agendas
- Prepare City Council Minutes
- Conduct Elections
- Serve as Escrow Officer – Process Deeds
- Serve on Permits and License and Claims Review Committees

25

COI_013147

098

EXHIBIT N



# Department Core Services-2

- Process Legal Publications
- Process Short- and Long-Form Agreements
- Process all Property Owner Participation Agreements
- Maintain all Conflict of Interest (700) and Campaign Statements (460)
- Process Weed Abatement
- Process Bids

26

COI_013148

099

EXHIBIT N



# Department Core Services-3

- Public Record Requests

- Claim Forms

- Maintain Ordinance and Resolution Books

- Issue Dog Licenses

- Handle Customer Service Requests

- Administer Oaths

27

**100**

COI_013149

**EXHIBIT N**



# Budget Authority & Staffing

| | FY 2010/2011 | FY 2011/2012 | Difference |
|---|---|---|---|
| **Budget Authority** | $546,411 City Clerk | $555,255 | $8,844 |
| | $509,088 Election | $5,500 | $ 503,588 |
| **Total Staffing** | | | |
| Part-time (PT) | 1 | 1 | 0 |
| Permanent PT | 2 | 2 | 0 |
| Fulltime or FTE | 4 | 4 | 0 |

**EXHIBIT N**

28

COI_013150

**101**



# Impacts, Efficiencies & Challenges

**Impacts**
- The rising cost of office supplies
- Election Coordinator

**Efficiencies**
- The City Clerk incurs no travel costs and has eliminated all other such expenditures.

**Challenges**
- Elimination of Election Coordinator for FY 2011-12.
- Rising Advertising Costs
- Postage and Paper

COI_013151

29

102

**EXHIBIT N**



# City Treasurer

30

COI_013152

**103**

**EXHIBIT N**



# Department Core Services

- **CITY TREASURER**
  - Investment of City and Other Entities' Funds
  - Cash Management
  - Investment Policy
  - General Auditor



31

COI_013153

**104**

**EXHIBIT N**



# Budget Authority & Staffing

| | FY 2010/2011 | FY 2011/2012 | Difference |
|---|---|---|---|
| **Budget Authority** | $162,133 | $176,259 | $14,126 |
| **Total Staffing** | | | |
| Part-time (PT) | 1 | 1 | 0 |
| Permanent PT | 0 | 0 | 0 |
| Fulltime or FTE | 1 | 1 | 0 |

COI_013154

**EXHIBIT N**

32

**105**



# Program Impacts

- City Treasurer Student Intern Program



COI_013155

106

33

EXHIBIT N



# Operational Efficiencies

- Preservation of Investment principal without incurring any losses

34

COI_013156

107

EXHIBIT N



# Department Challenges

- Generating investment interest income in a declining economic environment.

- Accomplishing more accounting related projects with one staff member.



COI_013157

108

35

EXHIBIT N



# City Attorney



36

COI_013158

109

EXHIBIT N



# Department Core Services

- Provides legal assistance to:

  - City Council

  - Redevelopment Agency

  - Housing Authority

  - Public Finance Authority

  - Other City Officers

  - All City Departments

COI_013159

EXHIBIT N

37

110



# Department Core Services

- Conduct or supervise all litigation involving the City, including representing the City's interest before Federal and State Court and Administrative Agencies.

- Prosecute misdemeanors occurring in the City.

38



COI_013160

111

EXHIBIT N



# Department Core Services

- Responsible for the City's Risk Management Program:

  - Implement Risk Management policies and procedures

  - Implement insurance policies and procedures

  - Identify risk exposures and mitigation strategies

  - Resolve Third-Party Claims for Damages to city property

  - Defend Small Claims actions against the City

39

COI_013161

112

**EXHIBIT N**



# Budget Authority & Staffing

| | FY 2010/2011 | FY 2011/2012 | Difference |
|---|---|---|---|
| **Budget Authority** | $2,333,133 | $2,151,742 | -$181,391 |
| | | | |
| **Total Staffing** | | | |
| Part-time (PT) | 1 | 1 | 0 |
| Permanent PT | 0 | 0 | 0 |
| Fulltime or FTE | 15 | 15 | 0 |

40

113

COI_013162

**EXHIBIT N**



# Department Challenges

- Reduction in staffing.

- Reduction in work hours.

- Reductions in staffing and work hours does not stop lawsuits from being filed or criminal prosecutions.

- The reductions severely impacts our efficiency to handle civil lawsuits and criminal prosecutions.

41

COI_013163

114

**EXHIBIT N**



# Administration
# (Office of the City Manager)



42

COI_013164

**115**

**EXHIBIT N**





# Department Core Services

- The Administration Department consists of the Office of the City Manager.

- Primary Functions:

  - Coordinate and Direct Policies Adopted by the Mayor and City Council.

  - Provide leadership and direction for the City's Municipal Organization.

  - Monitor and Evaluate Municipal Operations.

43

COI_013165

116

EXHIBIT N





# Budget Authority & Staffing

| | FY 2010/2011 | FY 2011/2012 | Difference |
|---|---|---|---|
| **Budget Authority** | $1,390,842 | $1,441,293 | $50,451 |
| | | | |
| **Total Staffing** | | | |
| Part-time (PT) | 0 | 0 | 0 |
| Permanent PT | 0 | 0 | 0 |
| Fulltime or FTE | 9 | 9 | 9 |

**Notes:** Difference Mostly Attributable to Increased Retirement & Healthcare Costs.
---------
1- Administrative Secretary position (vacant) deleted.
1 - Administrative Assistant position transferred from Section 3040 (Community Development) funded as follows:  Gen Fund 50% / Redevelopment 50% .

COI_013166

44

117

EXHIBIT N



# Budget Authority & Staffing

## Major FY 2011-12 Budget Increase Costs

| | |
|---|---|
| Retirement | $23,406 |
| Health Ins. | 7,666 |
| Unemployment Ins. | 5,265 |
| Dental/Vision Ins. | 3,730 |
| Vacation Reserve | 3,457 |
| Printing/Copy Charges | 2,800 |

| | |
|---|---|
| Salary Variance:   FY 2010-11 | $937,196 |
| FY 2011-12 | 853,744 |
| Salary Savings (excludes benefits) | $ 83,452 |

45

COI_013167

118

EXHIBIT N



COI_013168

119

46

# Human Resources

EXHIBIT N





# Department Core Services

- Employee/Labor Relations
- Contract Administration
- Classification, Recruitment & Selection
- Compensation & Retirement
- Benefits Administration
- Training & Compliance
- Workers Compensation/Disability Retirement
- Employee Health & Safety
- Conflict Resolution



47

COI_013169

120

EXHIBIT N



# Budget Authority & Staffing

| | FY 2010/2011 | FY 2011/2012 | Difference |
|---|---|---|---|
| **Budget Authority** | $1,143,731 | $955,512 | -$188,219 |
| | | | |
| **Total Staffing** | | | |
| HR Administration/ Employee Relations | 2.0 | 2.0 | 0.0 |
| Recruitment/Selection | 6.0 | 5.0 | -1.0 |
| Employee Health | 2.45 | 1.95 | -0.5 |

Notes:   In the 2010-11 amended budget TWO critical position were eliminated: (1) Senior Human Resources Analyst (Savings: $109K full year) (2) Employee Health Manager (Savings: for 2010-11 $65,000 full year $120,000) Totaling: $174, 032 in salary savings.  In addition, the HR Director was downgraded to Manager (-$23,658).  The HR Manager position remains vacant for the complete 2010-11 Fiscal Year realizing a savings of $158,021.

**EXHIBIT N**

COI_013170

121

48



# FY 2011-12 Program Impacts

- 2160 – Employee/Labor Relations

- Containment of negotiation costs

- Update MOUs for obsolete language and/or to clarify ambiguous language to minimize grievances, potential arbitrations, and/or litigations.

- 2160 – Capital Outlay

- Human Resources Office Painting, which has not been painted in 10 years.

- New Carpet and Office Paint Employee Health Services, which has not been painted in more than 10 years.

49

122

COI_013171

EXHIBIT N



# Operational Efficiencies

- Recruitment processes completed within 8 to 12 weeks.

- Cross training of staff to handle all aspects of HR and Labor Relations.

- Emphasis placed on staff development by increasing training on significant issues, problems, and mandates facing the modern Public Sector Human Resources Department.

- Improved physical appearance of the department to include Employee Health.

50

COI_013172

**123**

**EXHIBIT N**





# Department Challenges

- City's Civil Service Rules need to be updated and/or revised to reflect changes over the last 40 years.

- Employee benefits cost containment   ($11 million yearly).

- Workers Compensation Program cost containment ($3.5 million yearly).

- Employee recognition programs and events reduced and/or eliminated due to lack of staff and funds.

51

COI_013173

124

EXHIBIT N



# Department Challenges

- Lack of funds to complete required tasks to meet City's Human Resources services and expectations.

- Staff stretched to capacity with major assignments/projects leaving little staff time to implement new programs and policies as required.

- Human Resources Staff Development / Cross Training – not enough staff to perform all mandatory duties well.

COI_013174

125

EXHIBIT N

52



# Information Technology and Communications (ITC)

COI_013175

53

126

EXHIBIT N

# Department Core Services 1



- **Network and Support Services**
  - Computer Desktop and Printer Support
  - Email, Internet, and Desktop Applications
  - Infrastructure Security
  - Data Backup and Recovery
- **Telecommunications**
  - Land Lines/Office Phones Support
  - Cellular Phone Support

54

COI_013176

**127**

**EXHIBIT N**



# Department Core Services 2

- Systems Analysis and Implementation
  - City Internet and Intranet sites
  - Records Management
    - Document Retention
    - Document Management

55

COI_013177

**128**

**EXHIBIT N**



# Department Core Services 3

- **Public Safety Systems**
  - Computer Aided Dispatch (CAD)
  - Emergency Preparedness
- **Print Shop**
  - Reprographics (e.g., Agendas, Budgets, Utility Bills, etc.)
  - Publications for the Public
  - Mail Services

56

**129**

COI_013178

**EXHIBIT N**



# Budget Authority & Staffing

| | FY 2010/2011 | FY 2011/2012 | Difference |
|---|---|---|---|
| **Budget Authority** | $5,496,196 | $4,936,818 | -$559,378 |
| | | | |
| **Total Staffing** | | | |
| Part-time (PT) | 0 | 0 | 0 |
| Permanent PT | 0 | 0 | 0 |
| Fulltime or FTE | 28 | 18 | 10 |

**Notes:** 1. All reductions in personnel happened mid-year of FY 2010-11.
2. Five (5) staff were moved to other departments.
3. No reduction in staffing is budgeted for FY 2011-12.

**EXHIBIT N**

COI_013179

57

130



# Program Impacts

- No Onsite Microsoft Office Training.

- No Dedicated Telephone Support Staff.

- Reduction in New Computer Acquisition.

- Delay in Completing Network Switch Upgrade.

- New Digital Document Library.

- New Email Spam Filtration System.



58

COI_013180

131

EXHIBIT N



# Operational Efficiencies

- Automation of Software Distribution
- Streamline Helpdesk Calls
- Reduce Repetitive Calls (Password Reset)
- Reduce Power Consumption and Cost
- Reduce Creation Time for Council Meeting DVDs
- Automation of Forms
  - Short Forms
  - Agenda Request to Schedule



59

COI_013181

**132**

**EXHIBIT N**



# Department Challenges

- Virtually No Clerical Support

- Short One Technical Support Staff Member

COI_013182

60

133

EXHIBIT N



# Finance

COI_013183

**134**

61

**EXHIBIT N**



62

# Department Core Services

- Budget
- Revenues & Billing
- Customer Service
  - Utility Customers
  - Cashier Service
  - Business Taxes & Licenses
- Purchasing and Stores
- Financial Reporting
- Payroll
- Accounts Payable / Accounts Receivables

EXHIBIT N

COI_013184

**135**



# Other Important Services

- Process approximately 288,000 utility billings and collections annually.

- Invoice and collect business taxes for over 15,000 accounts.

- Process and track over 400 parking citation appeals.

- Process over 82,000 cashier transactions.

- Process and issue over 25,000 accounts payable checks.

**EXHIBIT N**

COI_013185

**136**

63



# Other Important Services

- Process approximately 3,300 purchase orders and contracts and 25 formal bids, RFQs, and RFPs annually.

- Process and issue over 16,000 salary disbursements annually.

- Prepare and submit numerous reports to external funding and regulatory agencies.

- Coordinate several audits, including Citywide annual financial audit, single audit, and local funding audits annually.

- Prepare the City's annual budget.

64

COI_013186

137

**EXHIBIT N**



# Budget Authority & Staffing

| | FY 2010/2011 | FY 2011/2012 | Difference |
|---|---|---|---|
| **Budget Authority** | $5,086,472 | $4,359,417 | -$727,055.00 * |
| | | | |
| **Total Staffing** | | | |
| Fulltime or FTE | 42 | 42 | 0 |
| Perm Part time | 1 | 1 | 0 |
| Part-time (PT) | 1.5 | 1.5 | 0 |

***Notes:** 1. Elimination of four (4) positions that happened mid-year of FY 2010-11.
2. No reduction in staffing is budgeted for FY 2011-12.

EXHIBIT N

COI_013187

**138**

65




# Operational Efficiencies

- Opened communication lines across all departments.

- Initiated cross-training of staff members.

- Initiated the development of a standard operating procedures manual.

COI_013188

**139**

**EXHIBIT N**



# Department Challenges

- Management vacancies in key positions
- Workforce reductions
- Institutional knowledge as a result of layoffs and early retirements
- Maintaining outstanding customer service
- Budget and staffing constraints have made the following difficult to achieve:
  - Update the department's policies and procedures and accounting manuals.
  - Identify and align processes to Eden System.
  - Training of staff with Eden Software at user level

67

**EXHIBIT N**

COI_013189

**140**



COI_013190

141

69

EXHIBIT N

# Parking and Outsource Services





# Department Core Services

- Inglewood Citation Management Services Program (ICMS) Administration.

- Contract Administration of Outsource Service Provider Agreements.

  - Professional Accounts Management

  - Law Enforcement Systems

  - Webiplex

  - Continental DataGraphics

69

COI_013191

**142**

**EXHIBIT N**



# Core Services Continued

- Marketing and Sales Management

- Parking Management Consulting

- Administer Parking Citation Fines and Penalties, Meter Rates, and Parking Structures

- City's Off-Street Parking Management

- Manage Employee Parking

COI_013192

70

143

EXHIBIT N



# Budget Authority & Staffing

| | FY 2010/2011 | FY 2011/2012 | Difference |
|---|---|---|---|
| **Budget Authority** | $3,995,721 | $3,926,750 | -$68,971 |
| | | | |
| **Total Staffing** | | | |
| Part-time (PT) | 0 | 0 | 0 |
| Permanent PT | 0 | 0 | 0 |
| Fulltime or FTE | 3 | 3 | 0 |

**Notes:  No changes in budgeted positions in FY 2011-12.**

**EXHIBIT N**

COI_013193

71

**144**

# Program Impacts



- Increased City Revenues for Parking Meters, Parking Citation Collections and Parking Permits, and Off-Street Parking.

- Implemented New Hosted Web Services for Client Agencies for citation review, payment, and administrative reviews.

- Renewal of Existing Client Agreements.

- Initiated Sales and Marketing Efforts.

72

COI_013194

**145**

**EXHIBIT N**



# Program Impacts Continued

- **Duncan Solutions Facility Lease - Relocation**
  - Streamline Processing Services
  - Consolidation of Staff Resources
  - Business Process Automation/Document Management
  - Relocation of Collection Operations
- **Implementation of New Collection System**



73

COI_013195
146
EXHIBIT N

# Program Impacts Continued

- Negotiation of new Collection Agreement

- Implement ALPR* Technology for the City

- No Service Cuts and/or Eliminations are Proposed this Budget Year

*ALPR → Automated License Plate Recognition

COI_013196

74

147

**EXHIBIT N**



# Operational Efficiencies

- Outsource service provider for parking garage operations was replaced to improve revenues and operations for the structures.

- Streamline accounts payable review and approval process using imaging workflow.

- Implemented Reject Citation Workflow.

COI_013197

**148**

**EXHIBIT N**



# Efficiencies Continued

- Implement Towing Application for the City.

- Automate Correspondence Processing for Imaged-based Workflow.

- Implemented New Hosted Web Services for customer administrative reviews requests.

76

COI_013198

**149**

**EXHIBIT N**



# Department Challenges

- Reviewing options for outsourcing parking enforcement and meters operations as directed by City Council.

- Working with ICMS contracts to implement new web services in rapid fashion.

- Contract renewal process is often difficult and cumbersome.

77

**150**

COI_013199

**EXHIBIT N**